IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al, | Case No. CV-03-0049-E-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## INTRODUCTION

The Court has before it the BLM's motion to dismiss and DuPont's motion regarding adjudication of discovery disputes by the Special Master. The Court heard oral argument on October 3, 2006, and took the motions under advisement. For the reasons expressed below, the Court will deny the motion to dismiss and grant in part the motion regarding the Special Master.

## ANALYSIS

### 1. Motion to Dismiss

The BLM argues that it is immune from suit under the FTCA's discretionary function exception. This is a question of law for the Court to decide. *See Kelly v.*

Memorandum Decision and Order – Page 1

*United States*, 241 F.3d 755, 759 (9th Cir. 2001). The burden of proving the exception is on the BLM, *Bear Medicine v. U.S. Dept. of Interior*, 241 F.3d 1208 (9th Cir. 2001), and the exception is to be "read narrowly." *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002). The BLM must prove that the conduct challenged by plaintiffs is both (1) "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and (2) "based on considerations of public policy." *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988).

Plaintiffs challenge two broad categories of decisions made by the BLM: (1) the decision to use Oust as the herbicide for this project, and (2) the more specific decisions concerning when and how to apply the Oust. The first challenged decision appears to satisfy the second prong of the test because it would be susceptible to policy analysis.

To be immune, however, the BLM must also show that it satisfies the first prong. On that issue, the BLM originally argued in its briefing that "[t]he use of Oust . . . was approved in the 1991 [FEIS]." *See BLM's Opening Brief* at p. 4, n. 2. While the 1991 FEIS did analyze Oust for its use on oil and gas sites, *see FEIS* at p. 3-80, and rights-of-way, *id.* at p. 3-83, the FEIS never approved the use of Oust on rangeland. *Id.* at pp. 3-74, E5-4, E8-12, E8-15.

**Memorandum Decision and Order – Page 2**

During oral argument, BLM's counsel maintained that even if the 1991 FEIS did not approve the use of Oust on rangelands, the State of Idaho granted specific approval for its aerial use on fire-damaged lands when it granted DuPont's application for a "Special Local Need 24(c) Labeling." The BLM argues that this was all the approval they needed to proceed with the project.

The Court disagrees. First, the approval of a state agency does not absolve the BLM of its NEPA duties. *See Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983) (holding that another agency's approval of herbicide did not extinguish BLM's NEPA duty to independently study herbicide's impacts).

Not only was NEPA generally applicable despite Idaho's approval, it was specifically applicable to this project. Applying an herbicide with its attendant risks[1] to over 70,000 acres of land has the potential to be a "major Federal action significantly affecting the quality of the human environment," *see* 42 U.S.C. § 4332(2)(C), triggering at the very least NEPA's duty to prepare an Environmental Assessment (EA),[2] *see* 40 C.F.R. § 1501.4, and perhaps a full EIS. *See Ramsey v.*

---

[1] The 1991 FEIS, describing the risks of Oust, noted that "decreased reproductive success has been noticed in rats" and that the herbicide is "slightly toxic to aquatic organisms." *See FEIS* at p. 1-31

[2] The BLM did prepare EAs for 17 of the 41 application sites. However, NEPA requires that similar actions be examined in a single analysis, 40 C.F.R. § 1508.25, to prevent an agency

**Memorandum Decision and Order – Page 3**

*Kantor*, 96 F.3d 434, 442-43 (9th Cir. 1996).  Indeed, that is why the BLM prepared an EIS in 1991 that examined the use of herbicides other than Oust on rangeland covering a three-state area.  *See FEIS* at p. 1-13.

The BLM's failure to comply with NEPA meant that the agency had no discretion – it could not proceed until it complied with NEPA.  The BLM argues, however, that NEPA is merely a procedural statute, and that the BLM retains full discretion to proceed with the project "even if the NEPA analysis identifies possible environmental impacts."  *See BLM's Reply Brief* at p. 8.  The BLM is essentially saying that the NEPA analysis would have made no difference.

But there is no way to know.  While a bad NEPA report does not automatically block a project, it could lead to that result, or to significant modifications.  It is impossible to say what the result would be.  And that means that the BLM loses because it has the burden of proof.  *Bear Medicine,* 241 F.3d at 1210 (9th Cir. 2001)(government bears the burden of proving that the discretionary function exception is applicable).  The burden is on the BLM to show that the

---

from dividing a project into "multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (citations omitted).  Here, at the very least, a single EA was required by NEPA to analyze the Idaho Oust project.  Moreover, the 17 EAs were all tiered back to the 1991 FEIS, which never approved Oust for use on rangeland.  The programmatic "EIS [analyzing herbicide use] will determine the scope of future site-specific proposals."  *Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1089 (9th Cir. 2003).  Thus, site-specific EAs cannot be used to approve action that is beyond the scope of the governing FEIS.

**Memorandum Decision and Order – Page 4**

NEPA analysis would make no difference – a showing it cannot make because the analysis *might have* made a difference.  The BLM appears to be arguing that plaintiffs have failed to show that the NEPA analysis would have made a difference, but plaintiffs bear no such burden.

Finally, the BLM argues that NEPA provides no private right of action.  This misperceives plaintiffs' use of NEPA.  They use it not to recover any remedy but to argue that the BLM was under a mandatory duty.  That is not an improper use of NEPA.

The Court therefore refuses to find that the BLM's decision to use Oust is immune from challenge under the discretionary function exception to the FTCA.  The Court turns next to the BLM's argument that its application decisions are immune.

Individual application decisions appear to be related to weather and ground condition factors rather than policy concerns.  The BLM argues, however, that the plaintiffs' claims are limited entirely to the application of Oust to dry and dusty soils, and that since fire-damaged lands are by definition dry and dusty, and all applications were made to dry and dusty soil, the plaintiffs are really only complaining about the policy decision to use Oust rather than individual application decisions.

**Memorandum Decision and Order – Page 5**

However, the plaintiffs' complaint does allege wind drift.  *See Second Amended Complaint* at ¶ 21 ("wind carried the Oust, or it drifted, from the United States' burnt and other public lands onto the Growers' lands, crops, and other property").  While the BLM argues that there is no evidence of wind drift, general discovery has not yet begun, and so it would be unfair to cast out plaintiffs' case at this point.  Here, the jurisdictional facts are intertwined with the merits of the case, and hence the Court will await further discovery on this issue before making any definitive jurisdictional rulings.  *See Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005).

Moreover, even if there is no evidence that wind carried the Oust applications to crops, is there evidence that wind carried dirt and dust treated with Oust to crops?  Did on-site BLM officials make decisions about whether rain was imminent that could diminish any dirt and dust migration?  Plaintiffs' complaint, broadly worded, could be fairly read to attack such weather-related discretionary decisions of on-site BLM officials.  This puts in dispute the BLM's argument that the on-site officials were going to apply the Oust to the dry and dusty soil in every case.  In other words, it is an open question whether wind and rain mattered.

The BLM also argues that the labels on Oust create no mandatory duties for application because they merely warn of consequences rather than set forth an

**Memorandum Decision and Order – Page 6**

outright ban on certain types of applications.  This argument ignores, however, the statements on the Section 3 label stating (1) "Do not use on food or feed crops," and (2) "AVOID GUSTY . . . CONDITIONS."  These are proscriptions, not mere warnings.

For all of these reasons, the Court will deny the Government's motion to dismiss.

**2.      Special Master**

The Court has reconsidered its prior Docket Entry Order (docket no. 182) approving the practice of the Special Master meeting with each side independently to resolve complex discovery matters.  The Court finds that the Special Master may continue this practice in an attempt to reach a mutually agreeable solution.  However, if the parties, with the assistance of the Special Master, cannot arrive at an agreed-upon solution, the parties shall file a an appropriate discovery motion and the Court will resolve the motion in the traditional manner.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to dismiss (Docket No. 173) is DENIED.

IT IS FURTHER ORDERED, that the motion regarding adjudication of

discovery disputes (Docket No. 188) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent that while the Special Master may continue to meet with each side independently to reach a mutually-agreeable settlement of discovery disputes, if that effort is unsuccessful, the parties shall file a motion with the Court, and the Court will resolve the dispute in the traditional manner.

DATED: **November 14, 2006**

/s/ B. Lynn Winmill
Honorable B. Lynn Winmill
Chief U. S. District Judge