IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| TIMM ADAMS, et al, | Civ. No. 03-0049-E-BLW |
| Plaintiffs, | |
| v. | MEMORANDUM DECISION AND ORDER |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## INTRODUCTION

The parties have raised a number of discovery disputes. The Court will resolve some of them below.

## 1. Core Group

DuPont's "core group" consisted of DuPont employees and attorneys assembled to respond to farmers' complaints about Oust drifting onto their crops. During depositions of core group members, DuPont's counsel instructed them to refuse to answer questions about their internal deliberations, claiming the deliberations were protected by the attorney-client privilege. DuPont also refused

**Memorandum Decision & Order – page 1**

to produce internal memos and reports generated by the core group, arguing that these documents were protected by the work product doctrine. Plaintiffs object, and seek discovery of these materials.

DuPont has the burden of proving that the attorney-client privilege and work product doctrine apply in this case. *See In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007). The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice as well as an attorney's advice in response to such disclosures. *See United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996). The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). That a person is a lawyer does not make all communication with that person privileged. *Id*. If a person retains a lawyer for advice, a rebuttable presumption arises that the lawyer is retained for legal advice. *Id*. The presumption can be rebutted by a showing that the attorney was retained "without reference to his knowledge and discretion in the law." *Id*. However, the presumption is not rebutted by showing that the attorney was retained to give legal advice about purely business affairs: "A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs." *Id*. at

**Memorandum Decision & Order – page 2**

1501.  When an attorney is retained in a dual role – as both an advisor on non-legal matters and as a legal counselor – "the [non-legal] aspects of the decision are not protected simply because legal considerations also are involved." *Hardy v. New York News*, 114 F.R.D. 633, 643-44 (S.D.N.Y 1987).

The work product doctrine, as set forth in Rule 26(b)(3), protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004).  Such documents may only be ordered produced upon an adverse party's demonstration of "substantial need [for] the materials" and "undue hardship [in obtaining] the substantial equivalent of the materials by other means." *See Rule 26(b)(3)*.  The Supreme Court has held that the work product doctrine applies to documents created by investigators working for attorneys, provided the documents were created in anticipation of litigation. *United States v. Nobles*, 422 U.S. 225, 239 (1975).  In reaching this conclusion, the Supreme Court stated:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

**Memorandum Decision & Order – page 3**

*Id*. at 238-39.

With these standards in mind, the Court turns to a review of the factual background.  In 2001, when DuPont started receiving complaints from farmers about Oust drifting onto their crops, the Oust Project Manager was Peter Thomas. He recommended that a core group be put together, comprised of a DuPont scientist (Dr. Frank Lichtner), DuPont's registration expert (Jack Cain), DuPont's crop protection expert (Gil Myer), DuPont's Public Affairs Manager (Gabrielle King), and four attorneys (Glen Baldwin, Win Rockwell, John Shively, and Amy Kittredge).  *See Thomas Deposition* at p. 93.

Thomas' objective for the core group was to "develop a better understanding of the alleged incident, get a better understanding of what the needs of the customers were, and do my best within the resources of DuPont to address those needs as would be reasonable."  *Id*. at 92.  When asked if he recommended the addition of the lawyers to the core group because he "saw the potential for liability or lawsuits in Idaho," he answered in the negative, explaining that he wanted the lawyers because "[t]he magnitude of the problem indicated to me that it required a review in expertise that I did not have."  *Id*. at 97.

Attorney Rockwell had a somewhat different purpose for the core group in mind.  In his view, the core group was formed to "coordinate resources inside and

**Memorandum Decision & Order – page 4**

outside of DuPont to investigate and thus shape a litigation defense." *See Rockwell Affidavit* at p. 2. The core group, according to Rockwell, "analyzed the array of issues relating to the (then potential) litigation for the purpose of preparing DuPont's defense and evaluating and managing the risk associated with the anticipated litigation." *Id*. At all times when the core group met, an attorney was present. *See Thomas Deposition* at p. 93.

Obviously, Rockwell's objective was different from that of Thomas. While Rockwell was focused entirely on potential legal liability, others in the group were focused on providing assistance to customers, seeking scientific answers, and mounting a public relations campaign to exonerate DuPont. Thus, on this record, it would not be accurate to deem all the work of the core group as being driven by an anticipation of litigation.

In the course of its work, the core group made public statements. For example, Thomas sent a letter to Robert D. Spencer of the Idaho State Department of Agriculture (ISDA) blaming the BLM for failing to follow the warning on the Oust label, and suggesting that there was evidence of other circumstances where the BLM failed to follow regulations in the application of Oust. Another core group member, Public Affairs Manager King, sent letters to farmers' representatives, the ISDA, the press, and the Idaho Congressional delegation,

**Memorandum Decision & Order – page 5**

stating that the Oust damage had been "overstated by some parties" and that other factors causing damage would have been "drought, wind damage and heat stress."

At their depositions, each of these core group members who had made public statements testified that they learned all of the information in their public statements from core group meetings where the lawyers were present. They were then asked by plaintiffs' counsel to discuss the deliberations within the core group that led to these public statements. For example, plaintiffs' counsel asked Thomas to explain how he learned that there was evidence that the BLM failed to follow regulations in applying Oust, and asked King about the core group's deliberations on how wind and drought caused the crop losses rather than Oust. The questions were not answered because DuPont's counsel interposed a privilege objection and instructed the witnesses not to answer.

Plaintiffs now claim that the privilege does not apply because the central purpose of the core group was customer service and public relations rather than preparing for litigation. Plaintiffs cite to the testimony of Thomas, quoted above, that these were his objectives for the core group, and that he did not seek its formation because he feared legal liability or lawsuits.

However, Thomas did recommend that four attorneys be part of the core group, and at least one attorney was present at every meeting. As discussed above,

**Memorandum Decision & Order – page 6**

the mere fact that an attorney is in the room when business matters are discussed does not render the conversation privileged. *Chen*, 99 F.3d at 1501. However, an attorney's legal advice on business decisions is just as privileged as that attorney's advice on litigation. *Id*. ("[a] client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs"). A rebuttable presumption arises under *Chen* that the four attorneys were added to the core group for their legal advice rather than for their advice on non-legal matters. Plaintiffs have presented nothing to rebut that presumption. Thus, the legal advice given by the four attorney members of the core group – and the communications directed to the four attorneys by non-attorney core group members for the purpose of obtaining legal advice – are privileged.

However, as the Court noted above, much of the work of the core group was not concerned with legal liability or obtaining legal advice. It appears from the record that non-attorney members of the core group had numerous discussions among themselves focused on helping customers, getting scientific answers, and conducting a public relations campaign. They deliberated over (1) whether the BLM followed the warning label and environmental regulations in applying Oust; (2) whether drought, wind damage, and heat stress were causing the crop damage rather than Oust; and (3) whether DuPont was responsible, among other things.

**Memorandum Decision & Order – page 7**

And then they made public statements on these very issues.

Deliberations among non-attorney core group members on these subjects would not be protected by privilege. These communications would involve factual matters and were not conducted for the purpose of obtaining legal advice.

The Court has now identified two broad categories of core group deliberations, one for the purpose of obtaining legal advice and the other for the purpose of exchanging factual information to serve customers and improve public relations. This becomes more clear when two hypothetical conversations between core group members are considered. In the first conversation, Thomas and King discuss among themselves whether heat stress and drought caused the crop losses for the purpose of helping King draft a press release. This first conversation is not privileged because it was not conducted for the purpose of obtaining legal advice.

But if King then had a second discussion with attorney Rockwell to get his legal advice on her press release containing the information provided by Thomas on heat stress and drought, that discussion would be privileged because it was for the purpose of obtaining legal advice. However, the fact that the second conversation was privileged does not transform the first conversation from unprivileged to privileged. They are two separate conversations and so must be treated separately.

**Memorandum Decision & Order – page 8**

Even if deliberations between non-attorney core group members on factual matters were somehow privileged, the privilege was waived to the extent of the public statements made by core group members. The doctrine of waiver of the attorney-client privilege is rooted in notions of fundamental fairness. *See Tennenbaum v Deloitte & Touche*, 77 F.3d 337, 340-41 (9th Cir. 1996). "Its principal purpose is to protect against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable." *Id.* Privileged information may not be used "first as a sword and [then] as a shield." *Samsung SDI Co. v. Matsushita Elec., Ind.,* 2007 WL 4302707 at *1; *see also*, *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 237 F.R.D. 618 (N.D. Ca. 2006) (holding that privilege was waived by selective disclosure to obtain legal advantage).

DuPont's public statements were a selective disclosure of deliberations between non-attorney core group members over factual members not conducted to obtain legal advice. DuPont used these selective disclosures in press releases and letters to potential legal opponents such as the farmers, but now claims the privilege to protect against disclosure of the deliberations behind the disclosures.

**Memorandum Decision & Order – page 9**

The authorities cited above establish that DuPont cannot use privileged information as both as a sword and a shield in this manner. DuPont's selective disclosure waived the privilege as to deliberations between non-attorney core group members concerning factual matters not for the purpose of obtaining legal advice.

The work product doctrine is applicable only to documents and tangible things, such as memoranda or letters. *See In re EchoStar Commc'ns Corp.,* 448 F.3d 1294, 1301 (Fed.Cir. 2006). It therefore provides no protection to DuPont for the verbal deliberations of core group members. Moreover, there is no work product protection for memos and other tangible items reflecting correspondence between non-attorney core group members concerning the subjects of the public statements referred to above.

In conclusion, the Court finds that (1) core group deliberations between non-attorney members and attorney members for the purpose of obtaining legal advice are protected by the attorney-client privilege, and (2) core group deliberations between non-attorney members on factual matters such as the BLM's fault in failing to heed Oust's warning label or regulations, whether there were other causes for the crop damage, whether DuPont was at fault, and other such matters, are not privileged.

**Memorandum Decision & Order – page 10**

**2.      Clawback Documents**

On May 30, 2008, DuPont sought to "clawback" certain privileged documents that it had inadvertently produced. The plaintiffs object to the clawback and have grouped the documents into six categories. *See Exhibits A to F* (docket nos. 525 & 526). For convenience sake, the Court will refer to the documents by those six categories.

The Court has conducted an *in camera* review of each category of documents to determine whether it is protected by the attorney-client privilege or the work product doctrine. As plaintiffs concede, category F is clearly privileged. While plaintiffs argue that certain documents were not "inadvertently produced" because they were used in depositions, that does not include any of the documents in category F. Accordingly, those documents were inadvertently produced, and must be returned because they are privileged.

Categories C, D & E contains documents transmitted to or from an attorney. As discussed above, there is a presumption that such material is transmitted for the purpose of obtaining legal advice as opposed to any other type of advice. While plaintiffs argue that the documents involve business decisions, the Court has discussed above that legal advice on business matters is protected. The Court therefore finds that these documents are privileged. They were inadvertently

**Memorandum Decision & Order – page 11**

produced and must be returned.

Categories A & B contain documents where at most an attorney was copied. From a review of the documents, none involve legal advice. The documents were sent to parties other than the attorney, and the attorney was merely copied on the document. These documents are not privileged and hence need not be returned.

### 3. Dr. Lichtner's bioassay proposal

Dr. Lichtner, a member of the core group, drafted a proposal for a bioassay in which he would study of effects of applying different doses of Oust to sugar beets and potatoes on a test plot in native Idaho soils. *See Dr. Lichtner Deposition* at pp. 92-96. He could not recall the impetus for the proposal – it may have been a "request from a lawyer" or "from kind of my own thoughts . . . ." *Id.* at p. 137. At another point in his deposition, he again expresses uncertainty, testifying that "I may have done it in response to what [two other researchers] had dreamed up, or I could have been asked . . . ." *Id.* at p. 100. He presented the proposal to the core group, and did not discuss it with anyone outside the core group. *Id.* at p. 135.

DuPont claims the bioassay proposal is protected by the attorney-client privilege and the work product doctrine. As discussed above, DuPont has the burden of proving these points.

**Memorandum Decision & Order – page 12**

The problem for DuPont in meeting that burden is that the record fails to reveal why Dr. Lichtner prepared the proposal – it may have prepared in anticipation of litigation or purely as a quest for scientific knowledge. Because the burden is DuPont's, this uncertainty cuts against them. DuPont cites no authority that the document can become protected simply because Dr. Lichtner presented it to the core group at a time when its attorneys were in the room. For all these reasons, the Court finds that DuPont has not carried its burden of proving that the bioassy proposal is protected.

4.  **Clinger Day Planners**

DuPont seeks to exclude from use at trial the day planners for the Clingers for 2000, 2001, and 2002. The day planners include some field-specific information on the Clingers' crops, and DuPont argues that the Court precluded any further production of such material in its decision of March 21, 2008.

In the March 21, 2008, decision, the Court took up DuPont's complaint that plaintiffs failed to provide field-by-field data for, among other things, seed information, planting dates, and harvest yields. Plaintiffs responded that the data does not exist beyond what they had already provided.

By that time, the case was about five years old. A tight discovery schedule was in place. The Court was concerned that despite their denials, plaintiffs may

**Memorandum Decision & Order – page 13**

come upon field-specific information late in the discovery process that would prompt requests to retake depositions and delay the process. To forestall that possibility, the Court held that "plaintiffs have admitted the data does not exist, and that it is time now to confirm that admission, prohibit any further supplementation on this issue, and move on."

About a month after this decision was issued, bellwether plaintiff Jerome Clinger was preparing for his deposition when he "remembered that there may be some scattered, random notations in my personal journals about a certain field on a certain date." *See Clinger Declaration* at p. 5. Clinger was referring to his day planners for 2000 and 2001 – he turned them over to his attorneys who "immediately produced them to defendants on April 9, 2008, more than a month before my deposition, which took place on May 13-14, 2008." *Id.* Clinger found his third day planner – the 2002 edition – while "cleaning out a spare bedroom" in May of 2008, and he immediately produced it to his attorneys. *Id.*

These day planners, according to Clinger, include data "about a certain field on a certain date." *Id.* That is precisely the type of data that the Court had in mind when it denied further supplementation based on plaintiffs' representations that no more data existed. The Court has no doubt that Clinger acted at all times in good faith. But even he admits that "I should have remembered the existence of the day

**Memorandum Decision & Order – page 14**

planners, especially since I believe I may have looked at them in preparing questionnaire responses." *Id*. at p. 6.  So he knew about the existence of the day planners well-before the Court's prohibition order.  While their late disclosure is inadvertent, it nevertheless violates the Court's order.  Accordingly, the Court will exclude Clinger's day planners from 2000, 2001, and 2002.

**5.      Soil Sample Production**

DuPont claims it has work product protection from producing in discovery soil sample results from testing done near Buhl.  DuPont took the samples from an area outside the plaintiffs' farms to validate the analytical method for the detection of sulfometuron methyl, an active ingredient in Oust.  DuPont claims that although the parties agreed to exchange soil sample results, this particular result was not included in that agreement because (1) it came from a county where there are no plaintiffs' farms; and (2) the sampling was not related to the plaintiffs claims.  Moreover, DuPont claims that the samples were taken at the direction of counsel for the purpose of this litigation and hence are protected by the work product doctrine.

The Court disagrees on all points.  The agreement – set forth in a series of letters between counsel – calls for the exchange of "all information relating to all samples taken and all tests conducted by or for the parties, their attorneys, or

consultants, or agents of the parties or their attorneys, or any third party that relate to the claims of any plaintiffs in this case or were taken from fields in the relevant Idaho counties." *See Shively Letter dated September 21, 2007.* This broad language is not limited to the counties where plaintiffs farmed. It would have been easy to put in such limiting language, but it was never done. Certainly the Buhl sample – taken to validate the testing method used by plaintiffs' experts – does "relate to the claims of plaintiffs in this case." This provision likewise waives any work product protection because it covers samples taken "by or for" the attorneys, consultants, or third parties.

For all of these reasons, the Court finds that the Buhl soil samples must be provided by DuPont to plaintiffs immediately. Moreover, the same analysis applies to the Morse Laboratories, Inc. and the handwritten notes on soil samples of DuPont's scientist Frank Lichtner.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that with regard to the core group issues raised in docket nos. 482, 503, and 527:  (1) core group deliberations between non-attorney members and attorney members for the purpose of obtaining legal advice are protected by the attorney-client privilege;

**Memorandum Decision & Order – page 16**

(2) core group deliberations between non-attorney members on factual matters such as the BLM's fault in failing to heed Oust's warning label or regulations, whether there were other causes for the crop damage, whether DuPont was at fault, and other such matters, are not privileged; and (3) Dr. Lichtner's bioassay proposal is not protected by the attorney-client privilege or the work product doctrine.

IT IS FURTHER ORDERED, that plaintiffs shall return the documents contained in Categories C, D, E, and F to DuPont, as set forth above.

IT IS FURTHER ORDERED, that with regard to the Clinger day planner issue raised in docket nos. 487 & 501: The Court will exclude from evidence Clinger's day planners from 2000, 2001, and 2002.

IT IS FURTHER ORDERED, that with regard to the soil sample issue raised in docket nos. 479, 505: The Court finds that the Buhl soil samples must be provided by DuPont to plaintiffs immediately. Moreover, the same analysis applies to the Morse Laboratories, Inc. and the handwritten notes on soil samples of DuPont's scientist Dr. Frank Lichtner.

DATED: **July 3, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge