IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TIMM ADAMS, et al, | ) | |
| | ) | Case No. CV-03-49-E-BLW |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM DECISION** |
| v. | ) | **AND ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it eight pre-trial motions.  The Court heard oral

argument on March 18, 2009, and took the motions under advisement.  The Court's

resolution of each motion is set forth below.

## ANALYSIS

### Jurisdiction – Discretionary Function Immunity

The BLM challenges this Court's subject matter jurisdiction by alleging that

it is entitled to immunity under the Federal Tort Claims Act's (FTCA)

discretionary function exception.  The Court earlier rejected this challenge, but the

BLM raises it again with a new set of arguments.  Because the issue is

jurisdictional, it is not governed by the standard of review applicable to motions

for reconsideration that would bar such a motion without new evidence or intervening law.  The Court will therefore consider the BLM's new arguments.

The parties do not challenge the standard of review employed by the Court in its earlier decision or the elements of the exception as stated there.  Whether the exception applies is a question of law for the Court to decide.  *See Kelly v. United States*, 241 F.3d 755, 759 (9th Cir. 2001).  The burden of proving the exception is on the BLM.  *See Bear Medicine v. U.S. Dept. of Interior*, 241 F.3d 1208 (9th Cir. 2001).  The FTCA, as a remedial statute, "should be construed liberally, and its exceptions should be read narrowly."  *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).  In order to establish that it is entitled to immunity under the discretionary function exception The BLM must prove that the conduct challenged by plaintiffs is both (1) "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and (2) "based on considerations of public policy."  *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988).

Plaintiffs challenge two broad categories of decisions made by the BLM: (1) the decision to use Oust as the herbicide for this project, and (2) the more specific decisions concerning when and how to apply the Oust.  With regard to the first challenged decision, the BLM had argued in its original briefing that "[t]he use of Oust . . . was approved in the 1991 Final Environmental Impact Statement

**Memorandum Decision and Order – Page 2**

[FEIS]." *See BLM's Opening Brief* at p. 4, n. 2.  The 1991 FEIS had considered

the effects of various herbicides on 5 specific program areas: (1) rangeland;

(2) public domain forest land; (3) oil and gas sites; (4) rights-of-way; and

(5) recreation and cultural areas.  *See FEIS* at p. 1-15.

The BLM argued that by approving the use of Oust on the first category –

rangeland – the 1991 FEIS gave the BLM the discretion to choose Oust, thereby

satisfying the first prong of the exception test. At oral argument on the original

motion, the BLM added the argument that even if the FEIS did not approve the use

of Oust on rangeland, the State of Idaho had granted specific approval for the aerial

use of Oust on fire-damaged lands when it granted DuPont's application for a

Special Local Need 24(c) Labeling.

The Court rejected both arguments in its earlier decision.  The Court found

that while the 1991 FEIS did analyze Oust for its use on oil and gas sites, *see FEIS*

at p. 3-80, and rights-of-way, *id.* at p. 3-83, the FEIS never approved the use of

Oust on rangeland.  *Id*. at pp. 3-74, E5-4, E8-12, E8-15.  The Court also held that

state approval would not absolve the BLM of its NEPA duties, citing Ninth Circuit

authority in support.

The BLM now asserts that "Oust was applied only to fire-damaged

rangelands upon which the BLM imposed grazing restrictions that removed these

**Memorandum Decision and Order – Page 3**

lands from the legal ambit of 'rangeland' and, instead, placed them under the framework of 'non-crop-land.'" *See BLM Brief* at p. 1.  The BLM asserts that "the 1991 [FEIS] did consider the application of Oust to non-crop land" by evaluating the impacts of its use on "Idaho soils and Idaho's climatic conditions the central issue presented in this case . . . ." *Id.*

However, the BLM points to no provision in the 1991 FEIS where the application of Oust is approved generally for non-crop land.  Instead, the BLM argues that the express approvals for use on oil and gas sites and rights-of-way were "two non-exclusive examples of non-crop lands where the use of Oust is authorized," arguing that by approving application on these two narrow areas, the FEIS was approving use on non-crop lands in general.  *Id.* at p. 9.  But there is no language in the FEIS that supports such a broad reading of the narrow approvals. The plain wording of that document treats those two categories as discrete and self-contained, rather than as proxies for a much broader area of "non-crop land."

The BLM argues that the use of Oust was permitted on non-crop lands by the § 3 label.  In support, the BLM cites testimony from its official Brian Amme stating that "the FEIS allowed for Oust to be applied for all uses permitted under the label, during the life of the FEIS."  *Id.* at p. 8.

The BLM cites no language, however, from the FEIS evaluating the impacts

**Memorandum Decision and Order – Page 4**

of application of Oust under the § 3 label.  Without that, the BLM cannot rely on the FEIS to create the "discretion" it needs for the exception.

The BLM turns from the FEIS to argue that the site-specific EAs gave the BLM discretion to apply Oust as they did.  The Court fully addressed this in its earlier decision and finds nothing new in the BLM's argument on this point that would cause the Court to change its decision rejecting this argument.

For all these reasons, the Court finds that the BLM's motion to dismiss for lack of subject matter jurisdiction must be denied.

## Jurisdiction – Loss Fields Leased After 2002 Tort Claim

The BLM argues first that the Court lacks subject matter jurisdiction over plaintiffs' claims regarding 29 of the fields at issue because they were first leased, or purchased, after April 15, 2002, the date of their first administrative claims.  The BLM argues that these are "*new* injury claims that the BLM could not have investigated or evaluated for settlement as part of the administrative claim process."  *See BLM Brief* at p. 7.

The Court has previously held that continuing damage to fields purchased or leased prior to the claim's filing in 2002 can be alleged for losses occurring in subsequent years.  The Court reaffirms that decision here.  But plaintiffs cannot seek damage to fields purchased or leased after the claim was filed in 2002 based

**Memorandum Decision and Order – Page 5**

entirely on the 2002 claim.  Here, they are not doing so.  Plaintiffs have another claim filed in 2003, and that claim includes most of the 29 fields the BLM challenges here.

The BLM complains that the plaintiffs have often asked this Court to ignore the 2003 claim as unnecessary, but plaintiffs do rely on it now in response to the BLM's motion, *see Plaintiffs' Brief* at p. 9, and there is no argument that the 2003 claim has been waived or withdrawn in any manner.  The BLM responds that 7 fields were purchased or leased after the 2003 claim was filed on March 21st. Plaintiffs allege there are only 4.  Whatever the number, the Court's analysis above prohibits plaintiffs from seeking any losses for fields purchased or leased after March 21, 2003.  To that extent, the Court will grant the BLM's motion.

## Jurisdiction – Loss Fields With Renewed Leases

The BLM also seeks to dismiss, on jurisdictional grounds, the plaintiffs' damage claims as to 20 fields – different from the 29 fields just discussed – that were (1) farmed by plaintiffs as tenants on leases that expired in 2001 and 2002; (2) claimed by plaintiffs as loss fields in 2001 and 2002; and (3) nevertheless leased again by plaintiffs in subsequent years for which they claim additional Oust damage.  The BLM argues that plaintiffs cannot, as a matter of law, recover damages beyond the 2001/2002 years because their damages are limited to the

**Memorandum Decision and Order – Page 6**

period of their leasehold interest.

The BLM then cites lengthy deposition testimony that plaintiffs were well-aware of the contamination of these 20 fields by the end of 2001, and should not be permitted to re-lease these fields and increase their damages thereafter.  However, as will be developed below, there are significant questions of fact over whether the plaintiffs were advised by DuPont, after the initial crop damage, to plant normally, and were not informed about the toxic persistence of Oust in the soil.  Due to these questions, the Court cannot resolve this issue as a matter of law at this time.

## Jurisdiction – Funk Group Damages

The BLM also seeks to limit the damage claims of the Funk group to $2.1 million, the sum sought in their administrative claim.  Based on the report of plaintiffs' expert Cornelius Hofman, the Funk group is seeking up to $9.3 million in damages through 2002.

The FTCA, however, does not limit a plaintiff to the amount sought in the administrative claim if an additional sum is "based upon newly discovered evidence not reasonably discovered at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."  *See* 28 U.S.C. § 2675(b).  The BLM argues that the Funk group "has not pleaded, and cannot prove, that intervening facts or new evidence

**Memorandum Decision and Order – Page 7**

arose after they submitted their administrative claims to the BLM.  *See BLM Brief* at p. 13.

Yet plaintiffs did plead this.  In their Third Amended Complaint, they "reserved the right to prove damages in excess of those contained in their FTCA tort claim, as provided by 28 U.S.C. § 2675(b)."  *See Third Amended Complaint* at ¶ 200.

The Government argues that because plaintiffs alleged continuing crop losses, those losses were foreseeable and thus should have been included in the tort claims.  While damage of some sort was anticipated, the actual amount could not be divined before it was incurred.  The plaintiffs had no way of knowing in advance what crop would be planted, how much would be damaged by Oust, what market prices would be, and how much money would actually be lost.

The BLM responds that the 2003 administrative claim continued to assert the same damage figure as asserted in the 2002 administrative claim – $2.1 million. The BLM argues that the Funk group is bound by the $2.1 million figure at least through the 2002 crop year, because the Funk group had full knowledge of those damages when it filed its claim on March 21, 2003.

While the Court agrees with this general analysis, the Court is concerned that the BLM raised this argument for the first time in its reply brief.  The Court

**Memorandum Decision and Order – Page 8**

typically does not consider such arguments, and they cannot trigger a duty on plaintiffs' part to come forward with some evidence in rebuttal.

Nevertheless, this matter is jurisdictional in nature and will persist throughout the case. To give some guidance to counsel, it appears to the Court that the Funk group is limited to $2.1 million in damages through the 2002 crop year, as set forth in the 2003 administrative claim, unless the Funk group can fit additional damages within the confines of 28 U.S.C. § 2675(b), quoted above.

The Court will have to await all the evidence to make the final call on whether plaintiffs satisfy the statutory requirement for additional sums beyond those alleged in the 2003 claim to be awarded against the BLM. Of course, this cap does not apply to DuPont.

## Jurisdiction – Pre-judgment Interest

The BLM seeks a ruling that this Court has no jurisdiction to award pre-judgment interest against it under the FTCA. Plaintiffs agree, and so this motion will be granted.

## Fraud

Dupont seeks summary judgment on Count 15, which contains a claim for fraud. Nine elements must be proved to sustain an action for fraud: (1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity;

**Memorandum Decision and Order – Page 9**

(5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury.  *See Country Cove Dev., Inc. v. May*, 150 P.3d 288, 294 (Id.Sup.Ct. 2006).  With regard to the requirements that a speaker know the statement is false, and intend to induce reliance upon it, the Idaho Supreme Court has held that "where a speaker gives an opinion when he is aware of facts incompatible with such opinion, the opinion may amount to a false statement of fact if made with the intention of deceiving or misleading."  *Id*. at 294.

Here, one of plaintiffs' fraud claims is that DuPont advised them to plant as normal for the next crop year despite knowing that (1) minute amounts of Oust could be lethal to crops, especially potatoes and sugar beets; (2) Oust binds to dust and could be wind-blown from application sites to cropland; (3) Idaho's alkaline soils made it likely that Oust contamination would persist into the next growing season; and (4) no specific studies on Oust persistence had been done in Idaho to show that it was safe to plant normally.

The Court discusses first what the record reveals on whether DuPont advised the growers to plant normally the next planting season, and whether they relied on that advice to their detriment.  DuPont had sent representatives to Idaho, and named Dan Schaeffer as a grower representative that DuPont "could communicate

with." *See Cantlon Deposition* at p. 506 (exhibit 35 to affidavit (docket no. 817)).

A DuPont representative attended meetings with growers, and his statements,

according to bellwether plaintiff Doug Hansen, were that "he was there to help us

and that he would help us get information that would help us survive.  We were

wondering how we were going to survive it because it was devastation to us."  *See*

*Hansen Deposition* at p. 161 (exhibit 46 to affidavit (docket no. 818)).

      Bellwether plaintiff Rodney Jentzsch recalls being told that he should "go

ahead the next year and do your normal [crop] rotations."  *See Jentzsch Deposition*

at p. 398 (exhibit 43 to affidavit (docket no. 818)).  Similarly, bellwether plaintiff

Jerome Clinger recalls that at "some of the meetings they told us: Farm as normal,

farm like you do every year, farm like you would on a regular year without the

problems."  *See Clinger Deposition* at p. 678.

      While these plaintiffs testified generally that this advice was coming from

DuPont, they could not recall the name of any DuPont representative who might

have made the representation.  For example, Jentzsch says the advice about

planting normally "could have" been made by a DuPont representative "but I don't

specifically remember who."  *See Jentzsch Deposition* at p. 399.  Similarly, Clinger

says, "I don't remember who said that."  *See Clinger Deposition* at p. 678.  These

growers testified that they may have also heard DuPont advice from other growers.

**Memorandum Decision and Order – Page 11**

This record creates issues of fact over whether DuPont gave advice to plant normally, and intended that the growers hear it, either directly or though grower representatives.  Liability for misrepresentation may be based on DuPont's statements to others that were intended by DuPont to reach the bellwether plaintiffs.  *See Advance-Rumely Thresher Co. v. Jacobs*, 4 P.2d 657, 660 (Id.Sup.Ct. 1931)("recovery can be had for representations made to another with the intent or knowledge that they should or would be repeated to complainant"); *Restatement (Second) of Torts* § 533 (liability for misrepresentation arises if "the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other and that it will influence his conduct in the transaction . . . involved").

The testimony of bellwether plaintiff Gary Hansen also addresses these issues.  Hansen attended a grower meeting in late August or early September of 2001, where he recalls a statement that "the half-life of Oust of five to six weeks." *See Hansen Deposition* at p. 362 (exhibit 45 to sealed Affidavit (docket no. 818)). That statement was made "just after he [the DuPont representative] was finished speaking and while he was standing . . . ."  *Id.* at 362.  When asked at his deposition if the statement was made by the DuPont representative, Hansen replied that, "[i]t may have been.  But I remember this: that he [the DuPont representative]

was there and he was standing in front of the room." *Id*. at p. 363.

This testimony at least creates questions of fact over whether (1) a DuPont representative actually made the half-life comment or (2) if he did not make that comment, whether he adopted it by not contesting it when it was made while he stood at the front of the room at the end of his presentation.

Hansen's testimony also creates questions of fact over his reliance on the statement.  Hansen testified that he decided to plant potatoes in the allegedly affected fields in 2002 "based on the half-life statement that made us feel like we had quite a period of time between harvest and the next spring that would – if that turned out to be true, we would be safe to plant those crops." *Id*. at p. 372.  If DuPont had told him to be "cautioned about planting potatoes" he "may have planted them in another region, either in our – southern part of our county or in Cassia County." *Id*. at p. 374.  But because DuPont failed to caution him, he planted potatoes in the allegedly affected fields and "suffered economic loss in trying to raise potatoes in those conditions." *Id*. at p. 375.

The testimony is echoed by other bellwether plaintiffs.  For example, Jerome Clinger – whose testimony that he was advised to plant as normal was discussed above – testified that the advice "didn't work" and that "that hurt us tremendously." *See Clinger Deposition* at pp. 678-79.

**Memorandum Decision and Order – Page 13**

The testimony of Hansen and Clinger raises additional questions of fact about (1) Dupont being the source of the advice to plant as normal, (2) the growers' reliance on the statements, and (3) their consequential damages.

The Court turns next to examine any questions of fact on whether the advice to plant normally was fraudulent.  This depends on what DuPont knew, or should have known, when it rendered that advice.

The record contains a DuPont memo from 1997 stating that "minimal Oust residues" could cause a "major problem" with potatoes.  *See Exhibit 5* (attached to affidavit (docket no. 772).  With regard to sugar beets, an internal and confidential DuPont study in 1989, *see Lichtner Deposition* at p. 242, showed that sugar beets were the most sensitive crop to Oust. They showed visual injury when exposed to Oust in soil at the minute level of 10 parts per trillion.  *See Exhibit 3* (attached to affidavit (docket no. 772)).

Dupont's representative, Dr. Aldos Barefoot, testified that "the long-distance transport phenomenon [of Oust] has really been well established for a long time." *See Exhibit 9* at p. 33 (attached to affidavit (docket no. 772)).  Dr. Barefoot then admitted that in 2000, DuPont did not know (1) how far dust from BLM lands in southern Idaho would travel, and (2) how much Oust would be carried by the wind-blown dust.  *See Exhibit 9* (attached to affidavit (docket no. 772)).

**Memorandum Decision and Order – Page 14**

On the persistence issue, plaintiffs offer the report of Dr. William Dyer, a professor of weed physiology at Montana State, that describes a DuPont study, published in 1976, showing that Oust degrades at a two-stage rate. Initially, the decay is relatively rapid, but a "biologically significant" portion of Oust diffuses into sites where it is "protected" from degradation, and any subsequent degradation occurs "extremely slowly." *See Dyer Report* at p. 14.

This slow second-half-life degradation was especially pronounced in alkaline soils like those found in Idaho. *Id.* In 1980, Dupont found that the first-half-life of Oust in Colorado was 21 weeks, substantially longer than in Canada and Oregon because of the "higher soil pH coupled with lower rainfall." *See Exhibit 62* at p. ISDA003815. These would be soils similar to Idaho's. *See Report of Dyer*. As Dr. Dyer points out, the toxic nature of Oust lasts past a 21 week first half-life, and continues into the much slower second half-life.

Studies of similar soils elsewhere indicate that the second-half degradation could last years. *Id.* Dyer reviews DuPont studies but finds none that specifically set out to study the second-half degradation of Oust in alkaline soils like those found in Idaho.

On the basis of this record, questions of fact exist over whether DuPont told farmers to plant as normal despite knowing that (1) Oust-contaminated dust could

**Memorandum Decision and Order – Page 15**

be wind-blown onto crop fields; (2) minute amounts (ten parts per trillion) of Oust

could be toxic to crops, with sugar beets and potatoes being especially sensitive;

(3) Idaho's alkaline soil could make it likely that Oust contamination could persist

into the next growing season; and (4) no studies supported DuPont's advice to

plant normally.  Thus, plaintiffs have established questions of fact on whether

DuPont knew or should have known that it was making a false statement when it

told growers to plant as normal for the next growing season, intending that the

growers rely on that advice.  Due to these questions of fact, the Court will deny

DuPont's motion for summary judgment on the fraud claim.

## Punitive Damages

Conduct justifying punitive damages requires "an intersection of two factors:

a bad act and a bad state of mind."  *See Linscott v. Ranier Nat. Life. Ins. Co.,* 606

P.2d 958, 962 (Id. Sup. Ct. 1980).[1]  The defendant must (1) act in a manner that

was an extreme deviation from reasonable standards of conduct with an

understanding of – or disregard for – its likely consequences, and must (2) act with

an extremely harmful state of mind, described variously as with malice,

---

[1]  At oral argument, plaintiffs recognized that a punitive damage claim is not a stand-
alone claim.  The Court agrees with Magistrate Judge Williams who stated in *Boise Tower
Associates LLC v. Washington Capital Joint Master Trust*, 2006 WL 1749656 at *12 (D. Id. June
22, 2006), '"[a] prayer for punitive damages is not a stand-alone cause of action, but flows from
an underlying cause of action, such as a breach of contract or a tort, when the conduct of a party
meets the threshold level of being oppressive and outrageous."

**Memorandum Decision and Order – Page 16**

oppression, fraud, gross negligence, wantonness, deliberately, or willfully. *See Meyers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004). For plaintiffs to be entitled to amend their complaint to add a claim for punitive damages, they need to show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* Idaho Code § 6-1604(2).[2]

Plaintiffs argue that they have a reasonable likelihood of proving that DuPont rendered the "plant as normal" advice to growers, and that this would support an award of punitive damages. The Court disagrees. Assuming that plaintiffs could prove the claim, and examining it under a light most favorable to the plaintiffs, Dupont's conduct does not demonstrate the harmful state of mind necessary to support an award of punitive damages. Plaintiffs have pointed the Court to nothing indicating that DuPont rendered the advice with the intent to injure the farmers or to confer some benefit upon itself. The same goes for the alleged Dupont statements that it would help plaintiffs, or would test soil samples and share the results. With no evidence of a bad state of mind, the Court cannot

---

[2] DuPont argues that "when a moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, a motion to amend to assert punitive damages will not be allowed." *See DuPont's Brief* at p. 2 (quoting from *Prado v. Potlatch Corp.,* 2006 WL 1207612 (D. Id. May 21, 2006). That decision was issued by another judge in this District, and does not accord with this Court's reading of Idaho law. For that reason, the Court declines DuPont's invitation to adopt *Prado's* standard.

allow an  amendment of the complaint to add punitive damages as a remedy for the misrepresentation claim.

DuPont argues that punitive damages are nevertheless an appropriate remedy for their claims that DuPont changed the label in 1995 to relax restrictions on Oust and pursue greater profits from selling it to BLM for use on fire-damaged land, as alleged in Count 10 (failure to warn), and Count 11 (misbranding).  Again, the Court disagrees.  In their briefing, plaintiffs have not pointed the Court to any evidence that the changes to the label were an extreme deviation from industry standards of conduct.  Without such evidence, the Court cannot allow this aspect of plaintiff's punitive damage claim to be inserted into the case.

For all of these reasons, the Court finds that plaintiffs have not shown "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  *See* Idaho Code § 6-1604(2).  For this reason, plaintiffs motion to amend will therefore be denied.

**<u>Failure to Warn Claims</u>**

DuPont seeks summary judgment on Counts 10 and 12, alleging failure-to-warn claims based on strict liability and negligence.  DuPont argues that because the BLM was a "learned intermediary" – that is, an entity positioned between DuPont and the end-user with full knowledge of the product's risks – the chain of

causation was broken and the failure-to-warn claims against DuPont must be dismissed.

Under Idaho law, a supplier positioned on the commercial chain remote from the ultimate consumer may, under certain circumstances, fulfill its duty to warn by adequately warning an intermediary. *Sliman v. Aluminum Co. of America*, 731 P.2d 1267, 1270-71 (Id. Sup. Ct. 1986). *Sliman* discussed two examples of this "learned intermediary" rule. First, a doctor may stand as a learned intermediary between a drug maker and the patient because a doctor understands the risks of the drug and is better-positioned to warn the patient. *Id*. at 1271. The second example involved a bulk supplier, one who sells a product to another manufacturer or distributor who in turn packages and sells the product to the public. "Because of its remote position and its lack of control over the labeling and marketing of the ultimate product, a component part manufacturer also should be able to issue warnings through an intermediary." *Id.*

Under both circumstances, however, *Sliman* requires the manufacturer to prove that (1) its reliance on the intermediary to pass on the warning to end-users was reasonable, and (2) it adequately warned the intermediary. *Id*. at 1272. Both questions are for the jury to decide. *Id.*

DuPont asks the Court to take these issues from the jury. The Court declines

**Memorandum Decision and Order – Page 19**

the invitation.  As discussed above, there are substantial questions regarding the

adequacy of DuPont's warning.  For example, there are questions whether DuPont

warned the BLM that even minute amounts of Oust were lethal, could travel for

many miles on wind-blown dust, and could persist in soils for months if not years.

DuPont claims that the BLM conducted its own investigation and testing of

Oust from 1992 to 1996, but this appears to be limited to Oust's effectiveness in

reducing cheatgrass, and did not examine the risk of wind-blown dust

contaminated with Oust.  Mike Pellant, with the BLM, testified that this testing

examined whether Oust was effective in controlling cheatgrass.  *See Pellant*

*Deposition* at pp. 27-34.  When asked whether there was an evaluation of  Oust's

off-target movement, he responded "No, there was not."  *See Pellant Deposition* at

p. 177.

DuPont also claims that the § 3 label gave adequate warning to the BLM.

That label noted that "low rates of Oust can kill or severely injure crops."  What

are "low rates"?  Should the BLM have been expected to know what DuPont knew

– that is, that Oust in levels of just 10 parts per trillion were toxic to sugar beets?

*See Exhibit 3, supra*.

The § 3 label also stated that applicators should avoid "gusty conditions"

and that treatment in dry soil "when there is little likelihood of rainfall" may cause

**Memorandum Decision and Order – Page 20**

damage to crops "when soil particles are moved by wind."  What are "gusty

conditions"?  How much "rainfall" is needed to avoid off-target movement?  How

far will the wind blow the contaminated soil?  What are "soil particles"?  DuPont's

own rangeland management expert, Celestine Duncan, testified that an applicator

would have to know answers to these questions, but they were not provided on the

§ 3 label.  *See Duncan Deposition* at pp. 255-56.  If DuPont was relying on the

BLM or the applicators to fill in the gaps in its warnings, this creates a question of

fact under *Sliman*: "Manufacturers . . . may not rely unquestionably on others to

sound hue and cry concerning a danger in its product."  *Sliman, supra* at 1271.

DuPont seeks to impute all the EPA's knowledge of the danger of off-target

movement of Oust to the BLM.  DuPont recognizes that knowledge is not

generally imputed between federal agencies, but argues that this case is unique

because the BLM and the EPA shared duties of reviewing the application of Oust

here.

The imputation of EPA's knowledge to the BLM may not benefit DuPont,

however.  It would result in the BLM being charged with knowledge of a DuPont

report to the EPA dated January, 1995, where DuPont states as follows:

> The long-range transport of [Oust] by wind blown dust has been the
> subject of extensive investigation . . . and expert testimony . . . .  The
> conclusions reached by all parties based on the 'weight-of-the-evidence'
> is that this is not even a theoretical possibility!

**Memorandum Decision and Order – Page 21**

*See Exhibit KK-3* (attached to supplement (docket no. 814)).  With this, there would be questions of fact as to whether DuPont's warning to the BLM about wind-blown dust contaminated with Oust was adequate.  In this memo, DuPont appears to be taking back whatever warning it conveyed on the § 3 label.  The Court need not decide whether to impute knowledge at this point in the litigation. It is enough to say that even if knowledge was imputed, there are questions of fact warranting denial of DuPont's motion for summary judgment.

All of this discussion has related to whether the BLM was a "learned intermediary," and whether DuPont had satisfied that defense's requirements that it prove (1) it adequately warned the BLM of Oust's risks, and (2) its reliance on the BLM to pass on the warning to end-users was reasonable.  *Sliman*, *supra* at 1272. Both questions are for the jury to decide.  *Id.*  Based on the analysis of the record discussed above, the Court cannot find that the learned intermediary issue should be resolved in DuPont's favor as a matter of law at this stage of the proceedings.

Finally, the Court is not holding that the "learned intermediary" doctrine should be extended beyond a physician/patient relationship.  Plaintiffs have a persuasive argument that it should not be so extended, but that issue need not be resolved at this point given the discussion above.

This same analysis applies to DuPont's arguments that the BLM was a

"sophisticated user" and that the risk was "known and obvious."  The Court

likewise refuses to grant summary judgment to DuPont on these issues.

## Design Defect Claims

DuPont seeks summary judgment on Counts 8 and 9 that allege design

defects under theories of strict liability and negligence.  DuPont argues that

"evidence of a failure to warn does not demonstrate a design defect . . . ."  *See*

*DuPont Brief* at p. 16.  That is not an accurate statement of Idaho law, however.

Idaho has adopted the rule of strict liability in tort as set forth in the *Restatement*

*(Second) of Torts*, § 402(A) (1965).  *See Shields v. Morton Chemical Company*,

518 P.2d 857 (1974).  Under that section of the Restatement, warnings are

considered as a feature of the product at issue in determining whether the design is

defective.  *See comment h* (product sold without adequate warning of danger is "in

a defective condition"); *comment j* (product supplied with appropriate warning "is

not in defective condition nor is it unreasonably dangerous"); *comment k*

("unavoidably unsafe" product, when accompanied by appropriate warning, is

neither defective nor unreasonably dangerous).

DuPont argues, however, that plaintiffs have failed to produce any evidence

of an alternative safe design.  That would be plaintiffs' burden under the American

Law Institute's revision of § 402A contained in *Restatement (Third) of Torts* § 2.

**Memorandum Decision and Order – Page 23**

That section requires plaintiffs to prove that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design." Through this provision, "section 402A [was] so far restated that one could say it had been repealed . . . ." *See Conk, Punctured Equilibrium: Why Section 402A Flourished and the Third Restatement Languished*, 26 Rev. Litig. 799, 836 (2007).

Yet Idaho has never adopted § 2 of the Restatement (Third). The currently operative Restatement provision in Idaho is § 402A, and it clearly does not require plaintiffs to prove an alternative safe design. DuPont has cited nothing in Idaho jurisprudence to indicate that the Idaho Supreme Court, if faced with the issue, would adopt the new Restatement position.

Given this, DuPont has the burden of proof on the issue. Under § 402A, the Idaho courts have put the burden on the product seller to prove an alternative safe design as part of the seller's overall burden to prove the affirmative defense of "unavoidably unsafe products." *See Toner v. Lederle Laboratories*, 732 P.2d 297, 338-39 (Id.Sup.Ct. 1987); *see also Restatement (Second) of Torts,* § 402A, comment k. To be entitled to that defense – a defense DuPont seeks summary judgment upon here – the seller must prove that no alternative safe design exists and that the product bestows benefits that outweigh its risks. *Id*. at 339.

**Memorandum Decision and Order – Page 24**

Because DuPont has not submitted any evidence on an alternative safe design, the Court refuses to grant it summary judgment on the defense of "unavoidably unsafe product."  Moreover, the Court finds that plaintiffs do not have the burden of proving an alternative safe design, and hence refuses to grant DuPont's motion that seeks to place this burden on the plaintiffs.

**Negligence *per se***

DuPont seeks summary judgment on Count 14, alleging a claim for negligence *per se* under Idaho's Pesticides and Chemigation Act (IPCA). Specifically, DuPont seeks summary judgment on plaintiffs' claim that DuPont violated § 3420(2) of the IPCA that prohibits making "pesticide recommendations in a manner inconsistent with its labeling . . . ."  *See* Idaho Code § 22-3420(2).

The Idaho Supreme Court has ruled that the IPCA will support a negligence *per se* claim.  *See Obendorf v. Terra Hug Spray Co.,* 188 P.2d 834, 841 (Id.Sup.Ct. 2008).  Plaintiffs claim that DuPont promoted Oust to the BLM knowing that it would be used in dry windy conditions near croplands, and that this use would be inconsistent with Oust's labeling.  They have supported these claims with the testimony of their expert, Dr. Charles Benbrook.  The Court finds that Benbrook's testimony creates sufficient questions of fact to make summary judgment on Count 14 inappropriate at this time.

**Memorandum Decision and Order – Page 25**

## Conclusion on DuPont's Omnibus Motion for Summary Judgment on Tort Claims

The Court has now found issues of fact on the tort claims for failure to warn, defective design, and negligence *per se*.  Accordingly, the Court will deny DuPont's omnibus motion that sought summary judgment on Counts 8, 9, 10, 12, and 14.

## Preemption

DuPont seeks summary judgment on Counts 10 and 11 that allege the labels used on Oust were false and/or misleading because they failed to contain adequate instructions and omitted necessary warnings.  DuPont argues that these claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).

The preemption provision of FIFRA directs that a state "shall not impose or continue in effect any requirements for labeling . . . in addition to or different from those required under this subchapter."  *See* 7 U.S.C. § 136v(b).  The Supreme Court has interpreted this provision to mean that a state rule is preempted if it is a requirement for labeling that is in addition to or different from those required under FIFRA.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005).  A state rule that is "equivalent to, and fully consistent with, FIFRA's misbranding provisions" need not explicitly incorporate FIFRA's standards to avoid preemption.  *Id*. at 447.

The states are not precluded from "imposing different or additional *remedies*, but only different or additional *requirements*." *Id*. at 447-48 (emphasis in original).

DuPont does not compare plaintiffs' state law claims with FIFRA's provisions and identify differences. Indeed, the Court's own examination shows that plaintiffs' claims appear to track FIFRA by alleging that the labels omit necessary warnings, do not contain adequate instructions, and are misleading. The Court stated at oral argument that its jury instructions would track FIFRA, and plaintiffs agreed that would accurately follow Idaho law.

DuPont argues, however, that the EPA has fully reviewed the § 3 label and concluded that it was "satisfactory to prevent damage to non-target crops when Oust is used in conformance with the label's instructions." *See Dupont Brief* at p. 6. Given the EPA's approval, this lawsuit is just an attempt to impose requirements in addition to FIFRA, argues DuPont.

DuPont's argument is based on the questionable premise that the EPA fully reviewed the risk of wind drift. Recognizing that courts were "erroneously concluding" that the EPA had evaluated pesticide warnings regarding crop loss, the EPA issued a statement that "approval of a pesticide[3] label does not reflect any

---

[3] FIFRA defines "pesticide" to include a substance that destroys "weeds." *See* 7 U.S.C. §§ 136(u)(1) & (t)(1).

**Memorandum Decision and Order – Page 27**

determination on the part of EPA that the pesticide . . . will not damage crops . . . ." *See PR Notice 96-4* at pp. 5-6.  More specifically, EPA officials have testified in this case that the agency did not consider the risk of wind-blown Oust contaminated dust when the § 3 label was approved.  *See Stubbs Deposition* at pp. 70-71.  For these reasons, the Court cannot find as a matter of law that FIFRA preempts plaintiffs' failure to warn and fraud claims.

**Government Emergency Doctrine**

DuPont seeks immunity under the government emergency doctrine established in California by *Macias v. State*, 42 Cal. Rptr. 2d 592 (Cal. 1995).  The Court declines to apply *Macias* in this case for three reasons: (1) Idaho has never adopted the doctrine; (2) Idaho has never declared a state of emergency similar to that faced in *Macias*; and (3) there is no concern here, as there was in *Macias*, with a private party interfering with the sovereign power of government by pursuing a lawsuit.

**DuPont's Motion on Prejudgment Interest**

DuPont filed a motion in limine to preclude plaintiffs from submitting before the jury any evidence as to the lost opportunity cost.  DuPont identifies this lost opportunity cost from the deposition testimony of plaintiffs' expert Barry Goodwin.  He testified that if, say, a farmer was entitled to $100,000 for crop loss

**Memorandum Decision and Order – Page 28**

in 2000, and he does not receive that money until he gets a jury verdict in 2009, the farmer is entitled to an additional recovery representing the opportunity lost to invest that $100,000 for 9 years and earn a rate of return on the sum.

DuPont argues that this lost opportunity cost is a question for the Court, not the jury, and cites *Burt v. Clarendon Hot Springs Ranch, Inc*., 793 P.2d 715, 720 (Id.Ct.App. 1990).  But that case was a court trial, and the cited page contains no language supporting DuPont on this issue.

It is well-established that the jury determines present value.  *See IDJI 9.13*. The lost opportunity cost computation is essentially a present value computation in reverse.  If a jury is competent to do the one calculation, it stands to follow they would be competent to do the other.  DuPont cites no law or case to the contrary. The Court will accordingly deny DuPont's motion in limine to the extent it seeks a ruling that no jury may consider lost opportunity cost.  Whether that issue goes to this jury will, of course, depend on the evidence, a matter that is not now before this Court.

## Motion for Exclusion of Certain Damage Claims

The BLM seeks to exclude any evidence of damages to 1,500 acres "loss fields" and $1.1 million in mitigation expenses that plaintiffs seek through the testimony of their expert Cornelius Hofman.  The BLM claims that the plaintiffs

failed to disclose these losses during discovery, revealing them only through their damage expert when it was too late for the BLM to investigate the losses during the discovery period.

Expert Hofman calculated damages on a crop basis.  He considered all the fields upon which a particular plaintiff grew a particular crop in a given year, regardless of whether the plaintiff made a claim upon each field.  The plaintiffs had advised defendants early in this litigation that they would be calculating damages on a crop basis rather than a field-by-field basis.  This was necessary, plaintiffs alleged, because their crop production records were maintained on a crop basis rather than a field-by-field basis.

The plaintiffs were claiming both losses to certain crops and mitigation expenses that they incurred attempting to cure Oust damage.  Having determined to proceed on a crop basis, the plaintiffs were under an obligation to provide the defendants with full discovery on the crop losses and mitigation expenses that their expert Hofman would be relying on to calculate damages.  If plaintiffs failed to reveal during fact discovery the underlying information on crop losses and mitigation expenses that Hofman would be relying upon, the deadline for fact discovery would pass making it impossible for defendants later (during expert discovery) to challenge Hofman's assumptions.

**Memorandum Decision and Order – Page 30**

This is precisely what happened, however.  For example, Hofman lists 2,540.2 acres of wheat in 2002 for the Funk group.  Yet the Funks' questionnaire lists fields totaling only 1,877.3 acres.  This is repeated for each of the bellwether plaintiffs, and the unrevealed acreage totals about 1500 acres.

The plaintiffs are entitled to calculate their damages on a crop basis, but they had an obligation to reveal the total acres they had planted in that crop for damage purposes.  Hofman knew the precise acreage – and he testified that he got that information from the plaintiffs.  *See Hofman Deposition* at pp. 216-217, 219.  If plaintiffs had this information all along, why did they not share it with defendants?

Plaintiffs allege that they were never asked for the information.  Yet they were asked in Questions 40 to 43 in the questionnaire and at depositions.  The gist of these questions was to fully reveal the basis for damages.  Hofman relied on total acreage, and he got that information from plaintiffs, so plaintiffs clearly had an obligation to provide this information to defendants during the discovery period.

Plaintiffs also allege that they did provide the information.  Plaintiffs argue that defendants had the same documents Hofman relied upon.  But they fail to explain why defendants should be forced to hunt blindly through a massive set of documents for acreage figures that plaintiffs had already culled out and were providing to Hofman.

**Memorandum Decision and Order – Page 31**

There are similar concerns with regard to certain mitigation expenses.  These are expenses the plaintiffs incurred to mitigate the alleged damage caused by Oust.  Again, the gist of the questions asked of plaintiffs in the questionnaires and at depositions was to reveal the mitigation expenses they would claim as damages.  While plaintiffs did list in detail those expenses, Hofman's report now lists many additional expenses that were never revealed by plaintiffs during the discovery period.

For example, the Clinger group listed during discovery various expenses incurred in 2000, 2001, and 2002.  However, in his calculation of damages, Hofman included additional expenses – never before revealed in discovery by the Clinger group – of about $36,000 for expenses incurred in 2003.

As another example, Hofman included for the Hansen group $53,000 in hoeing expenses and $27,000 in expenses for herbicide applications, all for 2003 sugar beets.  Yet during discovery, Hansen testified in his deposition that his herbicide costs were incurred in 2001 and his hoeing costs were incurred in 2001 and 2002.  *See Hansen Deposition* at pp. 460-61.  The Hansen group never supplemented these deposition answers to give defendants an opportunity to challenge the additional claims of damage that appeared in expert Hofman's calculations.

**Memorandum Decision and Order – Page 32**

All told, the following mitigation expenses were not revealed during the discovery period: (1) for the Clinger group, $36,679; (2) for the Funk group, $731,404; and (3) for the Hansen group, $80,816.  This totals to $848,899.

The Court will therefore grant the BLM's motion to the extent it seeks to exclude $848,899 in damages from the calculation by Hofman.  The Court will also exclude the 1500 acres identified by the BLM from Hofman's damage calculation.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that DuPont's motion for summary judgment on preemption and government action (Docket No. 740) is DENIED.

IT IS FURTHER ORDERED, that DuPont's omnibus motion for summary judgment on tort claims (Docket No. 743) is DENIED.

IT IS FURTHER ORDERED, that BLM's motion to dismiss certain loss fields and Funk claims (Docket No. 745) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to prohibit plaintiffs from seeking any losses for fields purchased or leased after March 21, 2003.  It is denied in all other respects.  Counsel for plaintiffs are put on notice, however, that the Court will

likely limit the Funk group to $2.1 million in damages through the 2002 crop year, as set forth in the 2003 administrative claim, unless the evidence shows that additional damages for the Funk group satisfy the elements set forth in 28 U.S.C. § 2675(b).

IT IS FURTHER ORDERED, that DuPont's motion for summary judgment on misrepresentation (Docket No. 754) is DENIED.

IT IS FURTHER ORDERED, that BLM's motion for exclusion of certain damage claims under Rule 37(c) is GRANTED IN PART AND DENIED PART. It is granted to the extent it seeks to exclude from the damage calculations of expert Hofman (1) $848,899 in mitigation losses, and (2) 1500 acres in crop losses. The motion is denied in all other respects.

IT IS FURTHER ORDERED, that BLM's motion to dismiss for lack of subject matter jurisdiction (Docket No. 760) is DENIED.

IT IS FURTHER ORDERED, that plaintiffs' motion to amend to add punitive damages (Docket No. 772) is DENIED.

IT IS FURTHER ORDERED, that BLM's motion to dismiss prejudgment interest claims (Docket No. 777) is DENIED.

**Memorandum Decision and Order – Page 34**

IT IS FURTHER ORDERED, that DuPont's motion in limine to exclude evidence relating to prejudgment interest (Docket No. 794) is DENIED.

DATED:  **April 1, 2009**

B. LYNN WINMILL
Chief Judge
United States District Court