IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al., | Case No. CV-03-0049-E-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

# INTRODUCTION

The Court has before it a motion to exclude the testimony of seven experts. The motion is fully briefed and at issue. For the reasons expressed below, the Court will grant in part and deny in part the motion.

# ANALYSIS

## Dr. Joseph DiTomaso

DuPont seeks to exclude certain portions of the testimony of Dr. DiTomaso on the ground that he lacks expertise in certain areas in which he is apparently prepared to offer an opinion. More specifically, DuPont seeks to exclude his testimony regarding (1) the stewardship standards required of a manufacturer, (2) Dupont's conduct as a manufacturer in failing to conduct studies to generate

**Memorandum Decision and Order – Page 1**

additional data in order to draft more specific label instructions, and (3) what the BLM might have done if the label had been different.

Turning first to the stewardship issue, DuPont argues that Dr. DiTomaso is an expert in non-crop land management, but has no expertise or experience in the stewardship obligations that apply to herbicide manufacturers. To resolve this issue, the Court will first summarize Dr. DiTomaso's opinion on stewardship, and then discuss his expertise to render those opinions.

Dr. DiTomaso testified that "[s]tewardship is a chemical industry standard," and that it required "warning against potential risks" in labeling. *See Dr. DiTomaso Report* at p. 3. Dr. DiTomaso concludes that DuPont violated its stewardship duty by failing to adequately warn against Oust's risks in the 24(c) label. *Id.*

Dr. DiTomaso has a Ph.D in botany/weed science. He has worked in land management, and implemented weed management strategies. He has published a considerable number of scholarly articles on the biology, ecology, and management of many types of weeds, including invasive species. He has also worked with herbicide manufacturers to test their herbicides and provide labeling information. *See DiTomaso Deposition* at p. 27. Specifically, he has worked with Dow on three different herbicides, and with BASF on another herbicide. *Id*.

**Memorandum Decision and Order – Page 2**

While DuPont characterizes these tests as "efficacy tests" that simply looked at whether the herbicide was effective, Dr. DiTomaso testified that the tests went further and looked at "risk management from the standpoint of what the chemical company needs on the label." *Id.* at p. 27. He has also published a scholarly article on the risks of aerial drift of a Dow herbicide known as Transline. *Id.* at p. 28. Finally, he has taught classes at Cornell on the environmental fate of herbicides. *Id.* at p. 30.

To summarize, Dr. DiTomaso has specialized knowledge in land management, weed biology and control, and the transport and fate of herbicides. Although he is not a chemical industry insider, he has worked closely with chemical companies in the testing and labeling of herbicides. His background gives him the necessary expertise to discuss the chemical industry standard of stewardship as it relates to herbicides, and specifically what that duty requires in terms of the information provided on herbicide labels. The Court therefore rejects DuPont's argument that he is unqualified in this area.

DuPont argues next that even if Dr. DiTomaso is qualified to speak on stewardship, he failed to articulate any standard for the duty. The Court disagrees. Dr. DiTomaso testified that because DuPont knew Oust's risks, it had a duty, before proceeding with the 24(c) label, to do studies specific to Idaho and its dry

**Memorandum Decision and Order – Page 3**

arid soils. *See Dr. DiTomaso Deposition* at pp. 154-55. According to Dr. DiTomaso, DuPont's failure to do those studies before proceeding with the 24(c) label, in the face of known risks, violated its stewardship duty. *Id*. at p. 156. By this testimony, Dr. DiTomaso defined the stewardship duty and its violation by DuPont.

DuPont complains that Dr. DiTomaso is holding DuPont to the same standard as a land manager. The Court again disagrees. As explained above, Dr. DiTomaso has defined the industry standard and explained how DuPont violated that standard.

Finally, DuPont challenges Dr. DiTomaso's conclusion that the Oust label had an impact on BLM's risk analysis or decision to apply Oust, because he was not familiar with the BLM's thought process in making that decision. However, the fact that Dr. DiTomaso doesn't claim to know what was in the minds of the BLM's employees does not undermine his conclusion that DuPont violated its stewardship duties. Dr. DiTomaso reviewed the documentation underlying the BLM's decision to apply Oust. This was sufficient to support his views as to DuPont's stewardship duties.

For all of these reasons, the Court will deny the motion to exclude Dr. DiTomaso's testimony.

**Memorandum Decision and Order – Page 4**

**Dr. Carol Mallory-Smith**

DuPont seeks to exclude any testimony by Dr. Mallory-Smith on (1) the sufficiency of the § 3 and 24(c) labels, and (2) what the BLM might have done if the labels were sufficient.  DuPont argues that she is unqualified as to the former, and is simply speculating as to the latter.

Dr. Mallory-Smith is an expert retained by the BLM.  She has a Ph.D. in plant science and teaches classes in weed management at Oregon State University.  Her specialty is a category of herbicides known as ALS inhibitors, a category that includes Oust.  As part of her class on weed management, she teaches the analysis of herbicide labels and the interpretation of label language.  She is a licensed consultant who lectures to chemical applicators on the analysis of herbicide labels.  For about six years, she worked with the EPA on establishing pesticide labeling guidelines, and has had frequent input in the processing of 24(c) herbicide labels in Oregon.  *See Dr. Mallory-Smith Deposition* at pp. 255-57.

In her report, she testifies that, among other things, (1) the BLM followed the label in its applications, (2) DuPont had a stewardship duty to provide all information it had about the movement of Oust in soil so that this data could be considered on the 24(c) label, and (3) it is not possible to tell if crop damage in this case was caused by Oust.

**Memorandum Decision and Order – Page 5**

DuPont objects to certain paragraphs in the report of Dr. Mallory-Smith, and argues that she is not an expert on FIFRA and thus cannot testify about the "sufficiency of label language or manufacturers' duties with respect to label language." *See DuPont Brief* at p. 2. With regard to manufacturers' duties, DuPont is referring to Dr. Mallory-Smith's opinion that DuPont had a stewardship duty to provide more information on the 24(c) label. DuPont's objection would be persuasive if Dr. Mallory-Smith was an ivory tower professor who engaged exclusively in scientific studies with no experience in labeling of herbicides. That is not the case, however. She has had extensive experience with the EPA regarding labeling guidelines, and with the State of Oregon on its 24(c) applications. Having applied her herbicide expertise to study labeling issues, she is well-positioned to testify about the stewardship duties of the industry to provide information for use on labels.

She also testified that the Oust labels contained mostly advisory language rather than mandatory language. *See Report* at § F. Once again, her specialized knowledge in this area supports her testimony.

DuPont argues, however, that even if so qualified, Dr. Mallory-Smith went too far by speculating on how the labels influenced the BLM. More specifically, DuPont points to her opinion that "if Dupont had been forthcoming and provided

**Memorandum Decision and Order – Page 6**

the Idaho Department of Agriculture with all of the data in its possession about claims of movement on soil, it might have influenced how much and where Oust would be used by the BLM and also the label language." *See Report of Dr. Mallory-Smith* at p. 7. At another portion of the report, she renders an almost identical opinion that "[t]his information [past documentation of Oust movement on soil] might have influenced the use of Oust on the burned sites or influenced the label language for its use." *Id*.

DuPont complains that in these opinions Dr. Mallory-Smith is improperly speculating about whether additional warnings would have altered BLM's actual conduct. The Court disagrees. She did not speculate about what the BLM *would have done* if provided with full information. Instead, she actually refused to speculate, testifying only that because the information "might have" made a difference – regardless of whether it actually *would have* made a difference – DuPont had a stewardship duty to reveal the information. Accordingly, the Court cannot find that Dr. Mallory-Smith is engaged in improper speculation.

For all of these reasons, the Court will deny the motion to exclude Dr. Mallory-Smith.

**Dr. John Gallian**

DuPont seeks to exclude the opinions of Dr. Gallian (1) on the standard of

**Memorandum Decision and Order – Page 7**

care applicable to herbicide manufacturers, and (2) that DuPont's lack of investigation of the damage showed that DuPont never had an intent to help growers but was merely establishing its legal position.

Dr. Gallian is an emeritus professor of plant pathology at the University of Idaho. For 29 years, he was an extension sugar beet specialist, and has extensive experience in southern Idaho helping farmers determine the cause of various problems with sugar beets. He testified in his report that (1) he would have taken 5 specific steps to investigate the crop damage in this case, and (2) because of DuPont's failure to take these five steps, "[i]t is obvious that DuPont did not have any intention to help growers, but was simply establishing a legal position. They set up a legal team for control of all communication and sent representatives to the growers to make promises that were never kept. At the outset, DuPont gave the impression to growers of being part of a team to help with the crop damage situation, when in fact this was untrue." *See Report of Dr. Gallian* at pp. 16-17.

With regard to the first opinion – that he would have taken 5 steps to investigate the crop damage – the Court finds that Dr. Gallian's long experience in diagnosing sugar beet problems in southern Idaho qualifies him to render this opinion. His second opinion – that DuPont never intended to help farmers but only intended to solidify its legal position – is improper speculation. He has no inside

**Memorandum Decision and Order – Page 8**

information about DuPont's intent, and no special expertise in the operations of large chemical companies. He would therefore be testifying on this specific issue as a lay witness under Rule 701. That Rule requires that his testimony be based on his "perception" and be "helpful" to the jury. It is neither. Accordingly, the Court shall exclude from Dr. Gallian's testimony the portion of his report quoted above regarding DuPont's intent.

**Dr. Russell Qualls**

DuPont seeks to exclude that part of Dr. Qualls opinion that the § 3 and 24(c) labels were insufficient. DuPont argues that he is unqualified to render such opinions.

Dr. Qualls has a Ph.D. in civil and environmental engineering. He teaches a the University of Idaho in the Department of Biological and Agricultural Engineering, and is the Idaho State Climatologist. His report provides a detailed analysis of climate patterns in southern Idaho, and an hourly analysis for the wind and rain for every day from January 1, 1999, through December 31, 2001.

At one part of his report, Dr. Qualls offers the opinion that "the recommendation to use Oust in this region represents poor advice because one cannot count on enough rainfall – either to move Oust into the subsurface where it is inaccessible to wind transport or to maintain a sufficiently wet surface to prevent

**Memorandum Decision and Order – Page 9**

wind from picking up dust and attached Oust and transporting it downwind." *See Report of Dr. Qualls* at p. 8.

While Dr. Qualls is clearly a climate expert, plaintiffs fail to identify his expertise in herbicides that would qualify him to render an opinion on the wisdom of using a particular herbicide. Examining his resume and biographical sketch, the Court can find no experience or study whatsoever regarding herbicides and labeling.

Accordingly, the Court finds Dr. Qualls unqualified to render the opinion that the "recommendation to use Oust in this region represents poor advice . . . ." *Id*. This decision applies equally to his deposition testimony regarding the wording of the labels and the impact of the 2008 Oust reregistration label.

Dr. Qualls is qualified to render opinions concerning environmental and climate conditions – e.g., that there is insufficient rainfall to move chemicals to the subsurface or to maintain a sufficiently wet surface to prevent wind from picking up dust and transporting it downwind – that may be used by other qualified experts in offering their opinion that DuPont's recommendations constituted "poor advice." What he cannot do is offer opinions which begin within his area of expertise but then moves into conclusions and opinions which are decidedly beyond his area of training, education and experience.

**Memorandum Decision and Order – Page 10**

**Dr. William Dyer**

DuPont seeks to exclude certain opinions of Dr. Dyer on the ground that he lacks expertise in those areas. More specifically, DuPont seeks to exclude his opinions (1) that DuPont was irresponsible in obtaining a 24(c) label allowing Oust to be used on fire damaged lands in southern Idaho, (2) that a DuPont expert improperly used a generic Kd value in his PRZM model, and (3) that alkaline soils have certain effects on the behavior of Oust.

Dr. Dyer is a professor of weed physiology at Montana State University. He has extensive experience and study in plant responses to herbicides and herbicide behavior in the environment. In his report, he renders opinions about how Oust moved through the growers' fields, how Oust was absorbed by the roots of plants, and how long it persisted in the soil. He reviews both scientific literature and DuPont's internal studies, and concludes that DuPont should have been aware of Oust's risks to crops and its long persistence in the soil. He further concludes that DuPont had failed to do specific testing of Oust in the soil of southern Idaho.

DuPont does not challenge Dr. Dyer's qualifications to render these opinions. DuPont does challenge, however, a statement Dr. Dyer makes at the end of his report where he charges that because the risks of Oust were well-known, "[i]t was highly irresponsible, and a violation of its stewardship obligations, for

**Memorandum Decision and Order – Page 11**

DuPont to obtain the 1997 24(c) label, which specifically recommended Oust use . . . 'on fire-damaged land.'" *See Report of Dr. Dyer* at p. 18.

DuPont does not challenge, however, Dr. Dyer's detailed study of DuPont's own scientific studies of Oust, and its lack of studies in southern Idaho. It also does not challenge his expertise on herbicides in general and Oust in particular. Thus, Dr. Dyer has an unchallenged expertise in (1) the risks of Oust to crops, (2) the state of knowledge of those risks in the scientific community generally, and (3) the state of knowledge within DuPont of those risks given its own studies in other areas and its lack of study in southern Idaho. Given this unchallenged foundation, Dr. Dyer was qualified to render an opinion on whether DuPont was responsible in pursuing a 24(c) label for use of Oust on fire damaged lands in southern Idaho.

DuPont also objects to Dr. Dyer's rebuttal report, challenging Dupont's expert Dr. Weber. Dr. Weber used a model known as PRZM to render opinions about the depth of water and Oust infiltration at the BLM application sites. Dr. Dyer specifically criticized Dr. Weber's use of one input into the model, a generic "Kd value" that measures the rate at which Oust moves between the soil and water in the subsurface. Dr. Dyer explained that Dr. Weber used a generic Kd value rather than a formula that Dr. Weber had developed himself for determining the value from site-specific parameters. Dr. Dyer pointed out that this made a big

**Memorandum Decision and Order – Page 12**

difference in the final Kd value that was inputted into the model. *See Dr. Dyer Report in Rebuttal to Dr. Weber.*

DuPont objects to this testimony in Dr. Dyer's rebuttal report on the ground that Dr. Dyer admitted in his deposition that he is not an expert in the PRZM model. But that objection misses the mark. Dr. Dyer is not challenging the model itself; he is challenging a single input upon which he has expertise. In his initial report, Dr. Dyer discusses Kd values at length, and DuPont makes no claim that he lacks expertise to evaluate Kd values. *See Report of Dr. Dyer* at p. 5. The Court finds this objection unpersuasive.

Finally, DuPont claims that Dr. Dyer admitted in his deposition that he is not an expert in alkaline soils. This is taken from a single sentence answer at the deposition, and it is not clear from the short question what Dr. Dyer meant by his answer. Importantly, Dr. Dyer never retracts or casts doubt on the lengthy analysis that he provided of the behavior of Oust in alkaline soils in his initial report. Dr. Dyer obviously has significant experience with herbicide behavior in all sorts of soils. Given this, the Court cannot find that a single ambiguous answer in a deposition would result in exclusion of all his testimony regarding alkaline soils.

**Dr. Terry Miller & Dr. Gary Franc**

DuPont seeks to exclude a portion of the testimony of Drs. Miller and Franc

**Memorandum Decision and Order – Page 13**

where they discuss Oust marketing and labeling.  Specifically, DuPont seeks to exclude Dr. Miller's testimony regarding the reasons, or lack thereof, for DuPont's decision to change the Oust label in 1995.  The Court agrees.  Dr. Miller is a crop expert with no expertise in herbicide labeling.

Dr. Franc testified regarding his personal experiences with Oust in Colorado potato fields, an experience that he says was very similar to that here.  From that, he concludes that the Oust label should have contained more specific warnings about its effect on specific sensitive crops like potatoes.  DuPont seeks to exclude this last portion of Dr. Franc's testimony, about what the Oust label should have included.  The Court agrees.  Dr. Franc has no labeling expertise, and the motion shall be granted to that extent.  The Court expresses no opinion on Dr. Franc's testimony regarding his experiences with the Colorado potato damage as DuPont's motion was limited to objecting only to his testimony about the Oust label.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to exclude (Docket No. 751) is GRANTED IN PART AND DENIED IN PART.  It is granted in part to the extent it seeks to exclude:

(1)     Testimony from Dr. Terry Miller regarding the reasons that DuPont

**Memorandum Decision and Order – Page 14**

changed the label in 1995;

(2)   Testimony from Dr. Gary Franc about what the Oust label should have included;

(3)   Testimony from Dr. John Gallian that Dupont never had an intent to help growers but was merely establishing its legal position;

(4)   Testimony from Dr. Russell Qualls that DuPont's recommendation to use Oust in this region represents poor advice, and any testimony regarding the wording of the labels and the impact of the 2008 Oust re-registration label.

The motion is denied in all other respects.

DATED:  **April 9, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 15**