IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TIMM ADAMS, et al, | ) ) ) | Civ. No. 03-0049-E-BLW |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, et al, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it various motions regarding plaintiffs' expert Cornelius Hofman, and issues that arose during his testimony.  In addition, the Court has before it DuPont's motion to exclude the testimony of Dr. Barry Goodwin.  The Court's resolution of these issues is set forth below.

## ANALYSIS

**Mitigation Costs & Non-Analyzed Crops**

Mr. Hofman is an economist who will testify about plaintiffs' damages. DuPont seeks to exclude his testimony regarding losses that he did not independently analyze but instead accepted on the basis of the growers' own

**Memorandum Decision & Order – page 1**

information and calculations.  More specifically, DuPont seeks to exclude Mr.

Hofman's testimony regarding (1) certain mitigation costs incurred by the growers,

and (2) certain crop losses.

For example, Mr. Hofman would generally calculate expected yields by

looking at historical production records, among other factors.  But plaintiff Gary

Hansen did not have production histories, and so Mr. Hofman had to rely entirely

on Hansen's statements regarding projected yield.  *See Transcript for May 27,*

*2009,* at pp. 3858-59.  This was true for two other crops – the Funks' onion crop

and the Jentzsch-Kearly wheat crop.  For these specific crops, Mr. Hofman had to

rely entirely on the grower's representations for projected yields.  DuPont seeks to

exclude this testimony on the ground that Mr. Hofman is simply reciting

information provided to him by the growers rather than providing any expert

analysis, and hence his testimony does not fit within Rule 702.

The Court disagrees.  Rule 703 allows an expert to rely on information

provided by others if the information is the type that experts in this field typically

rely upon.  There is no testimony that economists do not rely on such information

in calculating expected yields.  Indeed, the growers themselves are competent to

testify under Rule 701 about projected yields.  *See Advisory Committee Notes To*

*2000 Amendments* (a business owner may testify to the "projected profits" of the

**Memorandum Decision & Order – page 2**

business based on the "particularized knowledge that the witness has by virtue of his or her position in the business"). Thus, Mr. Hofman's reliance on such evidence cannot be deemed unreasonable.

**Order of Proceeding**

DuPont accurately points out, however, that at the time Mr. Hofman took the stand, plaintiffs had not put on any evidence from the growers regarding their mitigation costs and crop losses. While Mr. Hofman can rely on what the growers told him, he cannot establish these foundational facts because he lacks personal knowledge. *See Rule 602.* By proceeding in this manner, the plaintiffs will elicit testimony from Mr. Hofman on losses that have not yet been proven, and may never be proven.

Rule 611(a) gives the Court authority to preclude plaintiffs from proceeding in this manner, and to require them to lay a foundation for the losses before calling Mr. Hofman. The Court gave serious consideration to this option. However, the Rules of Evidence specifically provide for evidence to be conditionally admitted, subject to the later introduction of facts "sufficient to support a finding of the fulfillment of the condition." *See Rule 104(b); see e.g., United States v. Loya*, 807 F.2d 1483, 1490 (9th Cir.1987) (allowing district court to provisionally admit co-conspirator's statement subject to a motion to strike if defendant's connection to

**Memorandum Decision & Order – page 3**

conspiracy is not established).

The Court finds that in this case, any prejudice created by calling Mr. Hofman "out of order" will be alleviated by (1) jury instructions, and (2) striking any testimony for which no foundation is ultimately offered by plaintiffs.   More specifically, the Court will instruct the jury – at the time Mr. Hofman is testifying – that he has not independently assessed certain costs or losses and is depending entirely on material provided by the growers, and that if the growers' later testimony is not persuasive on that issue, the jury should disregard Mr. Hofman's testimony on that particular matter.  In addition, if the foundation is never laid by plaintiffs, the Court will instruct the jury at the close of plaintiffs' case that all of Mr. Hofman's testimony relying on the unsupported losses will be struck.

The Court will therefore proceed in this manner pursuant to Rules 104(b), and further finds, based on the discussion above, that Rule 403 does not operate to prevent plaintiffs from proceeding in this fashion.

## Effect of Granting BLM's Motion to Clarify

In an earlier decision, the Court granted the BLM's motion to exclude from Mr. Hofman's testimony any evidence of (1) damage to 1,500 acres, and (2) mitigation expenses of $848,899.  More recently, the Court amended that decision to clarify that (1) $278,631 in mitigation claims from the Jentzsch-Kearly Group is

**Memorandum Decision & Order – page 4**

excludable for the same reasons as set forth in the Court's earlier decision, (2) $37,000 representing a claim by the Funk Group for land rental costs should be added back in as the BLM withdrew its objection to that amount, and (3) the precise acreage excluded is 1,651.4 acres.

This decision was issued pursuant to Rule 37 because plaintiffs did not put defendants on adequate notice of these claims during discovery. The Court intended that these items would be removed from Mr. Hofman's damage calculations, and that the resulting damages would be accordingly reduced.

That did not happen, however, with regard to the loss acres – Mr. Hofman concluded that their withdrawal resulted only in an insignificant reduction in damages, and so his bottom-line damage numbers did not change. To reach that result, Mr. Hofman concluded that "the most economically reasonable [assumption] is the one to say actual production on these fields equaled expected production." *See Transcript of May 27, 2009,* at p. 3805. However, these fields had been included as loss fields prior to the Court's exclusion order, and hence the Court found that while economic theory might support Mr. Hofman's analysis, reality did not. The Court found that the soundest assumption – give the Court's exclusion order – was that the excluded fields were damaged fields. *Id.* at 3806-07.

**Memorandum Decision & Order – page 5**

To remedy the disconnect between Mr. Hofman's model that calculated damages on the basis of crops, and the Court's exclusion order that withdrew acres from the loss calculation, the Court stated that it would reduce whatever damages the jury awarded by the percentage of excluded acres to total acres. *Id*. at pp. 3834-35. Plaintiffs responded by suggesting that Mr. Hofman recalculate his figures, assuming that the excluded fields were damaged fields, and applying the percentage reduction discussed by the Court.

To give Mr. Hofman time to make those recalculations, the Court recessed for about an hour. Mr. Hofman completed his recalculations and showed them to defense counsel before proceeding again with the jury. The next day was not a trial day, giving the defendants time to prepare for cross-examination the following day.

Mr. Hofman's recalculations reduced damages in accord with the Court's intent in its order of exclusion. *See Memorandum Decision (docket no. 893)*. The defendants retain their right to cross examine Mr. Hofman on his recalculations when trial resumes.

**Prejudgment Interest**

DuPont seeks to exclude evidence of prejudgment interest, arguing that plaintiffs' damage lack the certainty necessary for such an award under Idaho Code

**Memorandum Decision & Order – page 6**

§ 24-22-104.  DuPont also seeks reconsideration of the Court's earlier decision where the Court rejected DuPont's assertion that the Court, and not a jury, must resolve plaintiffs' claim for lost opportunity costs.

The Court first finds that plaintiffs' claim for lost opportunity cost is not a claim for prejudgment interest governed by Idaho Code § 24-22-104.  In *Spreader Specialists, Inc. v. Monroc, Inc.,* 752 P.2d 617, 623 (Id.Ct.App. 1987), *overruled on other grounds, Walton, Inc. v. Jensen*, 979 P.2d 118 (Id.Ct.App. 1999), the court found that prejudgment interest was the "money which the injured party hypothetically could have earned through investment if the injury-causing party had timely paid compensation for the harm."  *Spreader* went on to hold that prejudgment interest did not include "interest charges incurred on a loan obtained in good faith, as part of a reasonable course of action to mitigate losses."  *Id*. at 624.  Such interest "may be recovered as an item of consequential damages."  *Id.*

The lost opportunity cost sought by plaintiffs is the interest cost of lines of credit that each plaintiff had to pay due to the losses incurred allegedly due to Oust damage to their crops.  *See Transcript of May 27, 2009,* at pp. 3891-94.  Mr. Hofman examined the lines of credit each plaintiff took out, and calculated the interest rate the plaintiffs actually paid from their bank records.  *Id*. at pp. 3894-

**Memorandum Decision & Order – page 7**

95.[1]

Given this testimony, the plaintiffs' claims for lost opportunity costs do not constitute prejudgment interest governed by Idaho Code § 24-22-104. Because the plaintiffs are pursuing lost opportunity costs, they may not also pursue prejudgment interest. Moreover, this is not an appropriate case for the award of prejudgment interest as the amount of liability was not liquidated or readily capable of ascertainment by mathematical process or by a legal or recognized standard. *See Opportunity, LLC v. Osseward*, 38 P.3d 1258, 1265-66 (Id.Sup.Ct. 2002).

Thus, the Court will grant that portion of DuPont's motion seeking to exclude any evidence of prejudgment interest. The Court will deny the motion to the extent it seeks (1) to exclude evidence of plaintiffs' claims for lost opportunity costs, and (2) reconsideration of the Court's earlier decision that the jury (rather than the Court) will resolve the lost opportunity cost claim.

**<u>Motion to Exclude Goodwin</u>**

---

[1] In its earlier motion, DuPont cited deposition testimony of plaintiffs' expert Barry Goodwin that defined lost opportunity cost as the hypothetical investment profits the plaintiffs could have earned if defendants had immediately reimbursed plaintiffs for their losses. This testimony appears to fall within the definition of prejudgment interest as set forth by the *Spreader* case, discussed above. However, plaintiffs are no longer proceeding under this theory, and thus the admissibility of such testimony by Goodwin is a moot issue. If plaintiffs attempt to introduce such testimony, DuPont retains the right to object.

**Memorandum Decision & Order – page 8**

DuPont seeks to exclude certain testimony of plaintiffs' expert Dr. Barry Goodwin. Specifically, DuPont seeks to exclude his testimony concerning the Risk Management Agency (RMA) contained in the Rebuttal Report filed to rebut the opinions of DuPont experts Capps and Nixon.

Dr. Goodwin has a Ph.D. in economics and currently is the William Neal Reynolds Distinguished Professor at North Carolina State. Besides teaching, Dr. Goodwin has worked as a consultant to the RMA on issues pertaining to the design and rating of crop insurance policies. He has written, or co-written, 27 articles on crop insurance, including a number on crop yields and the use of statistical models on crop yields.

His Rebuttal Report contains a rebuttal to the opinions of DuPont experts Capps and Nixon who presented an econometric analysis of crop insurance records taken from the RMA's Data Acceptance System (DAS). The RMA is an agency within the Department of Agriculture that oversees the operation of the Federal Crop Insurance Corporation, a wholly-owned government corporation offering crop insurance to farmers. Capps and Nixon had used the results of their econometric analysis to provide estimates of the damages associated with Oust exposure.

Dr. Goodwin's Rebuttal Report contains his analysis of the opinions of

**Memorandum Decision & Order – page 9**

Capps and Nixon.  Dr. Goodwin concludes that while RMA's DAS can be a valuable source of crop yield information in some situations, the analysis of Capps and Nixon is flawed and "reflects a fundamental misunderstanding of the data and crop insurance program."  *See Rebuttal Report* at p. 2.

DuPont argues that Dr. Goodwin's "limited insurance work with one arm of the RMA does not qualify him as an expert at interpreting and questioning the content data of the RMA."  *See DuPont Reply Brief* at p. 6.  Yet Dr. Goodwin's list of publications – the accuracy of which is not questioned – displays extensive work with crop insurance data, and his consulting work with the RMA signifies an understanding of the agency.  Dr. Goodwin states in his Rebuttal Report that he has had "extensive experience in working" with RMA DAS data.  *See Rebuttal Report* at p. 12.  This experience qualifies Dr. Goodwin to render opinions on the use of RMA data by Capps and Nixon.

DuPont argues, however, that in deposition testimony, Dr. Goodwin stated that he would "defer to the RMA professionals," and thus lacks expertise.  *See DuPont Reply Brief* at p. 6.  For example, in one exchange, DuPont's counsel asked Dr. Goodwin whether he considered himself an expert in the RMA's audit and verification procedures.  Dr. Goodwin answered that "I know a fair bit about it. But it has not been a major part of my research programs or my contracting work."

**Memorandum Decision & Order – page 10**

*See Goodwin Deposition* at p. 184.  Counsel then asks whether Dr. Goodwin would "defer to the RMA in terms of explaining what those procedures are?"  *Id.*  Dr. Goodwin answers, "[a]bsolutely I would, yes."  *Id.*

This exchange does not conclusively establish that Dr. Goodwin lacks expertise in the audit and verification procedures of the RMA.  What did Dr. Goodwin mean by saying he would defer to the RMA?  That he and the agency were both experts, but that the agency could best explain its procedures?  We do not know what he meant because DuPont's counsel did not follow up with questions that would define his meaning.  Answers to vague questions that are not pursued cannot form the basis for a conclusive ruling as a matter of law.

For these reasons, the Court will deny the motion as to Dr. Goodwin.

## ORDER

In accordance with the Memorandum Decision filed above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to exclude Mr.  Hofman and Dr. Goodwin (docket no. 750) is DENIED.

IT IS FURTHER ORDERED, that DuPont's motion to exclude evidence of prejudgment interest (docket no. 1124) is GRANTED IN PART AND DENIED IN PART.  The Court will grant the motion to the extent it seeks to exclude evidence of prejudgment interest.  The Court will deny the motion (1) to the extent it seeks a

**Memorandum Decision & Order – page 11**

ruling that plaintiffs' claims for lost opportunity costs are equivalent to claims for prejudgment interest, (2) to the extent it seeks a ruling to exclude evidence of plaintiffs' claims for lost opportunity costs, and (2) to the extent it seeks reconsideration of the Court's earlier decision that the jury (rather than the Court) will resolve the lost opportunity cost claim.



DATED:  **May 29, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 12**