IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al, | Civ. No. 03-0049-E-BLW |
| Plaintiffs, | |
| v. | MEMORANDUM DECISION AND ORDER REGARDING RULE 50(a) AS TO FRAUD. |
| UNITED STATES OF AMERICA, et al, | |
| Defendants. | |

## INTRODUCTION

The Court has before it DuPont's Rule 50(a) motion seeking judgment on plaintiffs' fraud claim. For the reasons expressed below, the Court will grant the motion.

## STANDARD OF REVIEW

**Rule 50 Standard**

The court may grant a motion for judgment as a matter of law against the non-moving party only if "there is no legally sufficient evidentiary basis for a

**Memorandum Decision & Order – page 1**

reasonable jury to find for that party on that issue." *See Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006). "This necessarily means that the court must draw all reasonable evidentiary inferences in favor of the non-moving party." *Id*. In ruling on the motion, "the court . . . may not make credibility determinations or weigh the evidence." *See City Solutions, Inc. v. Clear Channel Communications, Inc*., 365 F.3d 835, 841 (9th Cir. 2004).

### Fraud

Fraud requires plaintiffs to prove by clear and convincing evidence each of the following elements: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) actual reliance by the hearer; (8) which reliance is justifiable; and (9) resultant injury to the hearer. *See Partout v. Harper*, 183 P.3d 771, 776 (Id.Sup.Ct. 2008)). Each of these elements must be proved by clear and convincing evidence. *See Country Cove Dev., Inc. v. May*, 150 P.2d 288 (Id.Sup.Ct. 2006).

### Fraud Claim

Plaintiffs explained their fraud claim as follows: "DuPont's message to the growers led them to believe that Oust would not persist in the soil beyond the 2001

**Memorandum Decision & Order – page 2**

growing season, through such statements as 'farm as normal,' 'we're here to help,' 'we've got three teams of scientists working on this issue 24/7,' and 'we'll take and conduct our own soil samples and report the results back to you.'" *See Plaintiffs Brief* at p. 4.  The immediate problem with this list of statements is that only one could reasonably have misled growers into believing Oust would not persist:  The statement "farm as normal" implies that Oust will not persist.  However, the other statements say absolutely nothing about persistence.  That is a critical failure because the growers base their fraud claim on being misled into what they refer to as "re-cropping" – that is, planting the same crops in the same ground the very next season, ground that turned out to be still toxic with Oust.  No grower could have been misled into re-cropping – and no grower testified that he was so misled – by statements from DuPont that it would "help" or that it had a "team of scientists" working on the problem or that it would share soil sample results.

While a promise to share soil samples – even if knowingly false – implies nothing about Oust persistence, it might constitute fraud for another reason.  If growers stood ready to take their own samples but delayed doing so in reliance on DuPont's knowingly false promise until it became too late, forcing them to plant in un-sampled soil that turned out to be toxic, the promise might rise to the level of

**Memorandum Decision & Order – page 3**

fraud (depending on the presence of other elements of fraud).  However, plaintiffs cite no such testimony from any of the bellwethers.  There is no evidence that any bellwether stood ready to take his own soil sample but delayed doing so until the "point of no return" due to DuPont's promise.

Thus, plaintiffs' fraud claim hangs on a single premise – that DuPont told the bellwether plaintiffs to farm as normal, or words to that effect.  Plaintiffs allege that "[e]ach of the Bellwether Plaintiffs undisputedly relied upon DuPont's false statements, which were a substantial factor in their decisions to plant as normal."  *See Plaintiffs' Brief (docket no. 1284)* at p. 18.

That statement does not hold up to scrutiny.  The plaintiffs cite no evidence that the Clingers – Jerome and his wife Tina – received advice from anyone at DuPont, or anyone at all, that they should "plant as normal," or words to that effect.  The same is true of bellwether Lance Funk; plaintiffs cite no evidence that he was told by anyone to "plant as normal," or words to that effect.

Bellwether Gary Hansen did testify at one point that he recalled being advised to plant as normal, but an objection to the testimony was sustained and the answer stricken because it was given on redirect and was beyond the scope of cross examination.  *See Transcript* at p. 5957-58.  Plaintiffs cite to no evidence that Hansen relied on any advice to "plant as normal."

**Memorandum Decision & Order – page 4**

Plaintiffs argue that Hansen's agronomist, Kurt Harman, testified that he heard DuPont representatives advise growers "that there was no re-cropping issue, to 'just go ahead and plant as your normally would.'" *Id.* at pp. 498-500. Plaintiffs claim that Harman must have relayed this advice to Hansen. But plaintiffs cite no testimony from Harman that he communicated this advice to Hansen, and no testimony from Hansen that he heard this advice from Harman.

Plaintiffs also assert that grower representative Dan Schaeffer heard DuPont say that growers should plant as normal. *Id.* at pp. 4339-40 (Schaeffer recalls DuPont representatives stating that the growers should "farm as normal and water" because "irrigation and water would help mitigate our problem"). But once again, plaintiffs cite no evidence that Schaeffer passed this advice to Hansen or any other bellwether plaintiff.

Plaintiffs argue that Amalgamated fieldman John Schorr "told Gary Hansen about DuPont's promises." *See Plaintiff's Brief (docket no. 1284)* at p. 22, n. 2. Schorr did testify that he "would have visited with Mr. Hansen about some of these promises that were made by DuPont." *See Transcript* at p. 760. Because the testimony was given during cross-examination by DuPont, Schorr's answer was not pursued by DuPont's counsel, and it was not addressed on re-direct. There is thus no evidence as to what "promises" were communicated to Hansen. But it is

**Memorandum Decision & Order – page 5**

clear that the single representation that now constitutes the fraud claim – the plant-as-normal claim – was not communicated to Hansen by Schorr:

| | |
|---|---|
| Q. [by counsel] | Were there any representations by any DuPont representatives as to re-cropping, that you recall? |
| A. [by Schorr] | *We did not receive information on re-cropping.* |
| Q. | Did you ask for information on re-cropping? |
| A. | *This was one of the important questions we had, is how long it persists in the soil, whether we could – and what type of crops could be replanted back in the soil.* |
| Q. | And what did the DuPont representatives tell you when you asked them about that? |
| A. | *That type of information was forthcoming.* |
| Q. | And did it ever come forth? |
| A. | *No, it didn't* |

*Id.* at p. 706.  Plaintiffs cite no testimony from Schorr that DuPont ever advised him to plant as normal, or that he passed such advice along to Hansen.  The exchange quoted above shows that DuPont was in fact not making any representations to Schorr on re-cropping issues.

      Plaintiffs argue that they should not be required to link the testimony of

**Memorandum Decision & Order – page 6**

Harman, Schorr, or Schaeffer to any particular bellwether plaintiff. Plaintiffs allege that it is enough that "DuPont made misrepresentations, and the bellwether plaintiffs relied upon these representations." *See Plaintiffs' Brief (docket no. 1284)* at p. 24. But even under this standard the claim fails as to the Clingers, Hansen and Funk because these plaintiffs have not shown that they relied upon the advice *of anyone* to plant as normal.

The only bellwether plaintiff who testified that he relied on the advice to plant as normal was Rodney Jentzsch. He was asked whether he "remember[ed] any statements made by DuPont at either of these meetings [in July of 2001]." *See Transcript* at p. 5090. He answered, "the only thing I ever remember getting out of it was 'just keep continuing on.' 'Just keep your normal rotation.' 'Keep going on as normal.' That is what I remember." *Id*. In response to the next question asking whether he relied in 2002 on that representation, he replied, "[y]es. We just kept planting our normal crop rotation."

Jentzsch's fraud claim relates entirely to post-2001 crops – trial testimony shows that the 2001 crops were already in the field when DuPont began making its representations. *See Transcript* at p. 500. Because Jentzsch has no claim for 2003 damages, *see Plaintiffs' Brief (docket no. 1284)* at p. 21, the fraud claim would relate solely to his claims for crop damage in 2002 and 2004.

**Memorandum Decision & Order – page 7**

By 2002, Jentzsch knew he had Oust in his fields. *See Transcript* at p. 5459 ("we discovered the Oust in 2001"). Prior to planting the 2002 crop, Jentzsch "noticed the fields down south weren't affected as much." *Id*. at p. 5107. He knew that he "was getting killed on the quality so bad on my potatoes." *Id.* He "became desperate," and made a "concerted effort to move out of the area." *Id*. To that end, in 2002 he rented all the fields available to him south of his operation. *Id*. at 5459. He could only move part of his crops because it was "impossible" to move all crops south, *id*. at p. 5191, due to "rotational problems." *Id*. at p. 5192. In addition to renting all available fields to the south for 2002 crops, he rotated crops in his existing fields "if we could, and when we could, to mitigate the effects, to have the least impact." *Id*. at 5190.

Jentzsch took every opportunity to avoid planting as normal in 2002. In the face of this testimony, no reasonable juror could find by clear and convincing evidence that Jentzsch relied on DuPont's advice to plant as normal, despite his testimony that he did rely on that advice.

Moreover, there is no evidence that Jentzsch was damaged by DuPont's advice to plant as normal. He did not testify that DuPont's advice lured him into forgoing available opportunities. Without any evidence that Jentzsch could have done anything different if not told to plant as normal, the jury would be left

**Memorandum Decision & Order – page 8**

entirely to speculate in determining whether Jentzsch had been damaged by DuPont's advice. Thus, no reasonable juror could find by clear and convincing evidence that Jentzsch had been damaged by the alleged fraud.

For all of these reasons, the Court will grant DuPont's motion under Rule 50 with regard to the fraud claim.

**Preclusive Effect**

The Court finds that this decision can have no preclusive effect on the remaining plaintiffs. The evidence does not permit the Court to make findings that would apply to any plaintiffs beyond the four bellwethers. Accordingly, the fraud claims of any non-bellwether plaintiffs are wholly unaffected by the Court's decision.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for judgment as a matter of law under Rule 50(a) for post-application based causes of action (docket no. 1248) is GRANTED IN PART AND RESERVED IN PART. It is granted to the extent it seeks a motion for judgment as a matter of law dismissing the fraud claim as to the four bellwether plaintiffs. It is reserved in all other respects.

**Memorandum Decision & Order – page 9**



DATED:  **July 14, 2009**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 10**