IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TIMM ADAMS, et al., | ) ) ) | Case No. CV-03-49-E-BLW |
| Plaintiffs, | ) ) | **MEMORANDUM DECISION AND ORDER REGARDING COLLATERAL SOURCE ISSUES** |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, et al., | ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

The Court has before it the briefs of all parties discussing whether certain payments made to plaintiffs should be treated as collateral sources that reduce the judgment. The Court's analysis is set forth below.

## ANALYSIS

**1.  Legislated Payments**

A portion of the payments received by plaintiffs for their crop losses were made under three programs passed by Congress: (1) 2000 Quality Loss Program; (2) 2000 Apple and Potato Quality Loss Program; and (3) 2002 Crop Disaster Program. *See Declaration of Karmen.* The programs paid for loss of crop

production and/or quality during certain years due to natural disasters, damaging weather, or related events. Each program was funded by the Commodity Credit Corporation (CCC), a federally owned corporation through which the federal government provides income, price support, and disaster assistance to farmers. *Id*. The CCC is funded by the U.S. Treasury. *Id*. These programs pay farmers from unfunded general revenues of the United States; they are not special funds – like Social Security – where beneficiaries pay into the program nor are they insurance funds where beneficiaries pay premiums.

Testimony at trial showed that certain plaintiffs made claims under these programs for some of the crops on which they sought recovery in this trial. The plaintiffs testified that they initially attributed the crop damage to factors like heat, frost or hail – all factors that would trigger payment under the three Programs – but later discovered that Oust had made the crops more susceptible to those factors, and hence sought recovery in this lawsuit for those damages. There are four crops for which plaintiffs not only received Program payments but also recovered a damage award in this lawsuit.

Under the FTCA, payments made to plaintiffs by the United States as compensation for the same injuries sued upon are to be deducted from the judgment against the United States when those payments come from the

**Memorandum Decision and Order re Collateral Source Issues – Page 2**

Government's unfunded general revenues. *See Swanson v. United States*, 557 F.Supp. 1041 (D.Id. 1983); *Mays v. United States*, 806 F.2d 976 (10th Cir. 1986). That is the case here. Certain payments made under the three Programs came from the unfunded general revenues of the United States, and compensated plaintiffs for crop injuries that they attributed to Oust in this trial.

Plaintiffs concede this point as to the recovery obtained by the Jentzsch-Kearl Grower Group on their 2001 sugar beets, and the Hansen Grower Group on their 2002 potatoes. Plaintiffs argue, however, that this offset should go entirely to the United States and not be shared by DuPont. The Court agrees. The payments from the three Programs cannot be treated as standard collateral source payments that reduce the total judgment under Idaho Code § 6-1606 for two intertwined reasons. First, the payments are not "collateral" in nature – they are payments directly from the Government. *Mays*, 806 F.2d at 977 ("payments . . . from the general revenues of the United States . . . are not from a source collateral to the United States"). Second, it is unjust to rob the Government of the full benefit of the payments it made without assistance from DuPont. Consequently, the Court finds that the payments made under the three Programs will not reduce the amount owed by DuPont, but will only reduce the amount owed by the Government.

This leaves two crops for which plaintiffs received Program payments that

plaintiffs do not concede were for Oust-related damage. The first of these crops is the 2000 potato crop of the Hansen Grower Group. Plaintiffs made a claim for this crop under the Quality Loss Program and received a payment of $248,310.

Plaintiffs claim that this payment was for rain damage, not Oust damage, and hence cannot be used to reduce the Government's judgment. Yet at trial, Gary Hansen sought recovery for this entire crop on the ground that it was injured by Oust, not rain. *See Transcript* at p. 5664. On cross-examination, when asked why he had listed rain as the cause of the injury in his claim to the Quality Loss Program, he answered that it was not until 2007 that he became aware that Oust had been applied nearby. *Id*. at p. 5813. He testified that "that's why it's important that the judge understands that there is an Oust component to this loss." *Id*. at 5813-14. Ultimately, he did not allocate damage between rain and Oust, but instead claimed that Oust damaged his entire 2000 potato crop. The jury agreed, awarding him $386,737 for lost crop income on this crop.

Plaintiffs' expert Cornelius Hofman states that payment under the Program was "virtually guaranteed to those who applied," and that "regardless of Oust, and whether it damaged Hansen's 2000 potatoes or not, Hansen would have received payment under this program." *See Hofman Affidavit* at ¶ 14. But this is merely an argument that Hansen properly qualified for payment under the Quality Loss

**Memorandum Decision and Order re Collateral Source Issues – Page 4**

Program – it does not address the plain fact that Hansen is receiving a double recovery. Both the Program payment and the jury verdict constitute awards for the loss of quality and production in the 2000 potato crop. Even if Hansen properly qualified for the Program payment, the Government is entitled to an offset in that amount to avoid paying Hansen twice for the same injury to the same crop.

The Court turns next to the final Program payment at issue, a payment under the Quality Loss Program to the Jentzsch-Kearl Grower Group of $47,272 for their 2000 potato crop. Plaintiffs assert that this claim was made because of bruising, not because of Oust-caused or Oust-related damage, and that payment would have been made under this claim even without Oust damage. Once again, the Court disagrees for the same reasons just discussed. At trial, Rodney Jentzsch claimed that his 2000 potato crop was injured by Oust. *See Transcript* at pp. 5082-03. When asked why he had filed a claim on that crop under the Quality Loss Program stating that the crop was damaged by bruising due to heat, Jentzsch testified that "at the time" he believed that to be true, but it was only after harvesting crops in later years that he discovered the injury was due to Oust. *Id*. at pp. 5402-03. Additional testimony was offered that Oust made crops more susceptible to heat injury. *Id*. at p. 5952 (testimony that Oust-caused root damage disrupts water uptake and appears as heat injury).

**Memorandum Decision and Order re Collateral Source Issues – Page 5**

The bottom line is that the Program payment to the Jentzsch-Kearl Grower Group was for the same crop damage that it sought to recover – and did recover – in this case. Hence the Government is entitled to an offset for that Program payment.[1] Once again, the Court finds that only the Government, and not DuPont, is entitled to that offset, for the reasons expressed above.

Because the Government is entitled to an offset, the plaintiffs' debt-based costs must be reduced. Plaintiffs have recognized this, and calculated the reduction in the jury award for debt-based costs for the two Program payments that they conceded were offsets. The Court will add those sums to the offset. In addition, the Court will direct plaintiffs to provide the same calculations for the other two Program payment offsets that the Court has found over plaintiffs' objections. All the offset figures will be summarized at the end of this decision.

**2.     Federal Crop Insurance Payments**

The plaintiffs received federal crop insurance payments for some of the same crops on which they recovered damages in this trial. The defendants claim an offset in those amounts.

---

[1] Plaintiffs argue that the Program payment includes payment for the Miller Field, which the Court excluded and for which the plaintiffs received no jury award. *See Hofman Affidavit* at ¶ 18. The Government recognized this and so deducted the sum of $4,498 from that Program payment to recognize the exclusion of that field and reduce the offset accordingly. The Court finds that this resolves the issue.

**Memorandum Decision and Order re Collateral Source Issues – Page 6**

The plaintiffs received payments under the federal Multiple Peril Corp Insurance (MPCI). The MPCI policies cover "unavoidable loss . . . due to a naturally occurring event." 7 C.F.R. § 457.8. The Federal Crop Insurance Corporation (FCIC) is authorized to carry out the MPCI program, and is capitalized by the Department of Treasury. 7 U.S.C. § 1504. The Risk Management Agency (RMA) acts on behalf of the FCIC to administer the MPCI program. *See Paul Declaration* at ¶ 2.

The regulations give the Government the right to an offset when the FCIC has paid an indemnity on a policy to an insured grower, and the grower later recovers from another compensation for that same loss. 7 C.F.R. § 457.8(30). State laws affecting MPCI insurance agreements are preempted. 7 C.F.R. § 400.352(a). The Government subsidizes the premiums paid by the growers and provides the fund for the indemnity to be paid. 7 U.S.C. § 1504, 1508.

Plaintiffs made various claims under their MPCI policies, asserting that their crops were damaged by natural disasters such as hail, heat, frost, and hollow heart. Later, in this lawsuit, they sought recovery for the same injuries, claiming that they did not discovery until later that the symptoms that appeared as heat or frost damage were actually caused by Oust.

For the reasons expressed above, the Court finds that the plaintiffs have

received a double recovery when they receive an insurance payment and a jury award for the same damage to the same crop. Plaintiffs argue, however, that they are subject to subrogation claims from the insurance companies that made the payments under the policies. This could cause the very opposite of a double recovery – a double deduction – if plaintiffs are hit not only with an offset in this case but also a subrogation claim later.

The Court agrees that this would be manifestly unfair. However, the indemnities at issue here were paid by the Government under the MPCI program, and if the Government is awarded an offset here, that award satisfies any subrogation right up to the amount of the offset. Plaintiffs cannot suffer a double deduction, and the Court would use its authority to protect plaintiffs from any such result. Obviously, the situation is much different when a private insurer has made the payment, and the Court discusses that fact scenario below. But under the MPCI program where the Government pays, the Court will protect plaintiffs from subrogation.

The parties also argue over the amount of credit plaintiffs should get for the premiums they paid for the insurance. The Government argues that the credit should only include premiums on the crop units that were damaged by Oust, while plaintiffs seek credit for the entire premium they paid to ensure the crop.

In support of its argument, the Government submits the Declaration of Dave Paul, the Director of the Spokane Regional Office of the RMA. *See Paul Declaration* at ¶ 1. Paul states that MPCI policies are written crop-by-crop and county-by-county. *See Paul Declaration* at ¶ 8. "Producers may choose which of their crops to insure, and to insure a crop in one county but not in another, but in insuring a crop they must include all of the insurable acreage of that crop in the county, unless otherwise specified in the policy." *Id*. While the entire crop in the county must be insured, the grower may divide crops into "insurable units." For each unit, a "production guarantee" is calculated (based on historical production for that unit), and the policy pays if actual production falls below the unit's production guarantee. *Id* at ¶ 10. The insurance premiums are calculated on a per-unit basis. *Id.* Obviously, this give growers the flexibility to protect high-yielding units with high guarantees, and to save premiums on low-yielding units by setting lower guarantees.

The Government points out that if the plaintiffs receive credit for the full premium they paid for a crop, they will, in some instances, recoup premiums on units for which no indemnity was paid. The Government proposes that plaintiffs only get credit for the premiums they paid on units for which an indemnity was paid.

**Memorandum Decision and Order re Collateral Source Issues – Page 9**

The Government's proposal would be persuasive if plaintiffs were allowed to pick and choose which crop units – within their overall crop – they wanted to insure. If they picked certain units to insure, and no indemnity was ultimately paid on those units, the plaintiffs should not be entitled to a credit for the premiums on those units. But here they had no such choice – they were required to insure the entire crop. For that reason, the Court finds that plaintiffs are entitled to a credit for the entire premium paid for that particular crop.

Plaintiffs argue that any offset constitutes a double deduction because Hofman already reduced damages by ordinary weather events such as damage due to rain and heat. The Court disagrees. The plaintiffs sought insurance payments for weather events such as rain and heat, and received those payments. Plaintiffs later discovered that the rain and heat damage was caused by Oust, and they received payment (in certain cases) for the same damage to the same crops on which they received insurance payments. That is a double recovery, and entitles the Government to an offset.

For the reasons discussed above, in the section on Congressional Programs, the Court finds that the offset for federal insurance policy payments will also adhere solely to the benefit of the Government and not to DuPont. The Government set up the MPCI program, subsidized the growers' premiums, and

**Memorandum Decision and Order re Collateral Source Issues – Page 10**

provided funds for payment of the indemnities.  It would be unjust to allow DuPont to share in the offset under these circumstances.

3.      **Private Insurance Payment**

The Hansen Grower Group received a payment of $934,348 under a private "revenue protector" insurance policy.  The Court understands that this policy was not an MPCI policy but was instead issued by a private insurer with no connection to the Government.  This payment is thus governed by Idaho Code § 6-1606 that allows an offset for payments from "collateral sources" that exclude "benefits paid which are recoverable under subrogation rights created under Idaho law or by contract."  Here, the private insurance payment is recoverable under Idaho subrogation law, and hence cannot constitute a collateral source for which the Government is entitled to an offset.

3.      **Conclusion**

To summarize the Court's rulings on offsets, the Court provides the following two tables: (1) Offsets under Legislative Programs, and (2) Offsets from Federal Insurance payments.

For each of the following, pursuant to the discussion above, the Court finds that plaintiffs received a jury award at trial for the same damage to the same crop on which they also received a payment from either a Legislative Program or a

Federal Insurance Policy. In the tables below, the column "Net Offset" represents the amount of the double payment received from either the Program or the Insurance Policy.

With regard to the Federal Insurance Program payments, the Court finds that plaintiffs are entitled to a credit for the entire premium they paid for the crop, and the "Net Offset" amounts set forth below are computed accordingly. The column for "Debt-Based Costs" was taken from the computations of plaintiffs' expert Cornelius Hofman. *See Hofman Affidavit*. The column labeled "Total Offset" is simply the sum of the amount in the "Net Offset" column added to the sum in the "Debt-Based Costs" column.

With regard to entries stating "To be Computed," the Court will direct plaintiffs to provide a figure for debt-based costs from which the Court will compute a total offset.

| Offsets Under Legislative Programs | | | |
|---|---|---|---|
| Crop | Net Offset | Debt-Based Cost | Total Offset |

| Offsets Under Legislative Programs | | | |
|---|---|---|---|
| Jentzsch-Kearl 2000 potatoes | $47,272 | To be computed | To be computed |
| Jentzsch-Kearl 2001 Sugar Beets | $88,703 | $57,504 | $146,207 |
| Hansen 2000 Potatoes | $248,310 | To be computed | To be computed |
| Hansen 2002 Potatoes | $176,636 | $94,449 | $271,085 |

| Offsets From Federal Insurance Payments | | | |
|---|---|---|---|
| **Crop** | **Net Offset** | **Debt-Based Cost** | **Total Offset** |
| Funk 2001 Barley | $7,743 | $4,449 | $12,192 |
| Funk 2001 Sugar Beets | $396 | $228 | $624 |
| Funk 2001 Wheat | $5,861 | $3,367 | $9,228 |
| Funk 2002 Potatoes | $24,899 | To be computed | To be computed |
| Funk 2002 Sugar Beets | $10,009 | $4,761 | $14,770 |
| Funk 2002 Wheat | $5,215 | To be computed | To be computed |
| Funk 2003 Wheat | $8,637 | To be computed | To be computed |
| Hansen 2002 Potatoes | 0 | 0 | 0 |
| Hansen 2003 Potatoes | $7,983 | $3,424 | $11,407 |
| Jentzsch-Kearl 2001 Sugar Beets | 0 | 0 | 0 |

| Offsets From Federal Insurance Payments | | | |
|---|---|---|---|
| Jentzsch-Kearl 2002 Sugar Beets | $22,674 | To be computed | To be computed |

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendant United States is entitled to the offsets as set forth in the two tables above.

IT IS FURTHER ORDERED, that plaintiffs shall provide computations for the debt-based costs to fill in the slots in the tables above that contain the words "To be computed."



DATED: **December 8, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge