IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| TIMM ADAMS, et al, | ) ) ) | Civ. No. 03-0049-E-BLW |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | FINDINGS OF FACT & CONCLUSIONS OF LAW |
| UNITED STATES OF AMERICA, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## SUMMARY

In this lawsuit, more than 100 farmers sued the Bureau of Land Management (BLM) and DuPont, claiming that their crops were damaged by a DuPont herbicide used by the BLM to prevent the emergence of cheatgrass after wildfires. The plaintiffs farm land in ten Idaho counties, and claim damage in the years 2000 to 2004 to crops such as potatoes, sugar beets, corn, wheat, barley, alfalfa, and grain.

To deal with the large number of plaintiffs, but recognizing that many shared common issues, the Court adopted a bellwether trial plan in which the claims of a small number of growers would be decided first. To avoid wasteful repetition, the bellwether trial's resolution of some issues, which do not depend on individual

circumstances, will bind all the parties, including plaintiffs who are still awaiting trial.

The Court selected four bellwether plaintiff grower groups for the first trial – two from the Minidoka area (the Hansen and Jentzsch grower groups), and two from the American Falls/Aberdeen area (the Funk and Clinger grower groups). A jury was selected on May 4, 2009, and rendered a verdict on August 24, 2009. The jury found that both the BLM and DuPont were responsible for the bellwether plaintiffs' crop damage. They allocated the responsibility 40% to the BLM and 60% to DuPont, and awarded a total of about $17 million.

However, pursuant to the 7th Amendment and the Federal Tort Claims Act, the Court is the fact finder with respect to claims against BLM. Accordingly, the Court elected to have the Jury render an advisory verdict as to the BLM, to be followed up by the Court's own Findings of Fact and Conclusions of Law based on the Court's independent review of the record. This decision is the result of that review.

To summarize very briefly the Findings of Fact and Conclusions of Law set forth below, the Court finds that the BLM was negligent in applying Oust in 1999 and 2000, and that the BLM's negligence damaged plaintiffs' crops. The Court allocates responsibility 40% to the BLM and 60% to DuPont. Accordingly, the

*Findings of Fact & Conclusions of Law – page 2*

BLM is liable for 40% of the damages suffered by the four plaintiffs.  The Court

finds that the BLM's share of the liability is $6,064,858.[1]

## FINDINGS OF FACT

**Cheatgrass-Wildfire Cycle on BLM Lands**

1.      The Bureau of Land Management ("BLM") manages eleven million acres of

        public lands in Idaho.

2.      On those lands, the BLM manages grazing, recreation, wildlife habit,

        mining, geothermal uses, archaeology, forestry, access to public lands, and

        development of national monuments and parks.

3.      Each year, wildfires burn thousands of acres of BLM land.  *See Transcript at*

        *p. 10660.*

4.      The BLM engages in extensive efforts to repair and rehabilitate burned

        rangelands.

5.      These "fire rehabilitation" efforts share the same goals as the BLM's efforts

_____

[1] In reaching my conclusions in this case, I considered the jury's verdict, but also made my own independent assessment of the evidence.  To avoid being overly influenced by the jury's verdict, I took time while the jury was deliberating to review the verdict form submitted to the jury and make some preliminary determinations as to how I would have answered the questions on the verdict form.  My initial assessment of the comparative fault of the parties matched exactly that of the jury.   My calculation of damages was similar, but not identical, to that of the jury.  This decision reflects those preliminary assessment, as modified after considering the jury's verdict, reading the parties' post-trial submissions, hearing the arguments of counsel and reviewing the trial transcript.

in "fuels management," which is to manage vegetation and promote perennial species, which are more beneficial to habitat, foraging and grazing needs and less prone to wildfire than annual grasses, such as cheatgrass. *See Transcript at pp. 13088–90 (testimony of Andy Payne).*

6.     Vegetation management is a major part of the BLM's duties. Over time, undesirable annual grasses, such as cheatgrass, have increasingly infested areas of rangeland and out-competed desirable perennial species. *See Transcript at pp. 13170 –71 (testimony of Joe Russell); 13091 (testimony of Andy Payne).*

7.     Many of the wildfires that occur on federal lands in Idaho "are fueled by cheatgrass, and they tend to be very large, sometimes catastrophic." *See Transcript at p. 13170.*

8.     Cheatgrass is an annual exotic, non-native plant that grows up early in the spring, dries out very early in the summer, and provides a continuous bed of fuel, which fuels large fires generally. It is also a shallow-rooted species, leading to erosion in areas where it dominates.

9.     The BLM determined that cheatgrass is "not a desirable type of vegetation." *See Transcript at pp. 13170-72.*

10.    In contrast to cheatgrass, "[P]erennial vegetation is the desired plant . . . to

see on the landscape. It was historically what was there. [Perennials] [t]end

to be bunchgrasses, deep-rooted, provide good soil stabilization, provide for

good wildlife habit[at], provide for good diversity overall." *See Transcript*

*at pp. 13170-71.*

11.      In addition, "[p]erennials green up early in the spring, but tend to stay green

longer into the summer period, essentially, shortening [the] fire season. . . .

[T]here's a big difference between burn periods between perennial and

annual vegetation." *See Transcript at p. 13171.*

12.      The problems caused by frequent wildfires led the BLM to look at

vegetation management from the perspective of "fuels management," and to

look for ways to remove cheatgrass and substitute in its place a native

perennial "that stays green" and is more fire-resistant.

13.      The BLM's early efforts to remove cheatgrass were largely unsuccessful.

14.      The BLM's Twin Falls District had, over the years, tried a number of

methods of combating cheatgrass, including prescribed burns, plowing,

re-seeding and seed drilling.  The BLM's Andy Payne explained that such

methods had "maybe a 60 percent failure rate," because they typically did

not eliminate the cheatgrass.  *See Transcript at pp. 13090-91.*

15.      The BLM also tried to kill cheatgrass with the herbicide Roundup, which,

according to Payne, could be "very good one year and not at all one year." *See Transcript at pp. 13091-92.*

16.   Roundup is, according to Joe Russell of the BLM, a "postemergent-type herbicide" that must be sprayed on "green-growing vegetation in order for [it] to actively kill that plant.  Once it hits the soil, it pretty much is inactive . . . ."  *See Transcript at p. 13185.*

17.   As Payne explained, this chemical property of Roundup rendered it of only "marginal" effectiveness on cheatgrass.  *See Transcript at p. 13092.*

18.   In 1987, BLM ecologist Michael Pellant, who was the "program lead" for the agency's Emergency Fire Rehabilitation Program in Idaho, began to look into herbicides and other techniques the BLM could use "to break up th[e] cheatgrass-wildfire cycle."

19.   One of those herbicides being considered by the BLM was Oust.  *See Transcript at pp. 10103-04.*

**Oust**

20.   Oust, DuPont's trade name for the chemical compound sulfometuron methyl, is a non-crop herbicide that has been manufactured by DuPont and registered under the Federal Insecticide, Fungicide, and Rodenticide Act with the U.S. Environmental Protection Agency ("EPA") since 1982.  *See*

*Exhibit 45893 at p. 6 (DuPont's Response to EPA's Qualitative Assessment of Sulfonylurea Herbicides and Other ALS Inhibitors, January 1995).*

21.    Oust belongs to a family of chemicals called sulfonylureas – or "SU" – that DuPont invented in the 1970s. *See Transcript at p. 960 (testimony of Rik Miller, DuPont's Director of Global Marketing, Crop Protection Products).*

22.    SU chemicals are noted for their high potency at very low use rates compared to other types of herbicides. *See Exhibits 152, 204, 42180.*

23.    Oust is not labeled for any use on agricultural crops. *See Transcript at p. 14861.*

24.    The SUs work by inhibiting amino lactase synthase ("ALS"), and are thus also called ALS inhibitors. *See Exhibit 45893 at p. 19.*

25.    DuPont recommends Oust as effective in controlling a range of weeds, including cheatgrass, in areas with annual rainfall of 20 inches or less (arid areas). *See Exhibit 3 at p. 7 (Oust Section 3 Label).*

**The Oust Section 3 Label**

26.    As a pesticide sold in the United States, Oust is subject to the labeling requirements of the Federal Insecticide, Fungidice, and Rodenticide Act (FIFRA). *See Transcript at p. 12907 (testimony of James Tompkins, EPA's product manager for Oust); 7 U.S.C. §136a (2009).*

*Findings of Fact & Conclusions of Law – page 7*

27.   FIFRA requires that a pesticide such as Oust be clearly labeled so that it is
      safe for use and will not harm man or the environment.  *See 7 U.S.C. §136a*
      *(2009).*

28.   The label required by FIFRA is called a "Section 3" label.  This is the label
      that must be on every container of pesticide or herbicide (such as Oust) sold
      in the United States.  *See Transcript at pp. 9009-11 (testimony of Jack*
      *McCain, DuPont Product Registration Manager).*

29.   DuPont drafted the label language and submitted it as part of DuPont's
      registration of Oust with the US EPA.  *See Transcript at p. 12907-10*
      *(testimony of Tompkins).*

30.   In 1989, following more than 80 incidents of Oust movement and crop
      damage in California, DuPont drafted and added to its Oust section 3 label
      clarifying language that included the following: "IMPORTANT: . . . Do not
      treat powdery, dry soil or light sandy soils when there is little likelihood of
      rainfall soon after treatment. In areas where sensitive crops are grown, do
      not apply "Oust" before soil has been settled by rain as off-target movement
      by wind or water may occur.  Do not apply to impervious substrates such as
      paved or highly compacted surfaces nor to frozen ground as off-target
      movement will occur. . . .  Do not use in arid areas where irrigated cropland

*Findings of Fact & Conclusions of Law – page 8*

is next to a potential treatment site nor where the herbicide can be moved or washed or where treated soil can be blown. Into [sic] irrigated cropland as injury to crops is likely to occur. *See Exhibit 188; See Transcript at pp. 1236-37 (testimony of Rik Miller, DuPont Director of Global Marketing for Crop Protection Products).*

31.  These "do not . . ." provisions remained unchanged in DuPont's Oust Section 3 label accepted by the US EPA on November 4, 1993. *See Exhibit 294.*

**1991 Final Environmental Impact Statement**

32.  As part of its vegetation management duty, the BLM decided to initiate a study of the environmental impacts of various herbicides.

33.  In 1991, the BLM produced its Final Environmental Impact Statement – Vegetation Treatment on BLM Lands in Thirteen Western States ("1991 FEIS"), which considered the use of various herbicides as part of an assessment of vegetation management alternatives on BLM lands. *See Exhibit 60.*

34.  The 1991 EIS was a "programmatic" EIS in that it addressed the global issues related to rangeland management and herbicide applications anywhere in the 13 states, but did not assess the environmental consequences of

applications on any particular site.  *See Transcript at pp. 9998-10004.*

Those considerations were to be left for another day as each project was

developed.

35.    The 1991 FEIS intended to be in effect for 10 to 15 years.  *See Exhibit 60 at*

*p. 244.*

36.    A Record of Decision ("ROD") on the 1991 FEIS approved the use of 17

different herbicides, including sulfometuron methyl (Oust), for use in certain

circumstances on BLM lands in Idaho.  *See Exhibit 60 (1991 EIS); Exhibit*

*61 (ROD).*

37.    However, the 1991 EIS did not analyze the use of Oust on rangeland—the

type of land where BLM had Oust applied in 1999 and 2000 in Idaho, the

applications at issue here.

38.    The Court has twice addressed this issue in motions and twice found that the

1991 EIS failed to approve Oust for use on rangeland.  *See Memorandum*

*Decisions (docket nos. 204 & 893).*  No competent evidence was introduced

at trial to contradict this conclusion or the plain language of the EIS.

39.    Both the ROD and the EIS were programmatic in scale, and neither

addressed specific rehabilitation projects or application sites.

40.    The ROD required a site-specific environmental analysis prior to BLM

*Findings of Fact & Conclusions of Law – page 10*

undertaking rehabilitation activities at a particular site.  *See Transcript at pp. 843-44, 13256; see also Exhibit 61.0010.*

**Emergency Fire Rehabilitation Handbook**

41.   To set standards to rehabilitate specific sites in response to individual fires, the BLM developed, in July of 1999, an Emergency Fire Rehabilitation Handbook (EFR Handbook).  *See Exhibit 66.*

42.   The EFR Handbook states that an Environmental Assessment (EA) is the "preferred EFR procedure where wildland fire size and frequency do not warrant the time or effort to prepare a comprehensive NFRP [National Fire Rehabilitation Plan]."  *See Exhibit 66 at page 66.0011.*

43.   When asked whether, under this language, site-specific EAs are required, the BLM's expert on fire rehabilitation, Joseph Edward Russell, answered, "Yes."  *See Transcript at p. 13255.*

44.   Prior to the Oust applications in 1999 and 2000, BLM prepared some form of site specific plan or analysis for each of the application sites.  Some of these plans took the form of an Environmental Assessment, while others took the form of an Emergency Fire Rehabilitation Plan ("EFRP").  *See Transcript at pp. 13249-50.*

45.   In most cases, an EFRP was used, as was the case with the Stagebarn and

Cinder applications, which combined were the largest Oust application at over 17,000 acres.  *See Exhibit 46.*

46.     The BLM's expert, Joseph Edward Russell, testified that the individual EFRPs did not constitute Environmental Assessments.  *See Transcript at pp. 13259-60.*

47.     Neither the EFRPs nor the EAs addressed the potential for movement of the Oust or damage to downwind crops.  *See Transcript at pp. 9856, 9966, 9975, 10046-48, 10053-60, 10634, 10638-39, 10681 (testimony of BLM official Kraayenbrink), 13532-33 (testimony of BLM official Baker); Exhibits 17, 38, 39, 41, 46, 931, 951, 40137, 41755.*

48.     The plans or other assessments the BLM ultimately developed for each application site at issue "tiered" to the 1991 EIS and ROD, as well as other documents.  *See Transcript at pp. 2824-25.*  Tiering means that the earlier documents were incorporated in the site-specific plans by reference and formed the authorization for the later plans.  Because neither the 1991 EIS nor the ROD authorized the use of Oust on rangeland, the site specific plans that tier to them do not independently grant that authorization.  No evidence was presented at trial that authority to use Oust on rangeland derived from, or could derive from, any source other than the 1991 EIS or ROD.

49.     Thus, no document prepared by the BLM analyzed the risk at issue in this

case – that the application of Oust to large expanses of fire-damaged

rangeland in an arid, windy area might damage crops if soil eroded and

carried Oust with it.

50.     At trial, BLM contended that the individual EFRPs did not need to contain

an Environmental Assessment because they tiered to, and were authorized

by, the 1989 Shoshone District Normal Fire Rehabilitation Plan ("NFRP").

*See Transcript at pp. 15257-62; Exhibit 7.*

51.     The BLM now concedes that the NFRP "did not address the use of

herbicides."  *See United States Response to Plaintiffs Findings and*

*Conclusions at p. 15.*

*52.*     The BLM argues that the EFR Handbook requires an EFRP to be in place

within 21 days after a fire, and that it is impossible to complete an EA in so

short a time.  Yet the EFR Handbook, as discussed above, requires an EA if

Oust was being considered.  The tension between the two provisions is not

irreconcilable.  A risky procedure requiring the evaluation of an EA simply

cannot be used in a hastily-prepared EFRP.  *See Transcript at p. 13260*

*(testimony of BLM official Russell).*  Thus, the 21-day requirement is no

excuse to forego the EA required by the EFR Handbook.

**BLM Oust Studies**

53.     In 1992, Mr. Pellant conducted trials in Elko, Nevada, that compared the

effectiveness of Oust treatment, Roundup treatment, and other cheatgrass

control methods such as prescribed burning and disking the land with a

"Towner plow." The result of the trials was that "the Oust-treated area [had]

lower densities of cheatgrass than either the disk or the burned [test plots].

The Roundup treatment was basically ineffective. It didn't work well at all."

*See Transcript at pp. 10105– 06 (testimony of Michael Pellant).*

54.     In 1994, Pellant was involved in a BLM study of about 100 acres in

Mountain Home, Idaho, to see if the agency could replicate "the same kind

of results" as in the Elko trials.  The Mountain Home study allowed the

BLM to study treatment of an area larger than the experimental plots in

Elko, and to rely not just on an application in Nevada but on an application

in Idaho as well.  *See Transcript at pp. 10106-09 (testimony of Michael*

*Pellant).*

55.     The BLM concluded that the Mountain Home "study results were very

promising" in that "Oust was very effective."  *See Transcript at pp. 10111-*

*12 (testimony of Michael Pellant).*

56.     Based on the 1992 and 1994 studies, as well on "literature . . . provided . . .

*Findings of Fact & Conclusions of Law – page 14*

by DuPont through . . . product brochures," Pellant concluded that "Oust was effective in reducing cheatgrass." *See Transcript at pp. 10121-22.*

## Section 3 Label Amendment by DuPont

57. On May 5, 1995, DuPont submitted an application for amendment of the Oust section 3 label to "clarify" the restrictions by "[r]eplacement of many of the elective 'do not . . .' statements with instructional (directionally correct) language to prevent misue [sic] (ie [sic]:  spray drift management, resistance management)." Trial Ex. 215; 7/6/09 Trial Tr. 9110:8-19 (testimony of Jack Cain).

58. Essentially, DuPont changed its mandatory "do not" statements to advisory language.  *See Exhibit 215; see Transcript at p. 9110 (testimony of Cain).*

59. The proposed amendments, drafted by DuPont, were accepted by the EPA on June 15, 1995, and provide as follows: "IMPORTANT PRECAUTIONS: Injury to or loss of desirable trees or other plants may result from failure to observe the following: . . . Treatment of powdery, dry soil or light sandy soil when there is little likelihood of rainfall soon after treatment may result in off target movement and possible damage to susceptible crops when soil particles are moved by wind or water. Injury to crops may result if treated soil is washed, blown, or moved onto land used to produce crops.  Exposure

to OUST may injure or kill most crops.  Injury may be more severe when the crops are irrigated.  *See Exhibit 211.*

60. The "do not" statement regarding the use of Oust in arid areas in DuPont's prior labeling was completely removed from the Section 3 label at this time. *See Transcript at p. 12896 (testimony of Tomkins).*

61. The advisory "Important Precautions" remained unchanged in the Oust Section 3 label accepted by the US EPA on March 27, 1998.  *See Exhibit 639.*

62. Thus, the labeling changes DuPont made in 1995 were in effect for all of the BLM's Oust applications, discussed *infra*, from 1996 to 2000.

**BLM Proposes Large-Scale Oust Spraying**

63. In 1996, John Sullivan, the BLM's manager of the NCA, wrote to John Cantlon, DuPont's sales representative in Idaho, to express interest in using Oust to control cheatgrass within the Birds of Prey National Conservation Area (NCA).  *See Transcript at pp. 1841-42 (testimony of John Sullivan); Exhibit 139 (August 20, 1996, letter from John Sullivan to John Cantlon).*

64. Sullivan's letter was an "invitation by the BLM to collaborate with DuPont in developing a program that would help control cheat in the NCA."  *See Transcript at p. 1853 (testimony of John Sullivan).*

65.   Sullivan testified that he wrote the letter after a fire burned 50,000 acres of the NCA.  The BLM needed to spray some 10,000 acres of the NCA, a rocky terrain that required aerial application.  *See Transcript at pp. 2030 – 2031 (testimony of John Sullivan).*

**Section 24(c) Label**

66.   To address this need, Sullivan asked DuPont for an amendment to the Oust label that would allow aerial application to 10,000 acres in the NCA.  *See Transcript at pp. 1853 – 1855 (testimony of John Sullivan)*; *Exhibit 94 (September 18, 1996, letter from John Sullivan to John Cantlon).*

67.   But Sullivan's request expressed a desire to use Oust on a much larger scale beyond the NCA.

68.   Sullivan wrote that he found the label restriction against aerial application "quite burdensome" and that a lifting of that restriction "could have positive repercussions on large areas of cheatgrass-dominated public land throughout the Intermountain West."  *See Exhibit 94 at p. 1.*

69.   By large areas, Sullivan meant millions of acres.  *See Transcript at p. 1925 (testimony of BLM official Sullivan).*

70.   DuPont's Cantlon responded by seeking a statewide section 24(c) Oust label.  *See Transcript at pp. 1854-1856; 2004-2006 (testimony of John Sullivan)*;

*Exhibit 139 (August 20, 1996, letter from John Sullivan to John Cantlon);*

*Exhibit 96 (September 30, 1996, letter from John Cantlon to John Sullivan).*

71.   "Section 24(c)" refers to FIFRA and defines the right of states to issue "special local need" labels for pesticides in their states.  *See Transcript at p. 1424 (testimony of Dr. Charles Benbrook).*

72.   In seeking the 24(c) label, the BLM's Sullivan wrote DuPont's Cantlon, asking him, "Has DuPont researched the use of aerial applications of Oust on rangelands that are several miles from any agricultural lands?"  *See Exhibit 139 at p. 2.*

73.   Cantlon responded but failed to answer the question, stating only that "DuPont, independent researchers and years of commercial operations have provided a great deal of information on aerial applications.  These findings are represented in all labels we authorize."  *See Exhibit 96 (Letter of Cantlon to Sullivan dated September 30, 1996).*

74.   The BLM never followed up by seeking information about the transport and fate of Oust.

75.   The label was the first 24(c) label for helicopter application to fire-burned rangeland in the United States.  *See Transcript at p. 969.*

76.   Issued annually, the 1999 version of the section 24(c) label permitted the

application of Oust aerially, by helicopter only, and specified that it was "for control of weeds growing in noncrop areas on lands owned or administered by agencies of the federal government or the state of Idaho in the state of Idaho." *See Exhibit 2; see also Transcript 8315 – 8316, 8445 – 8446 (testimony of John Cantlon).*

77.   The 1999 section 24(c) label further states: "OUST® herbicide is recommended for control of downy brome . . . , cheat . . . and Medusahead . . . on noncrop lands owned or administered by agencies of the State of Idaho or the federal government such as the U.S. Department of Agriculture and the U.S. Department of Interior, including the Bureau of Land Management (BLM), the U.S. Forest Service (USFS) and the U.S. Fish and Wildlife Service (USFWS).  OUST® Herbicide may be used to control . . . pests on fire-damaged land, firebreaks, and other noncrop areas.  *See Exhibit 2.*

78.   The 24(c) label constituted a recommendation for use of Oust on all burnt rangelands managed by BLM in the State of Idaho.  *See Transcript at p. 2852 (testimony of DiTomaso).*

79.   The scope of the applications allowed by the 24(c) label, and the scope of the applications actually made, were unprecedented, and represented a new and expanded use of Oust.  *See Transcript at pp. 2810-15; 8163-64, 8199-*

*202.*

**1997 and 1998 BLM Applications of Oust**

80.     After DuPont issued the Idaho Oust section 24(c) label in February 1997, the

BLM's Boise District contracted with Thomas Helicopters for the

application of Oust by air starting in April 1997.  *See Exhibit 102.*  The

Boise District applied Oust on thousands of acres in 1997 and 1998.  *See*

*Transcript at pp. 10505-06, 10573-74 (testimony of Cindy Fritz, biological*

*technician at the Boise District of the BLM).*

81.     Among the 1997-1998 Boise District Oust applications were "Kuna Butte"

(also known in this case as "Bolyard" or "Darry-Air" application) in April-

May 1997, and "Rattlesnake" (also known as "Sid Wing" or "Squaw Creek

Farms") in November 1997.  *See Exhibit 102 (list of Oust applications in*

*Boise District).*

82.     Kuna Butte was a ground application of Oust halted by the contractor,

Darrell Bolyard, for a variety of reasons; Rattlesnake/Sid Wing was a fall

application of Oust by Thomas Helicopters and BLM ground sprayers.  *See*

*Exhibit 102.*

83.     In the Kuna Butte incident, the applicator notified BLM that it was

suspending a scheduled application because of high winds and the risk of

soil erosion carrying Oust from the site.  *See Transcript at pp.  1887, 1983, 1990; Exhibits 72, 73, 167, 853, 40205, 41378.*

84.   By at least the Spring of 1997, BLM recognized the phenomenon of downwind transport of contaminated soil after applications had been completed.  A BLM memo, written by Cindy Fritz, warns against spraying too late in the spring because the BLM did not want "dust to transport the chemical offsite." *See Exhibit 73.*  The memo further warned that allowing Oust to overwinter on the soil left the soil "bare and unprotected from drying out and blowing away in the wind.  Watch out for soil particle movement offsite, especially when you are around Agland and dwellings." *Id.*; *see also Transcript at pp. 1887, 1983, 1990.*

85.   The Kuna Butte/Bolyard incident in 1997 alerted the BLM to the downwind transport of contaminated dust long after applications had ceased. *See Transcript at p. 1887 (testimony of BLM official Sullivan).*

86.   The Rattlesnake/Sid Wing incident occurred one year later in the Spring of 1998, and involved a farmer who alleged crop damage from one of BLM's fire rehabilitation projects. *See Transcript at pp. 1884-85.*

87.   The ISDA, after investigating this incident, concluded that the BLM "knew or should have known that these conditions [wind erosion of soil prior to and

during Oust application] may have resulted in off target movement of Oust

Herbicide and damage to crops." *See Exhibit 423.*

### Fires in 1999 & 2000

88. After fires in 1999 and 2000 in the BLM's Shoshone and Idaho Falls

Districts, BLM developed fire rehabilitation plans that called for the use of

Oust, on tens of thousands of acres, most of which had burned during the

summer. (*Id.*, *see* Tr. at 10660.).

### BLM's Pre-Application Knowledge of Soil Erosion in the Application Areas

89. Prior to the applications at issue here, the BLM knew about the potential for

soil erosion on the lands where Oust was ultimately applied.

90. The Normal Fire Rehabilitation Plan, issued about two years before the 1991

EIS,  specifically discussed the high potential for soil erosion from

rangeland such as the application sites.  *See Transcript at pp. 9851, 9859,*

*13270-71.*

91. In addition to the Normal Fire Rehabilitation Plan, several of the site-

specific plans developed shortly before the applications at issue also detailed

the high potential for soil erosion, which was estimated to be as much as 100

tons per acre per year.  *See Transcript at pp. 9882-83*; *see, e.g., Exhibits*

*37.0012, 41.0009, 17.0017.*

92.   BLM considered erosion as low as 2.3 tons per acre to be severe erosion.

      *See Transcript at pp. 7878-79, 10633-37*; *see, e.g., Exhibits 37.0015,*

      *41.0009, 17.0017.*

93.   James May, the Upper Snake River District Manager during the 1999-2000

      time period, conceded the entire area was unique for severe wind erosion.

      *See Transcript at pp. 10423-24 (designated deposition testimony from Nov.*

      *15, 2005 Video Deposition at 79-83); see also, Exhibits 7 & 185 at 12*

      *(noting that the fire rehabilitation areas "are highly susceptible to*

      *accelerated soil erosion, either because of soil characteristics, steep*

      *topography, or recurrent high winds.").*

94.   BLM official Joe Russell testified that accelerated erosion after a fire,

      particularly in areas dominated by cheatgrass, is to be expected.  *See*

      *Transcript at pp.  13171-72, 13191, 13208, 13236, 13315-16.*

95.   Plaintiffs' soil erosion expert, Dr. Walter Shields, recited some of the

      historical record demonstrating that based on BLM's own studies it was

      predictable and foreseeable that soil from BLM ground would move off-site.

      *See Transcript at pp. 2421-23.*

96.   The ISDA, after investigating BLM applications in 2000 at issue here,

      concluded that the "BLM knew wind erosion of soil was occurring to BLM

lands prior to and during the application of Oust Herbicide . . . ." *See Exhibit 423.*

97.    In the Fall of 2000, Plaintiff Perry Van Tassell wrote to U.S. Senator Larry Craig, describing the dirt and dust eroding from the recently burned High Point site: "The wind erosion is so bad that you can't see the sun or sky. The borrow pits are full of dirt. There is dirt drifts clear across the road, and they are deep.  Hand lines are buried in dirt." *See Exhibit 744.*  Senator Craig forwarded the letter to BLM District Manager James May who responded in an October 2, 2000, letter that "A pattern of erosion in the wake of a large wildfire is common. The recent high wind in the area of the wildfire has intensified this erosion." *See Exhibit 744.0004.*  There was no suggestion that Mr. May's response was based on newly-acquired knowledge or was unique to the High Point site.

98.    Within weeks of this letter, BLM applied Oust to over 17,000 acres on the High Point site alone, which abuts Mr. Van Tassell's land as well as that of other Plaintiffs.  *See Transcript at pp. 13299 (Testimony of BLM's Russell that Oust was applied to 17,000 acres at High Point Fire site), 4451 (Testimony of Van Tassell that he farms "right up next to the High Point fire.").*

*Findings of Fact & Conclusions of Law – page 24*

99.     While Van Tassell is not one of the four bellwether plaintiffs, the incident

         shows that the BLM was well-aware of (1) the large-scale movement of dirt

         and dust off the High Point application site and (2) the potential for similar

         movement from the other sites.

**BLM's Pre-Application Knowledge That Eroded Soil Could Contain Oust**

100.    From the Kuna Butte and Sid Wing incidents in 1997 and 1998, the BLM

         was aware prior to the 1999/2000 applications that the eroded soil could

         contain Oust.  *See Findings regarding BLM's knowledge in 1997 & 1998.*

**BLM's Pre-Application Knowledge of Persistence**

101.    Prior to the applications, the BLM's understanding was that the half-life of

         Oust could be as long as 100 days, depending on soil conditions.  *See*

         *Exhibit 73.0002; see also Transcript at p. 10192 (testimony of Mike Pellant).*

102.    The BLM intended to apply Oust in the Fall so that it could be effective

         when weeds began to emerge the following Spring.  *See Transcript at p.*

         *10470.*

**BLM's Pre-Application Knowledge of Harmful Effects of Low Levels of Oust**

103.    Prior to the applications, the BLM's Cindy Fritz was told by Dr. Baker, the

         Idaho State Investigator, that Oust could damage crops at levels "below what

         a lab could detect."  *See Exhibit 45261-0002 (Fritz account of phone*

*conversation with Dr. Baker dated June 29, 1998).*

**Proceeding in Ignorance**

104.   BLM officials allege that DuPont, and especially Cantlon, misled the BLM

into believing that Oust could safely be used in the 1999 and 2000

applications.  The assurances were misleading, but they were also vague in

nature and therefore demanded a follow-up inquiry by the BLM.  However,

the BLM never made any inquiry into critical questions such as how

susceptible to erosion each application was, how far Oust would move down

into the soil with rainfall, how long Oust would persist on the application

sites, how much Oust would be contained on soil that eroded, how much

Oust was necessary to injure or kill sensitive crops, or how long Oust would

persist in the growers' fields.  *See Transcript at pp. 2815-22, 2829-34, 2847-*

*52, 2870-71, 2927-28 (Testimony of DiTomaso); 10650-51, 10698-700*

*(Testimony of Kraayenbrink).*

105.   The BLM responds that its inquiries would have yielded nothing because

neither DuPont nor anyone else had the answers at that time.  Assuming that

is true, the BLM's inquiry would still have revealed a critical fact:  DuPont

had done no studies on Oust transport and fate.  This fact would directly

refute DuPont's vague reassurances.  When combined with the BLM's

existing knowledge that Oust-contaminated dust could blow off the site and damage crops on downwind farms, the absence of DuPont's testing would be such a red flag of warning that a reasonable person in the BLM's position would halt the applications.  In other words, the BLM's inquiry into DuPont's testing would have made a significant difference.

106.   BLM should have demanded studies from DuPont on the transport and fate characteristics of Oust in South-Central Idaho soils.  *See Transcript at p. 2827 (Testimony of DiTomaso).*  However, BLM never obtained this crucial information from DuPont. (*Id.*)

**Oust Applications**

107.   Oust was applied during the Fall in 1999 and 2000 by licensed helicopter and ground application contractors hired by BLM.  *See Transcript at pp. 10621-702 (testimony of Kraayenbrink); 13133-38, 13168-332 (testimony of Russell); 10703-817 (testimony of Koonce); see also Ex. 60 at Table 1-2 through 1-6.*

108.   Much of Plaintiff Funk's cropland was within a few miles of a 2000 application site.

109.   The other bellwether plaintiffs – Clingers, Hansens and Jentzsch-Kearls – were located about 15 to 20 miles downwind from the application sites.

110.  The BLM's intent in applying Oust in the Fall was to control weeds as they emerged the following Spring. *See Transcript at pp. 13302-03*.

111.  In 1999, BLM's Burley, Idaho Falls, and Shoshone field offices had Oust applied to approximately 31,640 acres on 25 different application sites. *See Exhibit 30.*

112.  Some of the key 1999 application sites at issue in this litigation include (with their approximate acreages in parenthesis): Brigham Point (2,600); Mule Butte (Burley) (6,000); Mule Butte (Idaho Falls) (4,600); Mule Butte Green Strip (Idaho Falls) (2,094);  Cedar Butte Green Strip (200); Wilson Butte (1,670); Red Bridge (1,300); Wilson Ridge II (6,162); Mallard Lake (1,800); Grandview 1 (988); and High Point (1,030). *See Exhibit 30.*

113.  All of these applications were made in October and November of 1999, except the High Point application, which was made in March of 1999. *See Demonstrative Exhibit 35001.*

114.  In 2000, BLM's Burley, Idaho Falls, and Shoshone field offices had Oust applied to approximately 34,318 acres on nine different application sites. *See Exhibit 30.*

115.  Some of the key 2000 application sites at issue in this litigation include (with their approximate acreages in parenthesis): Sid Butte (1,774); Coffee Point

*Findings of Fact & Conclusions of Law – page 28*

North & Green Strip (3,477); Flat Top (3,963); Stagebarn Pasture (8,352); Cinder (8,828); 93 Junction (172). *See Exhibit 30.*

116. All of these applications were made in October and November of 2000.

117. The approximately 17,000 combined acres of the Cinder and Stagebarn Pasture sites were often referred to collectively at trial as the High Point site, and formed the largest contiguous Oust application area.

118. In the 1999 and 2000 time frame, Bart Koonce was the fire operations supervisor for the Shoshone Field Office. *See Transcript at pp. 10703-04.* He was the project inspector for the majority of the Oust applications. He was there to ensure no safety violations occurred, ensure contract compliance, ensure the applications complied with the label, monitor the contractors' progress, monitor the weather, and maintain the official contract diary. *Id. at 10705, 10709.* One of his duties was to issue a notice of noncompliance if there were any instances of noncompliance with the contract. *Id. at 10710.*

119. Koonce was not directed by the BLM to determine whether there was agricultural land around the application sites, or to notify farmers with land next to the application sites about the Oust sprays. *Id. at 10711.*

120. The BLM did not send any notice of any application to any of the plaintiffs.

*Findings of Fact & Conclusions of Law – page 29*

*See Transcript at p. 10648-49.*

121. Koonce testified that while he did not apply Oust to "dry powdery soil," *see Transcript at p. 10761*, he did apply Oust to "dry" soil without vegetative cover, and he did not consider the possibility of wind-eroded soil contaminated with Oust blowing onto cropland. *See Transcript at 10716-24.*

122. There was rain during and after many of the applications, but neither Koonce nor anyone at BLM knew how much rain was necessary to prevent the soil from drying out later and blowing away in the wind, the very harm warned about by the BLM's Cindy Fritz in the memo quoted above. *See Exhibit 73 (warning that allowing Oust to overwinter on the soil left the soil "bare and unprotected from drying out and blowing away in the wind. Watch out for soil particle movement offsite, especially when you are around Agland and dwellings.)"*

123. That rain was not holding back wind erosion was apparent from Koonce's written statement to the ISDA describing his activities as project inspector and noted, "On October 26 operation ceased at 14:38 hours when we observed a storm approaching from the south, which caused winds in excess of 30 miles per hour. The wind moved from the southeast to the northwest causing dust and dirt to move with it." *See Exhibit 9; Transcript at p.*

*10731.*

124.   At the time of the applications, Koonce had no conception that Oust could attach to dirt or soil and was unaware that it could affect agricultural crops if it did blow onto them. *See Transcript at p. 10809.*

125.   Koonce was never instructed by anyone at BLM to be on the lookout for, or to monitor in any way, the soil blowing off the Stagebarn or Cinder sites during the applications. *See Transcript at p. 10809.* Similarly, no one at BLM discussed with him prior allegations of off-target movement of Oust via wind-blown soils that had occurred at the Rattlesnake and Sid Wing property. *Id. at 10807.*

126.   On January 17, 2002, the ISDA concluded that BLM knew that wind erosion was occurring to soil on BLM lands prior to and during the application of Oust, and that BLM knew or should have known that these conditions might have resulted in off-target movement of Oust and damage to crops. *See Exhibit 423; see also Transcript at 10746-47.*

127.   Koonce worked with Rod and Dale Thomas of Thomas Helicopters to complete the applications. *See Transcript at p. 10800.* He described them as exceptional pilots and applicators who did a very good job on all of their contracts and who always followed the labels. *Id. at 10801.*

128. The applicators, Thomas Helicopters and DeAngelo Brothers, acted reasonably in following the language of the Oust label in connection with the applications made in 1999 and 2000.

**Growers Notice Crop Problems**

129. Beginning in the Spring of 2000, certain growers began to notice problems with their crops. *See Transcript at pp. 836-837 (testimony of Bauscher), 3050-3051 (testimony of Steele), 4850-4852 (testimony of Clinger), 5082-83 (testimony of Jentzsch), 5663 (testimony of Hansen), 6034-35 (testimony of Funk).*

130. Because the crop symptoms mimicked those caused by heat or frost, plaintiffs initially made claims for compensation under certain federal programs and insurance policies. *See Memorandum Decisions* (docket nos. 1650 & 1667).

131. The Court has issued two decisions finding that these payments (specified in the decisions and incorporated herein by reference) are to be deducted as an offset from whatever judgment is ultimately issued against the BLM. *Id.* These offsets are discussed more fully below.

132. In the Spring of 2001, growers once again observed damage to their sugar beet, potato, grain, and other crops, although this time the damage was more

significant.  *See Exhibit 654; see also Transcript at pp. 4505-34 (testimony of Van Tassell), 5027-36 (testimony of Jentzsch).*

133.    Investigations ensued, both by the Idaho State Department of Agriculture ("ISDA") and private crop consultants.

134.    The ISDA focused its investigation on the 2000 applications at sites named Coffee Point, Coffee Point Greenstrip, and Flat Top, all at issue here.  *See Exhibit 848.*

135.    The ISDA concluded that "severe winds caused Oust herbicide treated soil particles to move off the BLM target area resulting in damage to several agricultural crops." *Id.*

136.    Private consultants also concluded that there had been widespread injury from Oust transported from BLM land.  *See Transcript at pp. 6621-38 (testimony of Haderlie), 75558-59 (testimony of Miller); see also, Exhibit 654.*

**This Lawsuit**

137.    Ultimately, more than 100 of the injured growers filed suit against BLM and DuPont to recover their alleged losses.

138.    The Plaintiffs comprise over 110 grower groups who farm land in Lincoln, Minidoka, Power, Jerome, Blaine, Bingham, Bannock, Oneida, Twin Falls,

and Cassia counties. (docket . 499.) These growers claim damage to crops, including, but not limited to: potatoes, sugar beets, corn, wheat, barley, alfalfa, and grain for the years 2000-2004. (*Id.*).

139. To deal with the large number of plaintiffs, but recognizing the commonality of many issues between all parties, the Court adopted a bellwether trial plan in which the claims of a small number of growers would be decided first. *See Memorandum Decision (docket no. 272)*.

140. The Court issued a decision setting out the likely preclusive effect that would arise from this bellwether trial and govern the remaining trials. *See Memorandum Decision (docket no. 1047)*.

141. The Court selected four bellwether Plaintiff grower groups for the first trial—two from the Minidoka area (the Hansen and Jentzsch grower groups), and two from the American Falls/Aberdeen area (the Funk and Clinger grower groups). *See Third Case Management Order (docket no. 327) at p. 2.* Following is a list of the members of each of the four bellwether grower groups:

142. The Clinger grower group: Clingers, Inc., Jerome Clinger Farms, Jerome Clinger, Tina Clinger, Leland Clinger, and Dallas Clinger. *See Exhibit L to Brief (docket no. 405)*.

143.   The Hansen grower group: Gary Hansen, Richard Hansen, John Hansen, Doug Hansen, Hansen Farms Joint Venture, Ridge Ranch, Inc., Jody Hansen, Annette Hansen, and L. Patricia Hansen.  *See Exhibit M to Brief (docket no. 405).*

144.   The Funk grower group: Lance and Diane Funk Partnership d/b/a/ Lance Funk Farms (a general partnership between Lance Funk, Lisa Funk, and the Estate of Dianne Funk). *See Exhibit N to Brief (docket no. 405).*

145.   The Jentzsch grower group: Jentzsch-Kearl Farms, Rodney Jentzsch, Shirley Jentzsch, Darrel James Baker, Claralynne Baker, Warren P. Crane, Sarah Crane, Joseph Kearl, and Melynda Kearl.  *See Exhibit O to Brief (docket no. 405).*

146.   The bellwether trial commenced with jury selection on May 4, 2009, and a nine person jury returned a unanimous Special Verdict Form on August 24, 2009.  *See Special Verdict Form (docket no. 1516).*

147.   The special verdict form included findings against both DuPont and BLM as well as an allocation of fault between the two defendants.  *See Special Verdict Form (docket no. 1516).*

148.   However, pursuant to the 7th Amendment and the Federal Tort Claims Act, the Court is the fact finder with respect to claims against BLM.  *See* 28

U.S.C. § 2402.

149. The Court elected to have the Jury render an advisory verdict as to the BLM, and the Court set forth its reasoning – and the applicable authorities – in some detail in an earlier decision.  *See Pretrial Order (docket no. 972).*

150. The findings of fact and conclusions of law set forth here are solely those of the Court, based upon the Court's independent review of the record.

**General Causation**

151. Oust is capable of causing the damage observed in the plaintiffs' crops.  *See Transcript at pp. 3421-22 (Testimony of Dyer); 3474-75 (Testimony of Gallian), 6644-6715 (Testimony of Haderlie).*

152. Oust is capable of contaminating dust that is then blown by the wind off the BLM application sites in sufficient quantities to damage crops downwind from those sites.  *See ISDA Reports, Exhibits 837 & 848; Testimony of Dr. Walter Shields*, *Terry Miller, and Dr. Gary Franc.*

153. The Oust-contaminated dust is capable of being blown by the wind a sufficient distance to reach the farms of each of the bellwether plaintiffs in quantities capable of damaging crops.   *See ISDA Reports, Exhibits 837 & 848; Testimony of Dr. Shields, Terry Miller, and Dr. Gary Franc.*

154. The ISDA concluded, after a several-month long investigation, that "severe

winds caused Oust herbicide treated soil particles to move off BLM target area, resulting in damage to several agricultural crops." *See Transcript at pp. 11191-93; Exhibits 837 & 848*

155.  Oust-contaminated dust was blown by the wind from the High Point site (Stagebarn and Cinder sites) at least as far as the Clinger farm and deposited Oust in quantities of at least 23 parts per trillion in the soil there. *See Transcript at pp. 2348-62 (testimony of Dr. Shields).*

156.  That quantity of Oust is capable of damaging crops. *See Transcript at pp. 2348-62 (testimony of Dr. Shields).*

157.  Farmlands closer to the application sites, including those of the other bellwether plaintiffs, had at least as great or greater concentrations of Oust than the Clingers' farm. *See Transcript at pp. 2348-62 (testimony of Dr. Shields).*

158.  To reach these conclusions, Dr. Shields performed a three-part analysis:  (1) emission (how much dust blew off the BLM application sites and how much Oust was in that dust); (2) transport (how far the wind-borne Oust-contaminated dust traveled), and (3) deposition (how much Oust would be expected to land on the farms of the bellwether plaintiffs under this model). *See Transcript at p. 2167.*

159.   This three-part analysis is explained further below.  The Court finds that it is based on sufficient facts or data, is the product of reliable principles and methods, and that Dr. Shields has applied the principles and methods reliably to the facts of the case.  *See Fed.R.Civ.P. 702.*

**Emission:  How much dust blew off BLM sites and how much Oust was in that dust?**

160.   Dr. Shields began his analysis by determining how much dust blew off the BLM application sites.

161.   To estimate the amount of eroded dust, Dr. Shields examined the soil properties at the application sites along with the wind patterns and environmental factors like the amount of rain.  *See Transcript at p. 2167.*

162.   He estimated that the soil erosion caused by wind would vary among the application sites and would range from 20 tons per acre per year to 70 tons per acre per year.  *See Transcript at p. 2246.*

163.   To determine how much Oust was contained in that blowing dust, Dr. Shields used what he described as a "mass balance" calculation.  He began by determining how much Oust was present at the time of application at the BLM sites, and then compared that result to the amount found to be present in soil samples taken on the BLM sites at a later date.  *See Transcript at pp.*

*Findings of Fact & Conclusions of Law – page 38*

*2284-92.*

164.  He determined that "anywhere from 80 to 98 percent of the Oust that should
      have been there was missing . . . ." *See Transcript at p. 2413.*

165.  He then analyzed where that "missing" Oust went – was it blown away by
      the wind, leached down into the soil, or degraded in some manner? *See
      Transcript at pp. 2294-300.*

166.  The layer of soil that would be scoured and picked up by the wind is known
      as the  "erodible layer" and it varied from 0.62 to 1.5 centimeters deep. *See
      Transcript at p. 2469.*

167.  Although Oust leached down into the soil when it rained, it would leach
      down in most instances only a centimeter or so. *See Transcript at p. 2285.*
      Although he did not believe that Oust leached any further down than that,
      Dr. Shields did factor in a "worst-case assumption" that the Oust could leach
      downward from 5 to 10 centimeters. *Id. at p. 2439.* The Oust "just loves to
      stick to organic matter," and "in these desert soils, the organic matter is very
      high right near the surface." *Id. at p. 2296.* And Oust that was leached
      down into the soil would be wicked back toward the surface by a process
      known as capillary action. *Id. at p. 2603.*

168.  Because most of the Oust remained in the erodible layer, and the Oust would

not degrade much in the desert soil, Dr. Shields concluded that the "missing" Oust – that is, the 80% to 98% of the Oust that should have been on the site when it was retested – was carried away by the wind. *See Transcript at p. 2413.*

169.   The BLM argues that in using the mass balance, Dr. Shields relied on a Dr. Shane Needham to provide numeric values for those soil samples the MSU lab had labeled only "non-detect/trace" for the presence of Oust. *See BLM Response at p. 32-33 (docket no. 1656).* The BLM points out that although plaintiffs represented that they would call Dr. Needham as a witness, they never did so. The BLM argues that the mass balance calculation therefore relies on numbers that were never properly authenticated. The Court disagrees. In his mass balance calculation, Dr. Shields used only the soil sample results from the BLM application sites to determine the mass of Oust lost. *See Transcript at p. 2285.* The BLM itself recognizes this fact. *See BLM Proposed Findings at p. 80, #345 (docket no. 1646) ("While Dr. Shields used only information from the BLM application area soil samples for his mass balance calculation . . . .").* The BLM points to no samples taken from the BLM application sites that were labeled "non-detect/trace" by the MSU lab. Thus, the fact that Dr. Needham never testified to the non-

detect/trace numeric values does not weaken Dr. Shields' mass balance calculation.

170.   The BLM argues that Dr. Shields "ignored that the Oust applied to the BLM's fire-damaged rangeland was picked up by cheatgrass roots and metabolized . . . ." *See BLM Response at p. 33 (docket no. 1656).*  In support of this argument, the BLM directs the Court to its proposed finding of fact number 322 that cites the testimony of Dr Remy Hennet.  However, that citation does not contain any testimony from Dr. Hennet that Dr. Shields ignored plant uptake or degradation through plant metabolism.  *See Transcript at pp. 14072-73.*  The BLM does not direct the Court to any other testimony that Dr. Shields ignored these factors.  Dr. Shields did consider degradation generally, and there is no evidence the degradation rate he applied was deficient for ignoring plant uptake.  *See Transcript at p. 2289.*

**Transport:  How Far Did the Oust Travel?**

171.   The ISDA concluded that, as a result of its own soil samples, Oust had moved as far away as 13 miles east of the BLM target area.  *See Exhibit 848.*

172.   The ISDA findings did not set an outside limit on the distance Oust could travel because the ISDA did not use any model of wind transport as Dr.

Shields had done to obtain "a more refined answer." *Transcript at p. 2379 (testimony of Dr. Shields).*

173.   To obtain this "more refined answer" as to how far Oust-contaminated dust would travel on the wind, one important factor was the size of the dust particles and other characteristics of the soil at the BLM application sites. *See Transcript at pp. 2169, 2182-93.* Dr. Shields took multiple soil samples to study those factors.

174.   With the assistance of Dr. Paolo Zannetti, Ph.D., Dr. Shields modeled the erosion rate and particle transport of Oust laden soil from BLM application sites for 25 wind events. *See Transcript at pp. 2173-76.* He took the wind event data from 14 weather stations in South-Central Idaho. *Id. at pp. 2146, 2154, 2168-72.* He provided the wind data and the emission factors he calculated to Dr. Zannetti.

175.   Using CALPUFF, a wind modeling program endorsed by the EPA, and the data that Dr. Shields provided, Dr. Zannetti modeled the amount of dust that would be deposited at certain down wind locations called "receptors." *See Transcript at p. 2315.*

176.   Dr. Shields selected 14 receptor locations. *See Transcript at pp. 2355-56.* The modeled deposition at the receptor locations is representative of the

deposition on the bellwether plaintiffs' multiple fields over a large
geographic area "down the valley." *Id.* Dr. Shields then calculated the
deposition at each receptor location. *Id. at 2313, 2348, 2354, 2356-57,
2382-84.* The amount of deposition at each receptor is also contained in
Exhibit 830.

177. Based on the results of his calculation of emission factors from BLM land
and the CALPUFF modeling, Dr. Shields opined that Oust-laden soil moved
from the application sites across the growers' lands to the modeled receptors
located on or near each bellwether Plaintiff's farm. *Id. at 2312-13, 2319-20,
2352-56.*

178. Wind eroded 80 to 98 percent of the Oust off BLM land and deposited it at
least as far as the Clinger property, the farthest downwind farm of the
bellwether Plaintiffs. *Id.* at 2413.

## Deposition: How Much Oust Was Deposited On Plaintiffs' Farms?

179. On the Clinger farm, the minimum rate of deposition was at least 23 parts
per trillion. *See Transcript at pp. 2221-23, 2320; 2348-49, 2360-62, 2414*.

180. The actual amount may have been much higher. *See Transcript at pp. 2323-
24, 2335-36, 2373-74.*

181. The figures are minimums rather than absolutes: Dr. Shields testified that

*Findings of Fact & Conclusions of Law – page 43*

"we're trying to recreate what Mother Nature did . . . [and] the model is not capable . . . of telling you that there was exactly 1.5 ounces of dust that landed on Mr. Clinger's farm.  But what we can do is . . . say with a lot of certainty that . . . at least that much [landed on Mr. Clinger's farm]."  *See Transcript at p. 2223.*

182. Farmlands closer to the application sites, including those of the other bellwether Plaintiffs, had at least as great or greater concentrations of Oust than the Clingers' farm.

183. Once on the growers' fields, 95% of the deposited Oust would move below the three-inch soil sample layer by irrigation and tillage alone between April and late June/early July of the same season.  *See Transcript at pp. 15311-12.* That means to account for losses from just irrigation and tillage, Oust concentrations measured in a three-inch soil sample would have to be multiplied by 20.  *Id. at 15312.*

184. BLM application sites were unirrigated, dry desert land.  *See Transcript at pp. 2389-90.* In contrast, the plaintiffs' fields, generally, are heavily irrigated, cultivated, and experienced planting and other ground work.  *Id. at 2392-93.*  Dr. Shields considered the fact that the plaintiffs' fields where Oust samples were taken had been cultivated and irrigated both before and

after the Oust laden soil was deposited. *Id. at 2393.*  Also, the application on

BLM ground was uniform whereas the deposition of the Oust laden soil on

the Plaintiffs' fields was irregular and patchy. *Id. at 2393-94.*  Because of

these differences, Oust deposited on the fields would rapidly dissipate out of

the three-inch soil sample zone, whereas Oust applied to BLM sites would

stay within that zone unless eroded off. *Id. at 2394-400.*

185.   The amount of Oust in samples taken from the growers' fields, whether a

trace or quantified amount, does not indicate the amount of Oust present in

the grower's field because the soil samples were taken at a three-inch depth,

missing most, if not all, of the deeper-situated Oust. *See Transcript at p.*

*2408-09*

186.   But positive soil samples on agricultural lands definitively show Oust

movement. *Id. at p. 2409 (Testimony of Dr. Shields: "If you have a*

*detection – and I don't care if it's one part per trillion or 50 parts per*

*trillion, if the laboratory actually finds it, that's a fingerprint. That means*

*that it got there.").*

187.    Negative soil samples, however, do not necessarily negate the transport and

deposition of Oust because the evidence shows the pattern of Oust injury in

a field is patchy and random, rather than uniform. *See Transcript at pp.*

2403-05, 2414 *(Testimony of Dr. Shields: "[T]he soil tests on the farmer fields, the fact that you don't find it in a soil samples doesn't mean that it didn't get there.").*

188.    Rather, plants are more reliable indicators of whether Oust is present in a field.  Soil samples can only be tested for Oust within the confines of the soil sample, whereas plant roots form expansive underground networks with thousands of root tips.  *See Transcript at pp. 2405-07 (Testimony of Dr. Shields: "I just wanted to make the analogy between taking a bag of dirt to represent 160 acres and letting the plants do the sampling for you.  And plants have just, literally, billions of tiny root hairs in, probably, a square meter of soil. So they're out there sampling.").*

189.    Crops throughout the valley exhibited the same Oust symptoms, regardless of all other farming factors.  *See Exhibits 31135, 31141, 22759, 31457-62, 31305, 21402, 22247, 436, 31186, 21204, 33389, 257, 24173, 24171, 23759, 24139, 632, 433, 429, 456, 633, 582, 488, 635, 34018; see also Transcript at 342-54, 357-66, 395-97, 425, (Harman), 643-45 (Schorr), 825-26 (Bauscher), 2985-88, 3010-11 (Hollist), 3044-49 (Steele), 3467-68, 3473-77 (Gallian), 4128, 4144-46 (Schaeffer), 4510-12 (Van Tassell), 5582 (Hansen), 6161, 6195 (Funk), 6630-44, 6652-67, 6671, 6748-51, 6777-82*

*(Haderlie), 7241-7255, 7262-63 (Miller).*

190.  Crop injury can occur at levels below that at which Oust can be analytically

detected in soil.  *See Transcript at pp. 7327-28.*

*191.*  Oust caused injury to sugar beets and potatoes at concentrations below ten

parts per trillion.  *See Transcript at p. 7327-28 (Testimony of Terry Miller).*

192.  Oust can cause economic injury to potatoes at concentrations at least as low

as five parts per trillion, perhaps lower.  *See Transcript at p.* 15466

*(Testimony of Dr. Gary Franc).*

193.  Sugar beets are even more sensitive than potatoes.  *See Transcript at p.*

*15468.*

194.  In 2001, when the investigation into whether Oust was present on the

growers' fields began, the detection limit for Oust in soil samples was 50

parts per trillion. By the end of 2001 and into 2002, new testing methods at

MSU enabled  it to lower the detection limit to ten parts per trillion. (Tr. at

6917-18.).

195.  Because Dr. Shields did not rely on the quantified amounts provided by

Shane Needham, but only relied on the "trace" designation by the Montana

State University lab, the fact that Needham did not testify is irrelevant.

**Persistence of Oust in the Soil**

196. Once on the growers' fields, Oust was capable of persisting and causing crop injury for several years. *See Transcript at pp. 3417-20, 3423-28 (Testimony of Dr. William Dyer).*

197. Oust has an estimated half-life of at least nine months in the high pH soils that exist in the bellwether plaintiffs' fields. *See Transcript at 3427.*

198. Oust persisted in the soil on the growers' fields for "several growing seasons." *See Transcript at pp. 3428, 3417-20, 3723-28 (Testimony of Dr. William Dyer).*

199. Because Oust persists for several growing seasons, it remained on the Plaintiffs' croplands after 2001, regardless of whether additional Oust blew off BLM application sites after 2001.

200. Dr. Dyer explained that Oust will move to depths that correspond with the wetting front, which is about two feet for potatoes and three feet for sugar beets. *See Transcript at pp. 3384-86.* This movement is dissipation and it takes the Oust out of the soil sample zone.

**Specific Causation – Oust Injured Plaintiffs' Crops**

201. Crops grown by the bellwether plaintiffs were damaged by Oust that had been blown by the wind off the BLM application sites. *See Testimony of Dr. Terry Miller and Dr. Lloyd Haderlie.*

202.   Substantial proof of causation was presented by Plaintiffs' experts Dr. Lloyd
       Haderlie and Dr. Terry Miller.  Both are consulting agronomists who were
       involved in the Oust investigations since the Spring of 2001 while the
       damage was still ongoing.  Both conducted extensive investigations and
       visited hundreds of fields, with Dr. Miller focused on the western area
       around Burley and Dr. Haderlie focused on the eastern area around
       American Falls reservoir.

203.   Their opinions were based on their own continuing observations, analysis of
       information provided by the growers, and the confirmation provide by their
       extensive involvement in the detailed analysis they conducted with the
       Plaintiffs.  *See Transcript at pp. 6566-7807.*

204.   Dr. Haderlie and Dr. Miller also participated alongside Plaintiffs' damage
       experts and economists, Mr. Cornelius Hofman and the GEC group, in
       interviewing growers, reviewing yield information, and considering weather,
       agronomic practices, chemical usage, and other factors that may have
       affected yield. It was a collaborative effort that was supplemented with
       experience and other facts, such as observations of dust storms, the size and
       location of BLM sprays, and the absence of prior similar widespread
       occurrences despite the common issues that growers confront on a regular

basis.

205.   During these meetings, Drs. Haderlie and Miller received volumes of
information from the bellwether Plaintiffs.  *See Transcript at pp. 6782-807;
6774-75.*  They worked with the growers to prepare yield data and loss data
and reviewed "a huge amount of documents."  *Id. at 6774-75.*  They worked
with GEC and the growers to analyze their fields, yields, environmental
factors, disease, irrigation, and other factors to evaluate any problems.  *Id. at
6775.*  They assisted in determining figures for GEC's economic model. *Id.*

206.   Dr. Miller also testified about the information exchanged about the growers'
operations during the meetings with Mr. Hofman.  *See Transcript at pp.
7388-90.*  He explained how those present at the meetings—the bellwether
Plaintiffs, Drs. Miller and Haderlie, and accountants—evaluated every
damage year.  *Id.*  He explained the extensive farming information
discussed.  *Id.* at 7394-97.  The information exchanged included input from
Dr. Miller and the opportunity to analyze the growers' basis for claiming
damage, their mitigation costs, and the indexing of growers' performance off
of Cassia County.  *Id.* at 7397-404.

207.   As a result of his independent research, and presence on Hansen's and
Jentzsch's farms, Dr. Miller was "able to rule out all other causes for the

abnormal damages . . . other than Oust." *Id. at 7404-06.*

208. The bellwether plaintiffs also testified about the extensive amount of
information exchanged and topics discussed during the group meetings
between them, Drs. Miller and Haderlie, and Mr. Hofman. They met on
numerous occasions and provided hundreds of thousands of documents,
electronic data, and access to personnel to establish the damage amounts for
their operations. *See Transcript at pp. 4663-71 (testimony of Tina Clinger),
4916 (testimony of Jerome Clinger), 6198-200 (testimony of Funk); 5120-21,
5463, 5480 (testimony of Jentzsch), 5683-84, 5732-35 (testimony of
Hansen).* These documents and discussions included information regarding
their actual and expected crop production, revenue, prices, and mitigation
expenses. For example, they testified regarding actual crop production,
expected crop production, revenue, and/or crop prices. *Id. at 4652-55, 4663-
66, 4681-83 (testimony of Tina Clinger), 4913-15, 4938-47 (testimony of
Jerome Clinger), 6093-97, 6125-27, 6138-40, 6197-6200, 6471-74
(testimony of Funk), 5122-26, 5479-86 (testimony of Jentzsch), 5726-54,
5771-74, 5780-84 (testimony of Hansen).*

209. Dr. Haderlie opined that Oust caused the claimed injuries to Clinger's 2000,
2001, and 2002 sugar beets and 2001 and 2002 wheat. *See Transcript at pp.*

*6803-04.*

210. He also testified that Oust caused the claimed injuries to Funk's 2001 and 2002 barley, 2001 and 2002 sugar beets, 2001, 2002, and 2003 corn, and 2000, 2001, 2002, and 2003 potatoes. *See Transcript at pp. 6804-05.*

211. Plaintiffs also presented substantial causation testimony through Dr. Miller. He opined that growth inhibition by Oust makes sugar beet crops more susceptible to wind and frost damage by reducing the crop's vigor and extending the window of crop vulnerability to these factors. *See Transcript at pp. 7357-61.* He testified that Oust affects the entire root system of sugar beets, potatoes, grain, corn, and alfalfa. *Id. at 7507-08.* Symptoms on corn include stunted growth and discoloration, pruned roots, reduced yields, fewer kernels in the head, and shrunken kernels on wheat. *Id. at 7511-13 & 7457-60.*

212. Root pruning caused by Oust will inhibit a plant's ability to uptake water and cause drought-like symptoms. *See Transcript at pp. 7248-50 & 7363-65.* Oust symptoms on potatoes included the symptoms observed on the growers' potatoes. *Id. at 7338-41.*

213. Like Dr. Haderlie, Dr. Miller's investigation continued beyond 2001. He tracked the Oust symptoms in the area through 2006 or 2007. *See*

*Transcript at p. 7142*. He observed Oust symptoms in 2002, 2003, and 2004, and testified extensively that the symptoms were the same Oust symptoms present in 2001. *Id. at 7254-56.* In 2002, he looked at 300 fields from 70 different growers and confirmed that the Oust was still present in the fields in 2002. *Id. at 7316-17.* He also conducted a warehouse potato survey in 2002 where he identified Oust "marker" potatoes in storage sheds with Hansen and Jentzsch potatoes. *Id. at 7341-51.*

214. Dr. Miller opined that his potato storage survey validated his 2002 field observations, that Oust was still present and injuring crops. *See Transcript at pp. 7351-56.*

215. Dr. Miller's opinion that Oust injured the crops in 2000 was also based on his observations of SU injury on his own crops in 2000. *See Transcript at pp. 7373-77.* He also reviewed every ISDA 2001 crop damage report, which listed crop chemicals used by the growers in 2000. *Id. at 7384-85.* These reports included reports from the bellwether Plaintiffs. *Id. at 7433-34.* He also relied on the percipient observations of the growers, local agronomists, and other local crop consultants.

216. Dr. Miller observed that Hansen and Jentzsch potatoes had the same symptoms in 2002 and 2003 that he observed in 2001. *Id.* at *7366-68.*

217. He opined that Jentzsch had Oust injury on his 2001 and 2002 sugar beets and potatoes. *Id.*

218. He also testified that Oust injured the Hansen's 2001 and 2002 sugar beets. *Id.* He testified that Oust injured Hansen and Jentzsch's crops in 2000. *Id.* at 7431.

219. Dr. Miller presented reliable, relevant, and persuasive evidence that Oust injured the bellwether Plaintiffs' crops in 2000, 2001, 2002, 2003, and 2004. *Id.* at 7434-35.

220. Visual observations and the symptoms on the crops provided important diagnostic information for determining the cause of the growers' SU injury. In addition to this information, the bellwether plaintiffs and their experts relied on field histories, cultural practices, agronomist investigations, and crop records to conclude that Oust caused the injury. There was substantial evidence of specific causation from Drs. Haderlie, Miller, Gallian, and Kleinkopf, and the bellwether plaintiffs.

221. The BLM argues that Dr. Haderlie's testimony was "based on a visual examination" of the plants, and points out that he admitted that "a scientist cannot determine whether Oust caused injury to either sugar beets or potatoes solely by looking at visual symptoms." *See BLM Proposed*

*Findings at p. 87 (docket no. 1646)*.  But Dr. Haderlie relied on far more than visual symptoms.  *See Transcript at p. 6749 ("I . . .reviewed the detailed documents from the farmers and reviewed with the farmers what fields, what varieties, what herbicides, other conditions were used and – in this five-point yield analysis that we used.  And I was part of developing that with the GEC.")*.  The Court rejects this argument.

222.   The BLM argues that Dr. Miller "testified that Mr. Hofman's yield analysis supported his own conclusions, which were based upon plaintiffs' documents, but Dr. Miller admitted that he did not identify those documents in his Rule 26 expert report." *See BLM Proposed Findings at p. 93-94 (docket no. 1646)*.  This matter was argued extensively at trial.  Ultimately, the Court instructed the jury as follows: "Ladies and gentlemen I'm going to give you a limiting instruction at this time.  I discussed with you previously the effect of rule 26, the expert report which each party must submit for the experts they intend to offer.  I'm going instruct you that in determining the weight to give to Dr. Miller's testimony and what reliability you feel that it has that you are not to consider the role which he has testified to concerning Mr. Hofman's report and calculations as confirming the conclusions he'd already reached.  That was not disclosed in his report.  Therefore, it cannot

be considered by you.  You can consider his other reasons offered for the

opinions which he formed in determining the weight to be given to his

testimony and the reliability which you assign to it.  But because it was not

disclosed in his report, his opinion will have to rise or fall based upon the

other reasons which he has articulated here in the courtroom." *See*

*Transcript at pp. 7662-63.*  Because the jury was instructed to ignore Dr.

Miller's testimony that Hofman's report confirmed his expert opinion, the

prejudice the BLM complains of was cured.  None of this affects Dr.

Miller's testimony about his meetings with Hofman, the bellwethers, and Dr.

Haderlie to exchange information.  That testimony was fact-based rather

than expert opinion testimony, and thus the Court's ruling on the

insufficiency of the Rule 26 report had no impact on this testimony.

223.  The BLM also argues that Dr. Miller "opined that he had observed damage

to sugar beets exposed to less than 10 ppt of Oust in a study conducted by

another scientist named Don Morishita" who did not testify and whose

theory was not introduced into evidence and was not shown to be reliable.

*See BLM Proposed Findings at p. 94 (docket no. 1646).*  The argument

misstates the testimony.  When Dr. Miller was asked about the Morishita

study, DuPont's counsel objected on the basis of hearsay before Dr. Miller

responded.  *See Transcript at p. 7327.*  The objection was sustained.  *Id.*

The opinion testimony cited by the BLM did not occur at that point in the

proceedings, and there is no mention of it in the other citations provided by

the BLM.  Dr. Miller did later testify that in his opinion, Oust could damage

sugar beets at levels lower than 10 ppt.  *See Transcript at p. 7327.*  But he

did not mention the Morishita study in that testimony, and there was no

objection by either defendant.  The Court therefore finds this argument

unpersuasive.

224.   The Court finds that the testimony of Drs. Haderlie and Miller is based on

sufficient facts or data, is the product of reliable principles and methods, and

represents the reliable application of their principles and methods to the facts

of the case.  *See Fed.R.Civ.P. 702.*

225.   The bellwether plaintiffs themselves provided persuasive corroborating

testimony of Oust symptoms in their crops and the years the symptoms were

present:

226.   Clinger – *See Transcript at pp. 4849-51, 4918 (2000, 2001, & 2002 sugar*

*beets and 2001wheat).*

227.   Funk –  *Id. at 6097-98 (2001 & 2002 sugar beets), 6105-17 (2001 & 2003*

*barley), 6125- 27 (2001, 2002, & 2003 wheat), 6127-39 (2001, 2002, &*

2003 corn), 6138-41, 6145-62, & 6179-83, & 6475-76 (2001, 2002, & 2003 potatoes));

228.  Jentzsch – *Id. at 5027-35 (2001 sugar beets & potatoes), 5071-73 (2002 & 2003 sugar beets, potatoes, & wheat), 5078-81 (2004 sugar beets)); and,*

229.  Hansen – *Id. at 5620-67 (2000, 2001, 2002, 2003, & 2004 potatoes), 5788-89 (2001 & 2002 wheat), 5790 (2003 & 2004 potatoes, wheat, & sugarbeets), 5838 (2000-2004 potatoes, 2000-2002 sugar beets, & 2001-2002 wheat).*

230.  The symptoms on the bellwether plaintiffs' sugar beets during the claim years included stunted growth, erect and standing leaves, erratic spacing and patchiness, sprangled roots, reduced yields, and misshapen beets. *See Transcript at pp. 4633-50 (testimony of Tina Clinger), 4633-50, 4868-76 (testimony of Jerome Clinger), 6042-46, 6057-59 (testimony of Funk), 5027-32 (testimony of Jentzsch), 5560, 5566-67, 5636-37 (testimony of Hansen).*

231.  Funk's, Jentzsch's, and Hansen's symptoms in their potatoes during the claimed years included, for example, misshapen tubers, scarce root structure, stunted yields, and unusual growth cracks. *See Transcript at pp. 6036-37 (Funk), 5032-35 (Jentzsch), 5568-69, 5634 (Hansen).*

232.  Clinger's, Funk's, and Hansen's symptoms in their wheat and/or barley

*Findings of Fact & Conclusions of Law – page 58*

during the claimed years included, for example, erratic height, stunted

growth, failure to canopy, wavy appearance, poor root mass, "thin" and

reduced kernels in the head, and reduced yields.  *See Transcript at pp. 4901,*

*4918-19 (J. Clinger), 6109-19, 6125-27 (Funk), 5788-89 (Hansen).*

233.   Funk had Oust injury symptoms in his corn during the claimed years

including slow or stunted growth, discoloration on the leaves, and poor root

mass and structure.  *See Transcript at pp. 6127-34.*

234.   Photographs of the bellwether plaintiffs' crops demonstrate the presence of

SU/Oust symptoms in the bellwether plaintiffs' fields.  *See Exhibits 257,*

*436, 21204, 21402, 22247, 22759, 31135, 31141, 31186, 31305, 31457-62,*

*33389.*

235.   Amalgamated Sugar Company's 2001 crop damage reports show that the

same SU/Oust symptoms were present throughout the area of the plaintiffs'

fields.  *See Exhibits 632, 433, 429, 456, 633, 582, 488, 635, 24171, 24173,*

*23759, 24139, 34018.*

236.   The crop damage reports showed that only 1.2 percent of all sugar beet

fields investigated by Amalgamated did not have SU symptoms.  *See*

*Transcript at pp.* 690.

237.   Perry Van Tassell, Dan Schaefer, Kurt Harman, Ray Hollist, Duane Steele,

Randy Bauscher, Jerome Clinger, Gary Hansen, Rodney Jentzsch, and Lance Funk testified that they identified SU symptoms in their fields and other growers' fields throughout the valley.  *See Transcript at pp. 342-61, 420-30 (Harman), 3039-43, 3044-49, 3050-52 (Steele), 2984-85, 2991-93, 2990-2991, 2986-88, 2994-2995, 3000-01 (Hollist).*

238.   The bellwether plaintiffs had Oust symptoms in their respective crops in every year they are claiming damage.  *See Transcript at pp. 4849-51, 4918 (Clinger), 6097, 6113, 6126, 6138-39, 6475-76 (Funk), 5071-83 (Jentzsch), 5661-63, 5788-89, 5838 (Hansen).*

**Reasonably Likely Alternative Causes**

239.   Reasonably likely alternative causes of the crop damage – that is, causes other than Oust – were ruled out.

240.   No common sugar beet malady could account for the damage.  *See Testimony of Dr. John Gallian.*

241.   Plaintiffs' crop damage was not caused by cultural practices, nutrient deficiencies, or environmental stresses.  *See Testimony of Dr. Gail Kleinkopf.*

242.   During 2001, fieldmen and growers brought sugar beet samples into Dr. Gallian that had SU symptoms.  Samples with SU symptoms came from the

*Findings of Fact & Conclusions of Law – page 60*

area where the plaintiffs' crops were grown and not from any other area in

southern Idaho or eastern Oregon. *See Transcript at pp. 3467-69.*

243.   He also visited fields from four growers in the Aberdeen/American Falls

area during 2001 and confirmed that the symptoms were SU symptoms. *See

Transcript at pp. 3475-79.*

244.   Dr. Gallian personally observed fields inside and outside of the impacted

area.  No widespread SU symptoms occurred outside the impacted

area—upwind from BLM application sites—whereas the symptoms were

present throughout the impacted area. *See Transcript at pp.* 3475-80.

245.   Dr. Gallian reviewed every crop damage report and photograph from

Amalgamated Sugar Company's records of the 2001 investigation. *See

Transcript at pp. 3471-72.*  He explained that the growers and Amalgamated

Sugar fieldmen were, through their experience and education over the years,

capable of recognizing the common problems that affect sugar beets. *Id.* at

3463-64.

246.   He also reviewed photographs taken by Dr. Miller, Dr. Haderlie, growers in

the area, and the bellwether plaintiffs. *See Transcript at pp. 3471-72.*  The

photographs he reviewed depicted SU symptoms in the sugar beets, and the

crop damage reports demonstrated that the same symptoms occurred in

fields irrespective of seed variety, grower, cultural practices, and crop chemicals used. *Id*. at 3473-75. The symptoms were the same throughout the area. *Id*.

247. In the sugar beet growing area of Idaho, there were no extraordinary background issues that could account for the observed damage. *See Transcript at pp. 3465-70*. While background issues threaten crops every year, dealing with those issues is part of normal crop management that the growers were capable of recognizing and addressing. *Id. at 3469*.

248. Weather, disease, and pest infestations were ruled out as possible causes. *See Transcript at pp. 3470-75*.

249. Sencor, a crop chemical sometimes used on potatoes, does not and did not cause the SU symptoms attributed to Oust in the bellwether Plaintiffs' sugar beets. *See Transcript at pp. 3488*.

250. Dr. Gallian stated that crops in fields affected by Oust would suffer greater competition from weeds. The weakened crops would not take up water as quickly as normal, leaving more water for weeds to consume. The most prevalent weed in the affected sugar beet fields was an Oust-resistant kochia. *Id*. at 3489-92. Also, stunting delayed plant growth and the consequent ground covering, which increased weed exposure to sunlight and promoted

weed growth.

251.  According to Dr. Gallian, sugar beet exposure to Oust would also increase

plant sensitivity to other environmental stresses.  Stunting keeps the plants

small for an extended period of time. Small plants are more susceptible to

frost than larger plants. Thus, plants held back by Oust are more susceptible

to frost than normal plants.  Physiological processes in plants allow them to

ward off disease and injury. When plant growth is stunted, these processes

are delayed or inhibited, which increases the plant's sensitivity to disease

and injury.  *See Transcript at pp. 3492-94*

252.  The most prevalent weed in the affected sugar beet fields was an Oust-

resistant kochia.  *See Transcript at pp. 3492-94*.

253.  Dr. Gallian considered and eliminated sugar beet diseases and insects as

possible causes for the Plaintiffs' crop injury.  *See Transcript at pp. 3494-*

*3514*.

254.  He explained that there were no unusual occurrences of common sugar beet

problems other than Oust-caused problems in the area during the years 2000

through 2004.  He also eliminated fertilizer/nutrient problems as a possible

cause for the widespread crop injury during 2000 through 2004.  *See*

*Transcript at pp. 3514-16*.

255.   Dr. Kleinkopf is a leading expert in potato physiology and pathology.  *See Transcript at pp. 15492-500.*

256.   He was contacted in 2001 by Dr. Miller during the 2001 investigation.

257.   At that time, he observed the symptoms in the fields.  *Id. at 15502-05.*  He was also involved in the 2001 grower meetings where the growers discussed the crop symptoms.  *See Transcript at pp. 15545-51.*

258.   Dr. Kleinkopf's expertise includes chemical injury diagnostics.  *See Transcript at pp. 15498-500.*

259.   According to Dr. Kleinkopf, excess heat was not the cause of the observed symptoms, including those experienced in the bellwether Plaintiffs' fields.  *See Transcript at pp. 15510-22, 15536-38.*

260.   Rather, he opined that Oust was the cause.  *See Transcript at pp. 15522-26.*

261.   He explained the root and tuber symptoms of Oust and how root pruning hinders the plant's ability to uptake water, resulting in heat stress like symptoms.  *See Transcript at pp. 15526-36.*

262.   Further, all of the bellwether Plaintiffs had sophisticated irrigation systems, which functioned normally. There was no evidence of irrigation system failure or irrigation related explanations for the widespread damage.

263.   The Court was persuaded by Dr. Kleinkopf's testimony that reasonably

*Findings of Fact & Conclusions of Law – page 64*

likely causes other than Oust, including the types of crop damage threats

ordinarily faced by the plaintiffs, can be ruled out as the causes of the

Funk's, Hansen's, and Jentzsch's potato damage for all years claimed.  *See*

*Transcript at pp. 15504-15526.*

264.   Likewise, Dr. Haderlie testified that nothing else in the growing

environment during the Oust damage years could account for the Oust-injury

symptoms.  *See Transcript at pp.  6782, 6788, 6801-05.*

265.   Dr. Miller also ruled out all other reasonably possible causes except for

Oust.  *See Transcript at pp. 7384-86, 7394-406.*

**Testimony of Bellwether Plaintiffs Ruled Out Reasonably Likely Alternative**

**Causes**

266.   The bellwether plaintiffs ruled out all other reasonably likely alternative

causes.

267.   Each of the bellwether Plaintiffs demonstrated that, as farmers, they are

experienced at identifying various sources of crop injury and ruling out the

possible causes of injury and that they did so in this case to determine that

Oust was the likely source of their injuries.

268.   The bellwether Plaintiffs are experienced farmers.  For every crop year, they

address a variety of factors that could injure their crop or reduce their crop

revenues.  Such factors include wind, frost, heat, insects, pesticide and

fertilizer misapplication, and water shortages.  The bellwether plaintiffs

established that through their day-to-day experience, they have developed

expertise in diagnosing, managing, and preventing losses from these factors.

269. Rod Jentzsch considered and ruled out alternative causes of the injury

symptoms.  When asked if he ruled out alternative causes, he responded:

"Oh, you bet we did. . . . That is what farmers do. Whenever you have a

problem, you start going down the list . . . . What did we put in here last

year? What is the rotations? What is the seed sources? What sprays did we

put on? What fertilizers did we put on? Did we have an irrigation problem?

Did we have any insect problems? . . . That is what farmers do. We are kind

of like private investigators out there trying to figure out what is going on.

And if we cannot figure it out, we start bringing in people that can."  *See*

*Transcript at pp. 5083-84*.

270. Each of the other bellwether plaintiffs followed the same common farming

practice of ruling out alternative potential causes when concluding that Oust

injured his crops.  *See Transcript at pp. 5665-67 (Hansen), 4639-40, 4849-*

*51 (Clinger), 6043-48; 6052-53 (Funk)*.

271. In trying to determine the cause of his crop damage over his entire operation

from 2000 through 2004, Gary Hansen took into account and ruled out other potential causes for the damage including weather, pests, soil variety, irrigation, the frequency of deformation, and all other causes "that could possibly be considered." *See Transcript at pp. 5665-66.* He evaluated all other external factors as possible causes, but ruled them out as well. *Id. at 5666-67.* He also reviewed and ruled out possible internal errors to determine whether some action taken by the farming operation could have caused the crop damage. *Id. at 5567.*

272. Hansen described some symptoms as "unique" to the Oust years including: U-shape potatoes, small potatoes with growth cracks, potatoes with growth cracks running their full length or with five or six cracks. *See Transcript at pp. 5636-37.*

273. Tina Clinger and her husband Jerome had experience dealing with frost, rhizomania, other sugar beet diseases, and environmental conditions. None of these factors caused the injury they observed in their field. *See Transcript at pp. 4639-40.*

274. Likewise, Lance Funk investigated his farming practices to determine if he had done something wrong. *See Transcript at pp. 6043-44.* He looked at past chemical use, planting history, and cultivation practices from past

growing seasons to determine if anything was different.  *Id.*  When he could not explain the problem, he called crop advisors, the sugar beet company, and neighbors with similar problems to help determine the cause of the "unusual" problem.  *Id. at 6044-45.*

275.  Additionally, each bellwether plaintiff specifically addressed the various "alternative causes" raised by defendants during the trial.

276.  For example, both Lance Funk and Rod Jentzsch used Sencor for many years and had never experienced any injury as a result, and no other chemical caused the injuries they attribute to Oust.  *See Transcript at pp. 6052-53, 6463-65 (testimony of Funk), 5236-37 (testimony of Jentzsch); see also id. at 3076-80 (testimony of Duane Steele that Sencor could not have been cause of symptoms).*

277.  Further, Lance Funk testified that poor root masses or structures  resulted in his crops being unable to withstand normal environmental stresses that they would have otherwise normally withstood, such as weather.  *See Transcript at pp. 6446-47, 6449-50.*

278.  Likewise, Gary Hansen testified at length regarding Oust's adverse impact on his crops' ability to withstand weather conditions and his belief that weather was not the cause of his damages.  *See Transcript at pp. 5672-82,*

*5869-79, 5895-96, 5801-04, 5908, 5919-20.*

**Non-BLM Oust Applications**

279. During its 2001 investigation, the ISDA determined that Young & Young of Idaho Farms, the Eastern Idaho Railroad, the Idaho Transportation Department, and Power County Weed Control had applied Oust in the investigation area.  It also determined that the United States Forest Service applied Oust to a 40-acre parcel outside of the investigation area.  *See Exhibits 654, 837 & 848; see also, Transcript at pp. 11196-11205.*

280. Grower Steve Young – a plaintiff in this case although not one of the bellwethers – applied about 56 pounds of Oust along roads adjacent to four of his fields between April and June of 2001.  *See Transcript at pp. 11110-13.*

281. Young used a "surfactant" that made the Oust stick to weeds and largely, although not entirely, prevented it from eroding off of Young's roadsides. *See Transcript at p. 2557 (testimony of Dr. Shields).*

282. The Court finds credible the testimony of experts Dr. Shields, *see Transcript at 2556-60,* and Dr. Miller, *see Transcript at pp., 7773-75*, that while the Young applications may have caused some damage to Young's own fields, those applications did not damage the bellwether plaintiffs' fields.

*Findings of Fact & Conclusions of Law – page 69*

283.   Although the ISDA investigation concluded that it could not "rule out" the
Young applications as a cause of the crop damage to the east, *see Transcript
at p. 11139,* the testimony of Dr. Shields and Dr. Miller does rule out the
Young applications as a cause.

284.   The Idaho State Department of Fish & Game applied Oust to 40 acres of
vegetated state lands. The application was outside of the ISDA investigation
area. *See Transcript at p.* 11142; *see also Exhibit 837 at 2.*

285.   The ISDA did not investigate the Fish & Game application as a possible
source.  The ISDA's purpose was just to identify that "some Oust had been
used at some point in time." *See Transcript at p. 11143.* This application
was simply another Oust application considered by the ISDA. *Id. at 11155.*
The ISDA's investigation did not consider whether Oust moved off-target
from this application, and thus, never concluded that it did. *Id. at 11238 &
11196-97.* No credible evidence was presented at trial supporting an
inference that Oust from this application moved off-target onto the
Plaintiffs' crops.

286.   Along a 50-mile stretch of Idaho highway, the Idaho Transportation
Department sprayed one or two total ounces of Oust on guardrails. *See
Transcript at pp. 2547.*

287.  The application records state that the guardrails were located between
      milepost 5.2 and continued to milepost 54.  No witness testified about the
      location of milepost 5.2 or 54 or how many application spots were in the 50-
      mile stretch of highway.  ISDA Inspector Spencer did not know the locations
      of the guardrails.  *See Transcript at pp.* 11162.  He also did not know how
      much Oust was sprayed at each guardrail.  *Id.*

288.  The ISDA never found that the highway applications moved off target or
      caused any Oust damage.  *See Transcript at pp.  11198-99.*

289.  The Idaho Department of Transportation applications did not cause the
      bellwether laintiffs' damages.

290.  BLM's mapping expert, Thomas Hoffman, mapped railroad lines where
      Oust was applied, based on Eastern Idaho Railroad pesticide application
      records.  These railroad lines were within the Oust plume north of Burley.
      The lines mapped as Oust application locations were not in the American
      Falls/Aberdeen area.

291.  Hoffman testified only to the locations of the railroad lines that he mapped.
      He was unable to testify about the locations or character of the sprays.  *See
      Transcript at pp.  13660-61.*  His testimony was limited to stating he mapped
      railroad lines somewhere along which some Oust was applied.

292.   Dr. Shields investigated the railroad applications of Oust.  He determined that the applications were on non-erodible ballast rocks along the tracks.  *See Transcript at pp.  2548-49*.  Oust from these applications did not erode onto the growers' fields or injure their crops.  *Id*.

293.   The Court finds that the Eastern Idaho Railroad applications did not cause the bellwether plaintiffs' damages.

294.   The Power County Oust applications were spot applications, nearly all of which were south of Interstate 86.  *See Transcript at pp. 2568-69*.  The applications were nominal in comparison to BLM applications.

295.   The Court finds that the Power County Weed Control Oust applications did not cause the bellwether Plaintiffs' damages.

**Damages**

296.   Cornelius Hofman, forensic economist and the owner and president of the GEC Group, testified on behalf of the Plaintiffs.  He summarized the financial impact and economic loses suffered by the four bellwether plaintiffs as a result of the damage caused by Oust contaminated soil particles that blew onto their crops.  *See Transcript at pp. 3609, 3613*.

297.   Hofman and his team of independent consultants from GEC, including accountants, finance experts, and research assistants, collected documents

and data from the growers. *See Transcript at pp. 3619-20.* They gathered

1.6 million documents from all the growers, *id*. at 3621-22, with

approximately 250,000 pages from the four bellwether plaintiffs. *Id. at*

*3628-29.* These documents included financial records that discuss the

growers' farm and farm income (e.g., receipts, settlement sheets, etc.). *Id. at*

*3623.* GEC collected evidence on crop sales and acreage reports as well as

other documents that allowed them to consistently calculate historical yields.

*Id*. at 3623. GEC began this process in 2003 and has continued it through

trial – approximately six years. *Id*. at 3619, 3621.

298.   In addition to meeting with the growers, Hofman and his team at GEC met

with their agronomists, farm management team, accountants and other

individuals who knew about the farming operations. *See Transcript at pp.*

3629, 3621.

299.   Each of the four bellwethers testified about meeting with Hofman and GEC

and providing them with thousands of documents, electronic data, access to

personnel, and other information to establish the damage amounts for each

of their operations. *See Transcript at pp. 4663-71 (T. Clinger), 4916 (J.*

*Clinger), 6198-200 (Funk), 5120-21, 5463, 5480 (Jentzsch), 5683-84, 5732-*

*35 (Hansen).* The bellwethers also provided information regarding their

actual and expected crop production, revenue, prices, mitigation expenses, and debt-based opportunity costs. *See Transcript at pp. 4652-55, 4663-66, 4681-83 (T. Clinger), 4913-15, 4938-47 (J. Clinger), 6093-97, 6125-27, 6138-40, 6197-6200, 6471-74 (Funk), 5122-26, 5479-86 (Jentzsch), 5726-54, 5771-74, 5780-84 (Hansen).).*

## Methodology

300.   GEC's methodology is economically sound and reliable. *See Transcript at pp. 15842-43 (testimony of Dr. Barry Goodwin).*

301.   GEC's methodology involved five steps:

302.   <u>STEP 1</u>: Determine the value of the crop actually produced. *See Transcript at pp. 3649-51.*

303.   <u>STEP 2</u>: Determine the value of the crops that would have been produced had there been no Oust. *See Transcript at p.* 3651.

304.   <u>STEP 3</u>: Calculate the difference between the crop actually raised and the crop which would have been raised by subtracting Step 2 from Step 1. *See Transcript at pp. 3651, 3851.*

305.   <u>STEP 4</u>: Calculate net costs saved and mitigation costs spent. *See Transcript at pp.* 651-52.

306.   <u>STEP 5</u>: Determine reasonable value by taking the losses calculated in Step

3 and 4, and considering additional debt-based costs to arrive at the total economic loss. *See Transcript at pp.* 3889-94.

307.   GEC's methodology uses price to account for variations in crop quality – a grower is paid based on the worth of his crop and receives a higher premium for a higher quality crop. *See Transcript at p.* 3689.  GEC took quality into account by looking at actual versus expected prices from four sources during the damage years. *Id. at 3689-90.*

308.   GEC isolated the damage caused by Oust from the damage caused by other factors (e.g., environmental factors like hail, disease, etc.) that the growers face every year. *See Transcript at pp. 3642-43.*  To isolate the damage, GEC compared the bellwethers' production with the production of a control group – a group of farmers whose historical yields have a high correlation with the injured growers but who farm in a largely unaffected neighboring county. *Id. at 3700-04.*  GEC chose Cassia County because since 1949, it had a high correlation with the affected counties – between 94 & 99%. *Id. at 2925-26, 3695, 3700-04.*  GEC also "indexed" the grower's production history to the control group to account for the grower's efficiency compared to the control group. *Id. at 3709-11.*  By comparing the grower to the control group, the difference due to Oust can be measured. *Id.* at 4036-37.

309.   Thus, GEC's methodology compared the grower's Oust-damaged farm to a
normal farm in the control group–rather than a "perfect farm." *See
Transcript at pp. 3641-42, 4052-53.*  By calculating only the damage caused
to a normal farm by Oust, GEC accounted for systemic and other external
factors like hail and disease – factors that distinguish a normal farm from a
perfect farm. *Id. at 3987-88, 4036-37, 4055-56.*  This method thus
compared the grower's actual production to its expected production in a
normal year rather than a "perfect year."

310.   GEC's methodology accounted for disease specific to each farm by using
information directly from the growers and agronomists. *See Transcript at p.
3918.*  For example, the price GEC used to represent the quality of the crop
reflected deductions for nematodes. *Id. at 4039-41.*  Pricing also accounts
for other quality issues that include, for example, bruising, soft rot, frost, and
excess dirt. *Id. at 4042-44.*

311.   GEC controlled for weather by comparing Oust-affected growers to the
control group.

312.   While weather can affect a specific field, that same phenomenon occurs in
other counties and one must rely on the correlation between counties. *See
Transcript at pp. 16117-22.*

*Findings of Fact & Conclusions of Law – page 76*

313.   Dr. Barry Goodwin, a professor of agricultural economics at North Carolina

State University, and a team of PhD's he assembled, reviewed GEC's

approach and determined it used an acceptable economic methodology to

calculate damages—including debt-based costs.  *See Transcript at pp.*

*15814-16.*  He is also a private consultant for the federal Risk Management

Agency (RMA), *id. at 15804*, and he testified that defendants' damage

experts did not use RMA data correctly.  *Id. at 15820.*

314.   The Court has had the opportunity to personally observe Dr. Goodwin

present his testimony and finds it to be reliable, relevant, and credible.

315.   The Court concurs with his conclusion that GEC's methodology is

economically sound, reliable, and accurately represents the economic loss

experienced by the individual growers, and is more accurate and reliable

than the defendants' damage experts.  *See Transcript at pp. 15842-44.*

## GEC's Key Sources of Information

316.   GEC relied on ten key sources of information:

a.      Farmer documents.  *See Transcript at pp. 3619-31*;

b.      Meetings with farmers.  *See Transcript at pp. 3621, 3625, 3629-31*;

c.      Meetings with agronomists.  *See Transcript at pp. 3631-32*;

d.      Buyer documents.  *See Transcript at pp. 3632-33*;

*Findings of Fact & Conclusions of Law – page 77*

e.    Meetings with buyers. *See Transcript at p. 3633;*

f.    Amalgamated Sugar Company documents and data. *See Transcript at p. 3634;*

g.    USDA/NASS data. *See Transcript at p. 3634;*

h.    FSA documents. *See Transcript at p. 3635;*

i.    Information from the University of Idaho. *See Transcript at p. 3635;*

j.    Other experts. *See Transcript at pp. 3635-36); see also 4029 (Mr. Hofman clarified that these ten sources "aren't all the sources" he looked at).*

317. GEC used information it compiled from the bellwether Plaintiffs to calculate historical yields and production for their crops. *See Transcript at p. 3624.* All of this information was available to the Defendants, and all the documents relied upon by GEC to perform its damage calculations were produced to Defendants.

318. In conducting its analysis, GEC relied on, among other things, the following documents, data, and information for each of his five steps:

319. STEP 1: (Actual production): tax returns, general ledgers or checkbooks, settlement sheets, acreage reports, receipts, and interviews with the plaintiffs and their agronomists. *See Transcript at pp. 3623-24, 3632-34, 3654-90.*

320.   STEP 2: (Expected production): interviews with the plaintiffs and their agronomists, production and financial records showing farmers' income in non-damage years, control group data (including USDA crop yield data for neighboring counties), and the index method. *See Transcript at pp. 3630-32, 3634-36, 3690-711, 3759-77, 3842-60.*

321.   STEP 3:  Simply involves taking the difference between Steps 1 and 2. *See Transcript at p. 3770.*  Thus, it relies on the same sources as Steps 1 and 2.

322.   STEP 4:  (Cost savings and mitigation expenses): interviews with the Plaintiffs and University of Idaho agricultural school data. *See Transcript at pp. 3635,3875-89.*

323.   STEP 5:  (Debt-based opportunity costs): loan documentation and bank records of each of the bellwether Plaintiffs. *See Transcript at pp. 3894-96.*

**Step 1**

324.   In Step 1, GEC started by taking the total crop revenue from the grower's tax return for a given calendar year. *See Transcript at pp. 3654, 3657-60 (Hofman explained that this is only step one, as an economist cannot simply rely on tax returns because they are expressed on a calendar year basis and the numbers must be converted to a crop-year basis; further, they do not tell you how many acres or how much production it took to generate the*

*revenue).*

325.   Next, GEC compared the crop revenue from the tax returns with all of the grower's deposits in his general ledger or checkbook (accounting for all of them) and determined the total revenue for specific crops.  *See Transcript at pp. 3654-55, 3661-63.*

326.   After determining total crop revenue for specific crops, GEC matched deposits with the grower's income using settlements and production records that showed crops sold and amounts paid.  *See Transcript at pp. 3655-56, 3663-69.*

327.   Finally, GEC determined the grower's acreage and standardized the production into a unit per acre.  *See Transcript at pp. 3656-57, 3669-70 (Mr. Hofman did not simply rely on FSA acreages but used multiple sources, including the grower himself, to determine acreages); see also id. at 3678-3679.).*

## Step 2

328.   In Step 2, GEC determined what the bellwether plaintiff would have produced in the damage years had there been no Oust.  *See Transcript at pp. 3690-91.*

329.   To account for variability, GEC relied on five separate sources.  *Id.* at 4056.

*Findings of Fact & Conclusions of Law – page 80*

The five sources included:

a.    Source 1: The Farmer (*Id.* at 3692-94.)

b.    Source 2: Agronomists (*Id.* at 3694-95.)

c.    Source 3: The Farmer's Historic Yields in Non-Damage Years (*Id.* at 3695-99.)

d.    Source 4: The Control Group (*See supra* at ¶173; *id.* at 3695, 3700-04.)

e.    Source 5: The Index Method (*See supra* at ¶ 173; *id.* at 3695, 3709-11.)

330.  Hofman worked during meetings with the grower and the agronomist (sources one and two) to establish "expected yield" and "expected price." They determined these numbers with 20/20 hindsight—looking backward—knowing what actually occurred on the farm (historical yields, production history, control groups) and what weather conditions were like. *See Transcript at pp. 3760-62, 4028-29.*

331.  In determining expected price of potatoes, GEC's analysis considered whether the grower sold them to processors or shipped them to the fresh market.  *See Transcript at pp. 3847.* For example, processed potatoes are typically sold under a contract – thus stabilizing the price of potatoes for

those growers.  *Id. at 3847.*  Fresh potatoes are sold on the market without a

contract and are, therefore, much more susceptible to market fluctuations.

*Id*. During the damage years, the price of processed potatoes remained fairly

consistent from 2000 to 2002.  *Id.*  However, fresh pack potato prices

fluctuated (e.g., 2000 was a low price year and 2001 was a high-price year).

*Id. at 3848, 3856.*

332.   GEC ultimately determined expected yield by averaging the five sources.

*See Transcript at pp. 16136-37.*

**Application of the Five Steps: (Step 3: The Difference Between Actual and**

**Expected Production).**

333.   In Step 3, GEC took the difference between the first two steps – subtracting

actual production from expected production.  *See Transcript at pp.* 3770-71,

3851.  The pattern that developed showed some damage in 2000, a dramatic

increase in damage in 2001 and 2002, a decrease in 2003, and a further

reduction in 2004.  *Id. at 3874-75, 4075-76.*

**Application of the Five Steps: (Step 4: Cost Savings and Mitigation**

**Expenses).**

334.   In Step 4, GEC considered both costs saved because the grower did not

produce as much crop as expected, and additional expenses as growers

attempted to mitigate the effects of Oust.  *See Transcript at pp. 3875-76.*

335.   Costs saved include, for example, reduced hauling costs and lower crop settlement charges.  *See Transcript at p. 3878.*

336.   Costs incurred (mitigation costs) include, for example, costs for extra watering, deep plowing, applying extra chemicals, and hiring additional labor for weeding.  *See Transcript at p. 3879.*

337.   GEC determined the cost saved/incurred figures based on conversations with the bellwether Plaintiffs about specific costs and based on data from the University of Idaho. *See Transcript at pp. 3876-77, 3879-80.*  GEC tied information on costs saved to settlement sheets.  *Id. at 3878.*

**Application of the Five Steps: (Step 5: Debt-Based Costs).**

338.   In Step 5, GEC considered the total economic loss from Steps 1-4 and the additional debt-based costs—the actual interest charges that the bellwether plaintiffs had to pay since the damage occurred.  *See Transcript at pp. 3890-94.*

339.   GEC's analysis used the bellwether plaintiffs' actual loan rates on their debt during the years following the damage.  *See Transcript at pp. 3894-96, 15967.*  GEC looked at the actual interest rate year-by-year and month-by-month and calculated the debt-based costs. *Id.* at 15967-73.

340.    GEC calculated the debt-based costs by reviewing all of the indebtedness that related to operating the farms – farm debt including loans, lines of credit and other bank indebtedness like mortgage notes on farmland, cellars, beet shares, equipment, etc.  *See Transcript at p.* 15966.

341.    GEC determined debt-based costs through 2008 – when its report was due. *See Transcript at p. 15967.* The bellwether plaintiffs always had outstanding debt in excess of the amounts GEC calculated that related to what the bellwether plaintiffs would have received (year-by-year) had the Oust problem not occurred.  *Id. at 16135-36.*

**Claim Years**

342.    The Clinger grower group claim damages for the following crops and years:

   a.    Sugar beets: 2000, 2001, 2002;

   b.    Wheat: 2001.  *See Transcript at p. 4073.*

343.    The Funk grower group claims damages for the following crops and years:

   a.    Barley: 2001, 2002;

   b.    Corn: 2001, 2002, 2003;

   c.    Potatoes: 2001, 2002, 2003;

   d.    Sugar beets: 2001, 2002;

   e.    Wheat: 2001, 2002, 2003.  *See Transcript at p. 4074.*

344.   The Hansen grower group claims damages for the following crops and years:

    a.     Potatoes 2000, 2001, 2002, 2003, 2004;

    b.     Sugar beets: 2000, 2001, 2002;

    c.     Wheat: 2001, 2002.  *See Transcript at p. 4074.*

345.   The Jentzsch grower group claims damages for the following crops and years:

    a.     Potatoes: 2000, 2001, 2002, 2003, 2004;

    b.     Sugar Beets: 2001, 2002, 2004.  *See Transcript at p. 4074.*

346.   Discrepancy between farms for claim years (some claiming years that others do not) is accounted for by the fact that every farm is unique and growers' practices change from year to year (e.g., fluctuation in acreages farmed, changes in market price, unique rotation schedules, location of fields, ground sitting idle, etc.).  *See Transcript at pp. 3873, 4074-75.*

**Damage Findings: Net Crop Loss Calculations**

347.   GEC determined net crop loss calculations applying steps 1-3 of its model.

348.   The Court finds that bellwether plaintiffs established by a preponderance of the evidence the following net crop losses:

349.   <u>The Hansen grower group</u>: The Court finds that the Hansen grower group's net crop losses totaled: $4,792,176.00.  *See Transcript at pp.* 15994.  The

following shows Hansen's net crop losses broken down by crop and year:

| Hansen Net Crop Losses | | | | | |
|---|---|---|---|---|---|
| | *2000* | *2001* | *2002* | *2003* | *2004* |
| *Sugar Beets* | $74,902 | $58,730 | $189,537 | X | X |
| *Potatoes* | $515,649 | $1,576,296 | $961,277 | $839,569 | $433,361 |
| *Wheat* | X | $27,846 | $115,009 | X | X |

*Id. at 15994.*

350. <u>The Funk grower group</u>: The Court finds that the Funk grower group's net crop losses totaled: $2,390,807.00. *See Transcript at pp. 15997-98.* The BLM has a jurisdictional challenge to three fields farmed by the Funks, and the Court will deny that challenge. The Court's explanation is set forth below along with the resolution of a similar challenge to fields farmed by Jentzsch-Kearl.

351. The following shows Funk's net crop losses broken down by crop and year:

| Funk Net Crop Losses | | | |
|---|---|---|---|
| | *2001* | *2002* | *2003* |
| *Sugar Beets* | $111,414 | $274,220 | X |
| *Potatoes* | $429,595 | $220,899 | $387,380 |
| *Corn* | $9,566 | $53,569 | $24,201 |

*Findings of Fact & Conclusions of Law – page 86*

| Funk Net Crop Losses | | | |
|---|---|---|---|
| *Wheat* | $231,225 | $253,374 | $87,804 |
| *Barley* | $94,033 | $213,527 | X |

*Id. at 15997-98.*

352.  <u>The Clinger grower group</u>: The Court finds that the Clinger grower group's

net crop losses totaled: $956,243.00.  *See Transcript at p.* 15997.  The

following shows Clinger's net crop losses broken down by crop and year:

| Clinger Net Crop Losses | | | |
|---|---|---|---|
| | *2001* | *2002* | *2003* |
| *Sugar Beets* | $187,435 | $351,351 | $303,876 |
| *Wheat* | X | $113,581 | X |

*Id. at 15997.*

353.  <u>The Jentzsch grower group</u>: The Court finds that the Jentzsch grower

group's net crop losses totaled: $1,701,649.00.  *See Transcript at pp. 15997.*

354.  <u>Fields B-1 & B-2</u>:  In an earlier decision, the Court held that plaintiffs could

seek damages for fields they purchased or leased prior to the filing of their

second administrative claim – March 21, 2003 – even if those damages were

continuing in nature past that date.  *See Memorandum Decision (docket no.*

*893).*  But the Court prohibited plaintiffs from seeking any losses for fields

purchased or leased after March 21, 2003.  Plaintiff  Jentzsch-Kearl

*Findings of Fact & Conclusions of Law – page 87*

Growers seeks an award for loss of sugar beets in 2004.  Hofman testified that the net crop loss for that year was $26,666.  The only fields for which Jentzsch sought damages in 2004 were his fields B-1 and B-2.  *See Transcript at p. 5080*.  These were new fields he had just started farming in 2004.  *Id. at p. 5079.*  The lease on these two fields was signed on June 11, 2004.  *See Exhibit Z (docket no. 745).*  Because these two fields make up the entirety of Jentzsch's claim for 2004, and were not leased prior to March 21, 2003, the damages for those fields must be stricken.  Accordingly, the Court will strike $26,666 from the award to Jentzsch-Kearl Growers for the net crop loss for 2004 sugar beets.

355. The BLM seeks to have the same ruling applied to three potato fields leased by the Funks in 2003.  But that lease shows that its term began on March 15, 2003, six days before the cut-off of March 21, 2003, discussed above.  While the BLM point out that the lease was not signed by the Funks until March 28, 2003, there is no evidence that its terms did not begin on March 15, 2003, as it expressly so states.  For that reason, the Court will not strike these fields as it did with the Jentzsch-Kearl field above.

356. The following shows Jentzsch's net crop losses broken down by crop and year:

| Jentzsch Net Crop Losses | | | | | |
|---|---|---|---|---|---|
| | *2000* | *2001* | *2002* | *2003* | *2004* |
| *Sugar Beets* | X | $281,524 | $621,586 | X | 0 |
| *Potatoes* | $67,873 | $611,864 | $118,802 | X | X |

*Id.* at 15997.

**Damage Findings: Mitigation Costs**

357.   Hofman determined mitigation crop loss calculations applying step 4 of his model.

358.   The bellwether plaintiffs established by a preponderance of the evidence that their mitigation costs (except as described below) were reasonable, and that these costs were incurred due to the Oust injury to their crops. Furthermore, the growers exercised ordinary care to avoid or minimize existing damages and to prevent further damage.

359.   Based on the evidence presented, the Court finds that each of the bellwether Plaintiffs incurred all of the mitigation costs claimed.  The Court further finds that these mitigation costs were incurred due to the Oust injury to their crops.  Furthermore, the growers exercised ordinary care to avoid or minimize existing damages and to prevent further damage.  Accordingly, the

Court awards to the bellwether Plaintiffs all of their mitigation costs as set forth below.

360. **Hansen grower group**:

361. Hansen had the following mitigation costs: preparing fields for replanting-- disking, seed costs, planting costs (2001-2002), extra hoeing (2000-2002), application of additional herbicides (2001), beating costs (2002), and potato seed costs to purchase Norkotah variety (2002 and 2004). *See Transcript at pp. 5684-93.*

362. The Court finds that Hansen's mitigation costs totaled $242,678.00. *See Transcript at p. 3886.* The following shows Hansen's mitigation costs broken down by year:

   a.     2000: $16,937.00;

   b.     2001: $43,813.00;

   c.     2002: $159,475.00;

   d.     2004: $22,453.00;

363. TOTAL $242,678.00. *See Transcript at p.* 15994.

364. **Funk grower group**

365. Funk had the following mitigation costs: fertilizer and biological application costs (2001-2003), additional ground work including hoeing & cultivation

(2001); replanting and power irrigation costs (2001); land rental costs

(2002); equipment costs for eight tea brewers (2001); extra water cost (2002-

2003); crop consultant/agronomist costs (2001); and a contract penalty

(2002).  *See Transcript at pp. 6064-66, 6162-92.*

366.   The Court finds that the Funk grower group's mitigation costs totaled

$431,314.00.  *See Transcript at pp. 3887-88.*  The following shows Funk's

mitigation costs broken down by year:

a.   2001: $242,256.00;

b.   2002: $112,184.00;

c.   2003: $76,874.00;

367.   TOTAL $431,314.00.  *See Transcript at pp. 15997-98.*

368.   **Clinger grower group**

369.   Clinger had the following mitigation costs: herbicide chemical and

application costs (2001-2002); spraying weeds in the wheat crop (2001);

additional ground work including cultivation, hoeing, weed mowing,

moldboard plowing, roller harrowing, and cross ripping (2000-2002); seed

and planting costs for re-planting (2001-2002); additional power costs for

irrigation (2001).  *See Transcript at pp. 4915-33.*

370.   The Court finds that the Clinger grower group mitigation costs totaled

*Findings of Fact & Conclusions of Law – page 91*

$395,957.00.  *See Transcript at pp.* 3888.  The following shows Clinger's

mitigation costs broken down by year:

    a.     2000: $19,706.00;

    b.     2001: $144,084.00;

    c.     2002: $232,167.00;

371.   TOTAL $395,957.00.  *See Transcript at p. 15997.*

372.   **<u>Jentzsch grower group</u>**

373.   Jentzsch claimed the following mitigation costs: fertilizer, chemical and/or herbicide costs for corn (2001), sugar beets (2001-2002), potatoes (2002-2004), pesticide costs for southern fields (2003-2004); cultivation costs including weed mowing, bedding, moldboard plowing, swathing, hoeing,ripping, and/or discing, in sugar beets (2001-2003) and potatoes (2001); replanting costs – seeding and planting (2001-2002); land rental costs for move south (2002-2003); expense for conducting a bio assay (2002); and expense for lost contracts with McCain's (2003 and 2005) and Heinz (2002).  *See Transcript at pp. 5092-119, 5169-72, 5458-61, 5475-76.*

374.   <u>McCain Reduction in 2005</u>:  One of those alleged mitigation costs is $60,000 for McCain Food's reduced payment on a pre-season potato contract in 2005.  Jentzsch testified that the reduction was due to McCain

Food's perception that Jentzsch was an "Oust grower" whose potatoes were of poor quality. *See Transcript at p. 5118.* This description of the claim shows that it is not a true mitigation cost, as it was not an expense incurred to cure the harmful effects of Oust. *See Conclusions of Law, infra (and discussion therein of definition of mitigation costs under Casey v Nampa & Meridian Irrigation District, 379 P.2d 409, 412 (Id.Sup.Ct. 1963).* In addition, there was no documentary evidence of the deal or corroborating testimony. A critical component of Jentzsch's claim is that his reputation was tainted, and he points to a low score he received on a "grower matrix" that was based on potato quality and was used by buyers to make preseason contracts. His score was 80 in 2004. *See Transcript at p. 5115.* He claims that the score was low due to the Oust damage his potatoes suffered in prior years, and that his contract with McCain was cut back because of that Oust-caused taint to his reputation. He also testified that there is a two-year lag between the low-quality potatoes responsible for the score and the score itself. *Id. at 5118-19.* In 2000, his score was even lower – 43. *Id. at 5115.* That would reflect, according to his testimony, the quality of his potatoes in 1998, a year that was not affected by Oust. When these numbers are compared, it appears that his reputation actually increased during the Oust

years.  That fact, combined with the absence of any documentary or

corroborating evidence, makes this claim unpersuasive.

375.   <u>McCain Reduction in 2003</u>:  Using the same reasoning, Jentzsch seeks

$220,000 for a lost contract with McCain in 2003.  This contract was orally

promised to him by John Remsberg as an unwritten condition of their lease

agreement on the southern fields.  *See Transcript at p. 5455.*  Remsberg

promised that he could transfer that contract to Jentzsch, but failed to do so.

*Id.*  Jentzsch's attempt to explain why the contract was not transferred was

largely excluded because it was inadmissible hearsay.  *See Transcript at p.

5471-75.*  No admissible testimony was ever introduced to fill in this gap.

As a result, the record is quite vague as to why Remsberg could not perform

his verbal promise to transfer the McCain contract.  There is not enough

solid proof to raise this claim above the realm of speculation.  Moreover,

Jentzsch runs into the same problem he faced on his other claim with regard

to his allegation that it was Oust that ruined his reputation.  In 2003 – the

year at issue in this claim – his score was 60.  *See Transcript at p. 5115.*

That score was higher than the 43 he received in 2000 – a score reflecting

potato quality in the non-Oust year of 1998 – and so his reputation was on

the mend.  For all of these reasons, the Court will deny this claim.

376.  <u>Costs To Move to Southern Fields</u>:  Jentzsch also seeks mitigation expenses incurred in obtaining and preparing fields south of his Oust-contaminated fields:  (1) $238,484 in 2003 and 2004 for pesticide spraying; (2) $274,449 in 2003 for rental costs for those southern fields; and (3) $19,401 in 2002 for rental costs for the southern fields.  Jentzsch moved to these southern fields to escape the Oust contamination.  They proved to be very productive. Jentzsch testified that "we had better crops out there.  And because of that, there was no claimed damage for 2003." *See Transcript at p. 15705.*  Indeed, Jentzsch's gross income from crop sales grew from $3.5 million in 2000 to $12.7 million in 2004.  *Id. at p. 5270.*  Specifically, his sugar beet gross sales more than doubled between 2003 and 2004, jumping from $2.2 million in 2003 to $5.6 million in 2004, as a result of "all the southern acres."  *Id.* These figures were far above what Jentzsch earned just prior to the Oust applications.  *Id. at pp. 5272-5279.*  Because his move south worked so well, Jentzsch did not make a crop loss claim for 2003, and only a minor claim in 2004.  But he is seeking over $500,000 in mitigation costs for the rental fees and pesticide costs he incurred in obtaining and preparing these southern fields.  These expenses were an investment rather than a recoverable mitigation cost.  There is no loss associated with these expenses – indeed,

this investment paid off in sugar beet sales that more than doubled in a single year and were far above pre-Oust figures.  Because there is no loss associated with these expenses, the Court will not award them as mitigation expenses.

377.   Accordingly, the Court will strike the following from its award of mitigation costs to Jentzsch-Kearl Growers:

    a.    2002 – $19,401

    b.    2003 – $573,342

    c.    2004 – $159,591

    d.    2005 – $60,000

378.   Total to be struck: $812,334

379.   Subtracting that figure ($812,334) from the amount of claimed mitigation costs ($1,197,586.00) yields a final figure for mitigation costs of $385,252 for the Jentzsch grower group.  *See Transcript at pp. 3888-89.*

380.   The following shows Jentzsch's mitigation costs broken down by year:

    a.    2001 – $65,415

    b.    2002 – $196,645

    c.    2003 – $123,192

**Damage Findings: Debt-Based Costs.**

*Findings of Fact & Conclusions of Law – page 96*

381.  GEC determined debt-based costs applying step 5 of its model.

382.  GEC used the bellwether plaintiffs' actual interest rates on actual loans from

the growers' bank records to calculate the debt-based costs between 2000-

2008.  *See Transcript at pp. 3893-96.*

383.  GEC based its calculations on each grower's "actual interest cost" and

"actual cost of debt rates" during the relevant time period.  *See Transcript at*

*pp. 3896.*

384.  Each of the plaintiffs corroborated GEC's analysis of their debt-based costs

and testified regarding their loans, debt, interest, financing (and refinancing),

security agreements and/or liens.

385.  Hansen:  During the Oust years (2000-2004), the Hansen grower group

continuously borrowed money from the bank.  *See Transcript at p. 5699.*

Gary Hansen's bank would advance funds to his operation through the

course of the year so he could purchase seed and fertilizer, prepare fields,

plant crops, irrigate, prepare the fields in the fall, and pay for labor.  *Id. at*

*5699-700.*  Key Bank provided the operating loans used to cover his

expenses.  *Id. at 5886.*  The bank's name was on every check received by

Hansen Farms. *Id. at 15620.*  Hansen's income was down during the Oust

years and it did not have enough to pay back its loans.  *Id. at 5703-05.*

Hansen always has a large amount owing to the bank.  *Id. at 15620.*  If

Hansen had received any additional income during the Oust years, the

money would have been applied to the operating lines of credit.  *Id.* at

15620. Hansen had no other option but to reduce the principal balance on its

lines of credit, and it would never have been able to reduce them completely.

*Id. at 15620.*  Hansen gave GEC its financial and banking information.  *Id.*

*at 5683-84.*

386.  <u>Funk</u>:  From 2000 through 2008, the Funk grower group carried various

loans, including an operating line and term loans for equipment, buildings,

and irrigation.  *See Transcript at pp. 6200-02*.  Funk's settlement checks

listed both "Lance Funk Farms and/or U.S. Bank or Washington Mutual."

*Id.* at 6202.  Upon receiving a settlement check, Funk would take it directly

to the bank, where it would be applied to his operating line of credit.  *Id.* at

6202-03.  Funk is charged an interest rate on its operating line that is

adjusted based on prime.  *Id.* at 6203.  It carried loans continuously between

2000 and 2008 with an outstanding balance of between three and five

million dollars.  *Id.* at 6203.  If it had received the money it was claiming,

100% would have gone to the bank to reduce its operating line.  *Id.* at 6204-

05.  After the 2001 time period, Lance Funk had to "sign everything over

except for my firstborn to pay financing for the 2002 crop year." *Id.* at 6216-17.

387.   <u>Clinger</u>:  The Clinger grower group had to take out an operating loan every year. *Id.* 4718.  Interest charges continually accrue on the loans. *Id.* at 4942-43.  When crop buyers issue checks for crop settlements, the checks are written to two payees – Idaho Ag. Credit (the lender) and either Jerome Clinger Farms or Clingers, Inc. *Id. at 4683-90.*  Their crop revenues are pledged to the bank which include their operating and mortgage loans. *Id. at 4684.* The bank secures the loans with liens on the Clinger's crops and equipment, and it is entitled to be paid first. *Id. at 4690-95.*  In 2001, with only one payment left on the farm, the Clingers had to refinance their farm for 30 additional years to pay down their operating loan. *Id. at 4699-700.* The Clingers gave GEC their banking documents showing the interest rates on their operating loans and information about their refinance. *Id. at 4700-01.*  The Clingers did not break even during the Oust years. *Id. at 4713-15.*

388.   <u>Jentzsch</u>:  The Jentzsch grower group carries multiple loans, including operating loans, center pivot loans, machinery and equipment loans, potato cellar and refrigeration loans, and farm loans. *See Transcript at pp.* 5143-45.  The amounts of the loans fluctuate, but during the Oust damage years,

they had approximately six million dollars in total debt.  *Id.* at 5143-44.

Jentzsch continually has an operating loan secured by its crops.  *Id.* at 5144-

46.  Jentzsch's lender's name is on its check so it reads "Jentzsch-Kearl

Farms and Northwest Farm Credit Services, SA."  *Id.* at 5146.  The bank

receives the money first when it come in.  *Id.*.

389.  Based on testimony and other evidence at trial, the Court awards the

plaintiffs all of their debt-based costs.  The failure to pay the interest on their

annual operating lines of credit would have resulted in the bank calling their

loans and the termination of their operations.   Thus, the renewal of such

lines of credit (for increased amounts because of lost income resulting from

Oust damage) was tantamount to their obtaining loans to keep them afloat

during those years.

390.  The Court finds that the bellwether plaintiffs established by a preponderance

of the evidence their debt-based costs as follows:

    a.    Hansen grower group:    $2,847,232.00.  *See Transcript at pp. 3897-*
*98, 15994-95.*

    b.    Funk grower group:    $1,399,648.00.  *See Transcript at pp. 3899,*
*15995-96.*

    c.    Clinger grower group:    $759,119.00.  *See Transcript at pp. 3899-*

*900, 15996.*

d.      Jentzsch grower group:   $1,559,938.00.  *See Transcript at pp. 3898-99, 15995.*

**Other Causes**

391.   The damages awarded do not include crop damage or reduced yields caused
       by (a) the Growers' own farming practices, (b) environmental factors such as
       hail, heat stress, etc., unless Oust contributed to the severity of the
       environmental factor, or (c) herbicide applications done on behalf of Young
       & Young Farms, or others including Power County, the Eastern Idaho
       Railroad, the Idaho Department of Transportation and/or the Idaho
       Department of Fish & Game.

## CONCLUSIONS OF LAW

**United States' Liability Under the Federal Tort Claims Act**

392.   The Court has jurisdiction over Plaintiffs' claims against the BLM pursuant
       to 28 U.S.C. §1331, 28 U.S.C. §1346(b), and 28 U.S.C. § 2621.

393.   Under the Federal Tort Claims Act ("FTCA"), the United States may be
       liable for negligence under circumstances where a private person would be
       liable and is not held to a higher or different standard than would a private
       person under the same circumstances. *See* 28 U.S.C. § 1346(b); *see also*

*Findings of Fact & Conclusions of Law – page 101*

*Memorandum Decision (docket no. 1438); Jury Instructions (docket no. 1502) at 19.*

394. The Bureau of Land Management ("BLM") is responsible for the acts of its employees, agents, directors, and officers performed within their scope of authority. *See Jury Instructions (docket no. 1502) at 19*

## BLM's Defenses—Administrative Claims, Statute of Limitations, and Discretionary Function

395. BLM has raised defenses under the FTCA, including (1) limitations on crop damage years and amounts due to the administrative tort claims, (2) statue of limitations, and (3) discretionary function.

396. The FTCA is a remedial statute and "should be construed liberally, and its exceptions should be read narrowly." *See Memorandum Decision (docket no. 893) at p. 2.* (quoting *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).

397. The Court will consider each of the three BLM defenses below.

## Administrative Claims

398. After the Court issued the Third Case Management Order, the BLM moved to limit the bellwether plaintiffs' crop damage claims to crop years 2000 and 2001 on the ground that the Court lacked jurisdiction because the plaintiffs

*Findings of Fact & Conclusions of Law – page 102*

failed to file administrative claims for other years as required by the FTCA.
*See BLM Motion in Limine (docket no. 304).*

399.    Plaintiffs filed two rounds of tort claim notices under the FTCA, 28 U.S.C. §
1346(b), 2671, et seq.  They filed the first round of notices on April 15,
2002, and the second round on March 31, 2003.

400.    The 2002 tort claims alleged the BLM's 1999 and 2000 Oust spraying
injured the Plaintiffs' crops and contaminated the land such that Oust would
continue to damage future crops until it dissipated.  *See Memorandum
Decision (docket no. 387) at p. 2.*  The BLM fully understood that the
plaintiffs' claims included both (1) damage to 2000 and 2001 crops, and (2)
continuing damage from contamination.  That understanding was expressed
in the decision denying that claim as follows: "[Y]ou state that BLM applied
Oust herbicide . . . resulting in damage to your respective client's 2000 and
2001 crops . . . .  You further allege that this herbicide contaminated each
respective client's cropland and will continue to damage future crops until it
dissipates." *Id.*

401.    The plaintiffs' tort claim "need not be extensive." *Goodman v. United
States*, 298 F.3d 1048, 1055 (9th Cir. 2002).  The notice requirement is
"minimal," and only a "skeletal claim form, containing only the bare

elements of notice of accident and injury and a sum certain representing damages, suffices to overcome an argument that jurisdiction is lacking." *Id.* (quoting *Avery v. United States*, 680 F.2d 608, 610 (9th Cir.1982)). Plaintiffs satisfied this standard. Plaintiffs' claim contained in their first round of tort claim notices constitutes a claim for crop losses beyond 2001. The Government so understood the claim, and denied it. That is sufficient to confer jurisdiction on this Court to resolve claims for damage and the consequential crop losses beyond 2001 to include losses in 2002, 2003 and 2004. *See Memorandum Decision (docket no. 387).*

402. Plaintiffs' tort claim notices contained sums certain as required by the FTCA. The FTCA, however, does not limit a claimant to the sum certain stated in the notice if an additional sum is "based upon newly discovered evidence not reasonably discovered at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." *See 28 U.S.C. § 2675(b).* Thus, for crop years not completed at the time the tort claim notices were filed, a plaintiff is not limited to the sum certain stated in their tort claim to the extent the plaintiff meets the requirements of section 2675(b).

403. Based on the evidence presented at trial, the Court finds that it has

jurisdiction to decide the plaintiffs' claims for all years at issue.

404.   Prior to trial, the Court reserved ruling, however, on the BLM's argument

that a plaintiff's damages for crop years completed before filing its tort claim

notice should be limited to the amount stated in the claim. *See*

*Memorandum Decision (docket no. 893).* Specifically, the BLM argued that

the Funk grower group had completed crop years 2000, 2001, and 2002 prior

to filing its March 31, 2003 tort claim notice. Funk's 2003 notice stated

damages of $2.3 million. *Id.* Consequently, the BLM argued that its

liability to Funk for damages in 2000, 2001, and 2002 should be limited to

$2.3 million.

405.   As set forth below, the Court awards the Funks the sum of $1,595,510.60.

This renders the issue moot because that sum is less than the $2.3 million to

which the BLM sought to limit Funk for 2001 and 2002.

406.   The Court also reserved ruling on the BLM's motion to exclude from

plaintiffs' claims all fields that were (1) farmed by Plaintiffs as tenants on

leases that expired in 2001 and 2002; (2) claimed by Plaintiffs as loss fields

in 2001 and 2002; and (3) nevertheless leased again by Plaintiffs in

subsequent years for which they claim additional Oust damage. *See*

*Memorandum Decision (docket no. 893).* The BLM argues that the plaintiffs

knew by the end of 2001 that their fields were contaminated by Oust, and that they cannot receive damages for subsequent renewals of their leases after that point.  But the plaintiffs did not have such knowledge of Oust's persistence at that point that they should be blocked from recovering for any lease renewals after 2001.  Consequently, the Court finds that it has jurisdiction under the FTCA to decide damage claims on these fields.

**Statute of Limitations**

407.   The Court has previously ruled that plaintiffs filed their claims within the statute of limitations period.  *See Memorandum Decision (docket no. 69).* The Court reaffirms that ruling here.

**Discretionary Function Exception**

408.   The discretionary function exception does not apply for two independent reasons.

409.   First, BLM failed to comply with a mandatory, non-discretionary duty to comply with NEPA, which required BLM to analyze the potential impacts of applying Oust on rangelands.

410.   Second, the selection of Oust to control cheatgrass did not involve the weighing of social, economic, or policy considerations, but rather was a scientific and technical decision.

411.   BLM bears the burden of proving that the discretionary function exception is applicable.  *See Memorandum Decision (docket no. 893).*

412.   In order to establish that it is entitled to immunity under the discretionary function exception, BLM must prove that the conduct challenged by plaintiffs is both (a) "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and (b) "based on considerations of public policy."  *Id. at 2 (quoting Berkovitz v. United States, 486 U.S. 531, 536-37 (1988).*

413.   BLM has a mandatory, non-discretionary duty to comply with NEPA, which required BLM to analyze the potential impacts of applying Oust on rangelands, either through preparation of an EA, or a full EIS, and the BLM failed to comply with that duty.  See Memorandum Decisions (docket nos. 204 & 893).

414.   Nothing at trial altered the Court's analysis in the prior decisions quoted above.

415.   However, even if the BLM complied with NEPA, the discretionary function exception still does not apply.

416.   The BLM made a policy decision to control cheatgrass, and then made a scientific or technical decision to use Oust to accomplish that policy.

*Findings of Fact & Conclusions of Law – page 107*

417. The choice of Oust did not involve the weighing of social, economic, or policy considerations, but was rather based on Oust's effectiveness when compared to other herbicides. This is based on the testimony of BLM officials, set forth in the Findings of Fact above.

418. The Court therefore concludes that the discretionary function exception does not apply.

## BLM's Negligence

419. The BLM was negligent in its selection of the DuPont herbicide Oust to control cheat grass on thousands of acres of burnt rangeland in Southern Idaho.

420. The BLM was also negligent in its selection of the application sites.

421. Under the FTCA, the BLM is liable in the same manner and to the same extent as a private individual under like circumstances. *28 U.S.C. § 2674*; *see also, Memorandum Decision (docket no. 952).*

422. BLM had a duty under Idaho law both before and at the time of occurrence, to use ordinary care for the safety of the plaintiffs and the plaintiffs' property in deciding to use Oust and to apply it at certain locations. *See Memorandum Decision (docket no. 952) at p. 3.*

423. The words "ordinary care" mean: "[T]he care a reasonably careful person

would use under circumstances similar to those shown by the evidence. Negligence may thus consist of the failure to do something which a reasonably careful person would do, or the doing of something a reasonably careful person would not do, under circumstances similar to those shown by the evidence." *See IDJI at § 2.20.*

424. The BLM failed to use ordinary care in selecting Oust and in selecting the application sites for the 1999 and 2000 applications.

425. More specifically, the BLM failed to use ordinary care when it selected Oust to apply in 1999 and 2000, and when it selected the application sites for those years, despite (1) knowing that Oust could erode with the wind from those sites and damage crops downwind, and (2) knowing that it had obtained no information from DuPont or others allowing it to evaluate critical characteristics of Oust and the sites. *See Findings of Fact – Proceeding in Ignorance.*

426. The BLM's failure to comply with NEPA is some evidence – relevant but not determinative – that the BLM violated the duty of ordinary care set by Idaho law. *See Memorandum Decision (docket no. 952).*

427. But even if the BLM's violation of NEPA is not considered, the BLM's conduct described above was negligent under Idaho tort law.

*Findings of Fact & Conclusions of Law – page 109*

**Causation**

428.  The Court must maintain a distinction between general causation issues, that apply to all plaintiffs, and specific causation issues, that must be proved by each plaintiff.  *See Memorandum Decision (docket no. 1407) at p. 6.*

429.  In analogous cases involving toxic torts, causation "is typically discussed in terms of generic and specific causation."  *See In Re Hanford Nuclear Reservation Lit.,*292 F.3d 1124, 1133 (9th Cir. 2002).

430.  General or generic causation means "whether the substance at issue had the capacity to cause the harm alleged." *Id.*  In *Hanford*, for example, the Ninth Circuit explained that the general causation inquiry was "whether exposure to a substance for which a defendant is responsible, such as radiation at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population." *Id.*

431.  To ultimately prevail in such a lawsuit, however, a plaintiff must show both general and "individual" or "specific" causation.  *See Memorandum Decision (docket no. 1407) at p. 6.*

432.  Specific causation refers to whether a particular plaintiff suffered crop damage as a result of Oust exposure.  *See Memorandum Decision (docket no. 1407).*

*Findings of Fact & Conclusions of Law – page 110*

433. "Although many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis."   *See Memorandum Decision (docket no. 1407) at p. 6.*

**General Causation**

434. Plaintiffs established general causation by showing that Oust had "the capacity to cause the harm alleged."  *Hanford,* 292 F.3d at 1133; *see also Memorandum Decision (docket no. 1407) at p. 6; see also Findings of Fact above.*

435. Oust is capable of causing the damage observed in the plaintiffs' crops.  *See Transcript at pp. 3421-22 (Testimony of Dyer); 3474-75 (Testimony of Gallian), 6644-6715 (Testimony of Haderlie).*

436. Oust is capable of contaminating dust that is then blown by the wind off the BLM application sites in sufficient quantities to damage crops downwind from those sites.  *See ISDA Reports, Exhibits 837 & 848; Testimony of Dr. Walter Shields*, *Terry Miller, and Dr. Gary Franc.*

437. The Oust-contaminated dust is capable of being blown by the wind a sufficient distance to reach the farms of each of the bellwether plaintiffs in quantities capable of damaging crops.  *See ISDA Reports, Exhibits 837 &*

*848; Testimony of Dr. Shields, Terry Miller, and Dr. Gary Franc.*

438.   These findings on General Causation apply not only to the four bellwether

plaintiffs but also to all plaintiffs in this case.

## Specific Causation

439.   The Court concludes that the four bellwether plaintiffs presented sufficient

proof that BLM applied Oust to application sites in the vicinity of the

bellwether plaintiffs' croplands, and that the Oust attached to highly erodible

soil that blew off the application sites and onto their irrigated crop lands in

sufficient quantity to damage their crops.  *See Walker v. American*

*Cyanamid Co., 948 P.2d 1123, 1131 (1997) (evidence from several expert*

*witnesses that Plaintiff's crops suffered symptoms indicative of ASSERT*

*damage was sufficient to support Jury's findings that ASSERT was the*

*proximate cause of Plaintiff's damage.).*

440.   The Court addresses the issue of proximate cause more fully below.

## Exclusion of Other Causes

441.   Under Idaho law, the plaintiffs need only exclude reasonable likely causes,

not every possible cause.  *See Memorandum Decision (docket no. 1064) at p.*

*7; see also, Farmer v. International Harvester Co.,* 553 P.2d 1306, 1313

(1976).  The Court explained further: "No Idaho case allows defendants to

argue that theoretical causes of crop damage – with no support in the record—should have been ruled out by Plaintiffs.  In other words, to argue that plaintiffs failed to rule out a certain cause, defendants must point to some evidence in the record from which a reasonable juror could find that it was reasonably likely that the cause contributed to the crop damage seen here."  *See Memorandum Decision (docket no. 1064) at pp. 7-8.*

442.  Plaintiffs offered expert opinion testimony that (a) only the Oust from BLM rangelands could explain the widespread damage the Plaintiffs experienced and (b) the other applications could not have been the source of the damage. *See Memorandum Decision (docket no. 1447) at p. 7; see also Findings of Fact above.*

443.  The BLM's conduct produced the bellwether plaintiffs' injury, rather than other variables such as weather, insects, disease, weeds or the bellwether Plaintiff's own farming practices. *See Zanotti v. Cook,* 922 P.2d 1077, 1080 (Id.Ct.App. 1996) (citing *Wing v. Hulet*, 684 P.2d 314, 320 (Id.Ct.App. 1984)).  Plaintiffs have submitted evidence sufficient to avoid speculation about multiple causes.  *Wing*, 684 P.2d at 321.  Furthermore, inferences linking BLM's conduct to the damage are more probable than inferences connecting injury to other causes.  *Id.*

*Findings of Fact & Conclusions of Law – page 113*

444.   Bellwether plaintiffs have excluded reasonable likely causes as the possible cause of damage to their crops.

## BLM Did Not Violate the Idaho Pesticide and Chemigation Act

445.   Plaintiffs allege that BLM used Oust in a manner inconsistent with its labeling and in a faulty, careless, or negligent manner in violation of the Idaho Pesticide and Chemigation Act (IPCA). *See Idaho Code § 22-3420.*

446.   The Court concludes that BLM did not violate IPCA.

## BLM Did Not Violate the Federal Insecticide, Fungicide, and Rodenticide Act

447.   Plaintiffs allege that BLM used Oust in a manner inconsistent with its labeling and in violation of FIFRA.

448.   The Court concludes that BLM did not violate FIFRA.

## BLM Committed a Trespass

449.   Plaintiffs allege that BLM, by applying Oust to burnt and other public lands, committed a trespass by causing Oust to enter onto and to be dispersed upon the growers' lands, crops, and other property.

450.   Pursuant to Idaho case law, a "trespass" involves the "wrongful interference with the right of exclusive possession of real property." *Mock v. Potlatch Corp.,* 786 F.Supp 1545, 1548 (D. Idaho 1992); *Moon v. North Idaho Farmers Ass'n*, 96 P.3d 637, 642 (Id.Sup.Ct. 2004).

*Findings of Fact & Conclusions of Law – page 114*

451.   Trespass can give rise to FTCA liability.  *Hatahley v. U.S.*, 351 U.S. 173,
181 (1956).

452.   BLM, by applying Oust to thousands of acres of burnt rangeland where the
Oust was blown onto bellwether Plaintiffs' property, caused an invasion
affecting an interest in the exclusive possession of the bellwether Plaintiffs'
property.

453.   BLM intentionally applied Oust to thousands of acres of burnt rangeland
which resulted in the invasion.  The term "intentional" means the intent to
perform an actual, physical act, not the intent to accomplish a particular
result or consequence of that act.

454.   BLM's actions were negligent and wrongful.  *Id.*

455.   It was reasonably foreseeable that BLM's actions could result in an invasion
of the Plaintiffs' possessory interest.

456.   Bellwether plaintiffs suffered substantial damage to their crops as a result of
such conduct.

457.   Thus, BLM, by applying Oust to thousands of acres of burnt rangeland,
committed a trespass by causing Oust to enter onto and be dispersed upon
the bellwether plaintiffs' property and crops.  This was a wrongful
interference with the bellwether plaintiffs' right of exclusive possession of

real property.

## BLM Committed a Nuisance

458.   Plaintiffs allege that BLM engaged in a course of conduct that unreasonably interfered with the growers' enjoyment of their property and was a nuisance in violation of Idaho Code § 52-101.

459.   Idaho Code § 52-101 states in relevant part: "Anything which is injurious or any obstruction to the free use of property, so as to interfere with the comfortable enjoyment of . . . property . . . is a nuisance."

460.   As with trespass, the Court concludes that a nuisance claim can give rise to FTCA liability.  *See CHoPP Computer Corp., Inc.,* 5 F.3d 1344, 1347 (9th Cir. 1993); *Hatahley v. U.S.*, 351 U.S. 173, 181 (1956); *see also Nottingham Ltd., v. U.S.,* 741 F.Supp. 1447 (C.D.Cal 1990).  The court in *CHoPP* rejected an argument that a state strict liability claim is beyond the scope of the FTCA.  *ChoPP,* 5 F.3d at 1347 *(holding that conversion, a strict liability offence under California law, is not beyond the scope of the FTCA.).*

461.   BLM's application of Oust was injurious or obstructed the bellwether plaintiffs' free use of property so as to interfere with the comfortable enjoyment of property.

462.   The interference was substantial.

*Findings of Fact & Conclusions of Law – page 116*

463.  BLM's conduct was intentional.  The Court defines "intentional" as the
intent to perform an actual, physical act; not the intent to accomplish a
particular result or consequence of that act.

464.  BLM's conduct was negligent or wrongful under all of the circumstances.

465.  Thus, BLM committed a nuisance in that it engaged in a course of conduct
that unreasonably interfered with the growers' enjoyment of their property.

**BLM Did Not Negligently Supervise its Applicators**

466.  Plaintiffs allege that BLM was negligent in its supervision of the Oust
applicators – Thomas Helicopters & DeAngelo Brothers – because it failed
to give them proper directions and failed to ensure compliance with the
federal and state labels governing the application of Oust.

467.  The Court concludes that BLM did not negligently supervise its applicators.

**BLM Did Not Negligently Fail to Follow the Oust Label**

468.  The plaintiffs allege that BLM was negligent in failing to follow the Oust
instruction labels.

469.  The Court concludes that BLM and its applicators did not negligently follow
the Oust label, and in fact did follow the instructions and precautions
contained on the label.

**Proximate Cause**

*Findings of Fact & Conclusions of Law – page 117*

470. "Proximate cause" means:  [a] cause that, in natural or probable sequence, produced the injury, the loss or the damage complained of.  It need not be the only cause.  It is sufficient if it is a substantial factor in bringing about the injury, loss or damage.  It is not a proximate cause if the injury, loss or damage likely would have occurred anyway.  There may be one or more proximate causes of an injury.  When the negligent conduct of two or more persons or entities contributes concurrently as substantial factors in bringing about an injury, the conduct of each may be a proximate cause of the injury regardless of the extent to which each contributes to the injury.  *See IDJI at § 2.30.2.*

471. BLM's negligence, nuisance and trespass proximately caused damage to the Clinger grower group for the following crops and for the following years:

a.      Sugar Beets in 2001, 2002, and 2003;

b.      Wheat in 2002.

c.      BLM's negligence, nuisance and trespass proximately caused damage to the Funk grower group for the following crops and for the following years:

d.      Sugar Beets in 2001 and 2002;

e.      Potatoes in 2001, 2002, and 2003;

*Findings of Fact & Conclusions of Law – page 118*

    f.      Corn in 2001, 2002, and 2003;

    g.      Wheat in 2001, 2002, and 2003;

    h.      Barley in 2001 and 2002.

472.   BLM's negligence, nuisance and trespass proximately caused damage to the Jentzsch grower group for the following crops and for the following years:

    a.      Sugar Beets in 2001, and 2002;

    b.      Potatoes in 2000, 2001, and 2002.

473.   BLM's negligence, nuisance and trespass proximately caused damage to the Hansen grower group for the following crops and for the following years:

    a.      Sugar Beets in 2000, 2001, and 2002;

    b.      Potatoes in 2000, 2001, 2002, 2003, and 2004;

    c.      Wheat in 2001 and 2002.

## Apportionment of Liability to BLM

474.   The Court concludes that plaintiffs' damages were jointly caused by BLM's negligent selection of Oust and/or the application sites, nuisance, and trespass, and DuPont's sale of a defective and unreasonably dangerous product due to its design, negligent design of Oust, sale of a defective and unreasonably dangerous product due to a failure to warn, FIFRA violations, negligent warning, and violation of the IPCA.

475.   The Court apportions liability 40% to BLM and 60% to DuPont.

476.   The Court further concludes that Thomas Helicopters and DeAngelo

Brothers were not negligent in their application of Oust to BLM lands and

allocates 0 % liability and/or causal responsibility to them for plaintiffs'

damages.

477.   The plaintiffs agree with this apportionment of liability, but only seek 25%

of the total damages from the BLM, arguing that DuPont is liable for the

remaining 75% based on the advisory jury verdict. *See Plaintiffs' Proposed*

*Findings of Fact and Conclusions of Law at pp. 81-85 (docket no. 1645).*

478.   The BLM agrees, but for a different reason.  The jury allocated 25% of the

total damages to an award against DuPont on the assumed duty claim, a

claim that was not made against the BLM.  Accordingly, the BLM argues

that the advisory jury declined to award 25% of the damages as against the

BLM, and that the Court should do likewise.

479.   The Court disagrees with both parties.

480.   As the Court will explain in a separate decision, the jury's 75/25 allocation

of damages is without support in the record and must be set aside.

481.   The Court finds that because 40% of the fault that caused plaintiffs' crop

damage is attributable to the BLM, the BLM shall be liable for 40% of the

total damages, which are calculated below.

**Crop Losses**

482.   The appropriate measure of damages for crop losses is the difference
between the reasonable value of the crop actually raised upon the land and
the reasonable value of the crop that would have been raised upon it under
normal conditions during the same year, less the cost of maturing, harvesting
and marketing the additional portion of the crop.  *See Merrill v. Penrod*, 704
P.2d 950, 960 (Id.Ct.App. 1985); *Walker v. American Cyanamid*, 948 P2d
1123, 1131 (Id.Sup.Ct. 1997).

483.   This legal standard was used to calculate the Net Crop Loss figures for each
bellwether plaintiff set forth above in the Findings of Fact above.

484.   The BLM argues that Hofman's testimony on crop losses ran afoul of Rule
702 because it omitted critical predicate facts such as yield and price losses
that each plaintiff purportedly experienced on each claimed crop.  *See BLM
Proposed Findings & Conclusions (docket no. 1646) at p. 203.*

485.   The Court addressed all these arguments in some detail in a decision issued
toward the end of trial.  *See Memorandum Decision (docket no. 1410).*  The
Court reaffirms that decision and rejects the BLM's arguments on this issue.

**Mitigation**

*Findings of Fact & Conclusions of Law – page 121*

486.   "A party is entitled to recover the costs reasonably incurred in minimizing . .

. damages." *Casey v Nampa & Meridian Irrigation District, 379 P.2d 409,*

*412 (Id.Sup.Ct. 1963).*

487.   "Reasonable Mitigation Costs" include costs reasonably incurred by the

plaintiffs for the purpose of minimizing any crop damage caused by Oust

that came off BLM application sites.  *Id.*

488.   These legal standards were used to calculate the Mitigation Cost figures for

each bellwether plaintiff set forth in the Findings of Fact above.

**Debt-Based Costs**

489.   "Sovereign immunity generally bars an award of interest against a federal

agency . . . unless Congress expressly waives immunity with respect to

interest."  *See Far West Bank v. Office of Thrift Supervision*, 119 F.3d 1358,

1366 (9th Cir. 1994).

490.   In the FTCA, Congress expressly retained sovereign immunity from awards

of interest, stating that the United States "shall not be liable for interest prior

to judgment or for punitive damages."  *28 U.S.C. § 2674.*

491.   Debt-based costs as calculated by GEC for the bellwether Plaintiffs are not

prejudgment interest barred by § 2674.

492.   Section 2674 bars claims that are simply "compensation for the use of

money damages prior to judgment." *Library of Congress v. Shaw*, 478 U.S.
310, 322 & n.7 (1986), *abrogated by statue as indicated in Landgraf v. USI
Film Prods.*, 511 U.S. 244, 251 (1994),  *Preston v. United States*, 776 F.2d
754, 760 (7th Cir. 1985).

493.   In this case, however, the monies the bellwether plaintiffs paid on their
operating loans and lines of credit due to Oust crop damage constituted
increases in contract interest payments, *i.e.*, additional interest payments
pursuant to a contract between the bellwether plaintiffs and their banks.

494.   Damages in the form of actual contract interest are not barred by § 2674
because they are not prejudgment interest.  Instead, they are consequential
damages, which are recoverable under the FTCA.  *See Romero v. United
States*, 954 F.2d 223, 224, 227 (4th Cir. 1992) (consequential damages,
including financial losses, are recoverable under the FTCA); *see also Manko
v. United States*, 830 F.2d 831 (8th Cir. 1987) (holding that interest damages
arising from a contract between the plaintiff and the defendant, or on a
contract between the plaintiff and someone else, with which defendant's
wrongdoing has interfered, are recoverable under the FTCA and are not
properly characterized as prejudgment interest).

495.   Here, as in *Manko*, the plaintiffs seek redress for consequential damages

*Findings of Fact & Conclusions of Law – page 123*

arising from interest fixed by loan contracts, not for hypothetical damages due to delay in payment.  Because of the BLM's tortious conduct, the bellwether plaintiffs paid more contractual interest, which does not constitute prejudgment interest under 28 U.S.C. § 2674.

496.  "Debt-Based Costs" includes (1) interest charges incurred on a loan obtained or extended in good faith as part of a reasonable course of action to mitigate losses, and (2) that portion of interest charges incurred on operating lines of credit because a Grower was unable to reduce or satisfy the principle balance due to losses incurred when Oust damaged the crops.

497.  The Court finds that plaintiffs' claim for Debt-Based Costs is not a claim for prejudgment interest.

**Offsets**

498.  The Court entered prior decision on December 8, 2009, and January 18, 2010, detailing the offsets to which the BLM was entitled as to each of the bellwether plaintiffs.  *See Memorandum Decisions (docket nos. 1650 & 1667).*

499.  The Court will not repeat the findings in those decisions but will incorporate them by reference herein.

500.  To summarize those findings, the BLM is entitled to the following offsets

*Findings of Fact & Conclusions of Law – page 124*

from each of the bellwether plaintiffs:

a.   From Jentzsch-Kearl:    $264,688.

b.   From Hansens:    $722,062.

c.   From Funks:    $93,197.

d.   From Clingers:    $0.

**Judgment**

501.   The calculation of the final judgment is a three-step process.

502.   First, the Total Damages must be calculated for each bellwether plaintiff by adding together (1) Net Crop Loss, (2) Mitigation Costs, and (3) Debt-Based Costs.

503.   Second, the Total Damage figure is multiplied by .4 because the BLM is only liable for 40% of the Total Damages under the allocation set forth above.

504.   Third, the offsets must be subtracted from this figure to obtain the Final Judgment sum.  This three-step process is set forth below.

505.

| Hansen Grower Group Damages ||
| --- | --- |
| **Category** | **Amount** |

*Findings of Fact & Conclusions of Law – page 125*

| Hansen Grower Group Damages | |
|---|---|
| Net Crop Loss | $4,792,176 |
| Mitigation Costs | $242,678 |
| Debt-Based Costs | $2,847,232 |
| **Total Damages** | $7,882,086 |
| 40% of Total Damages | $3,152,834.40 |
| (Offset) | ($722,062) |
| **Final Judgment** | $2,430,772.40 |

506.

| Funk Grower Group Damages | |
|---|---|
| **Category** | **Amount** |
| Net Crop Loss | $2,390,807 |
| Mitigation Costs | $431,314 |
| Debt-Based Costs | $1,399,648 |
| **Total Damages** | $4,221,769 |
| 40% of Total Damages | $1,688,707.60 |
| (Offset) | ($93,197) |
| **Final Judgment** | $1,595,510.60 |

507.

*Findings of Fact & Conclusions of Law – page 126*

| Clinger Grower Group Damages | |
|---|---|
| *Category* | *Amount* |
| Net Crop Loss | $956,243 |
| Mitigation Costs | $395,957 |
| Debt-Based Costs | $759,119 |
| **Total Damages** | $2,111,319 |
| 40% of Total Damages | $844,527.60 |
| (Offset) | $0 |
| **Final Judgment** | $844,527.60 |

508.

| Jentzsch Grower Group Damages | |
|---|---|
| *Category* | *Amount* |
| Net Crop Loss | $1,701,649 |
| Mitigation Costs | $385,252 |
| Debt-Based Costs | $1,559,938 |
| **Total Damages** | $3,646,839 |
| 40% of Total Damages | $1,458,735.60 |
| (Offset) | ($264,688) |
| **Final Judgment** | $1,194,047.60 |

**Preclusion**

*Findings of Fact & Conclusions of Law – page 127*

509.  As discussed above, the Court earlier issued a decision setting forth the
likely preclusive effect of this bellwether trial on the remaining parties and
claims.  *See Memorandum Decision (docket no. 1047).*

510.  The parties have not had an opportunity to fully address the preclusive effect
of these Findings of Fact and Conclusions of Law, and the Court will await
full briefing on the preclusion issue.

DATED:  **March 24, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge

*Findings of Fact & Conclusions of Law – page 128*