IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>    Defendants. | Case No. 4:CV 03-49-BLW<br><br>**FINDINGS OF FACT**<br>**&**<br>**CONCLUSIONS OF LAW** |

## INTRODUCTION

This matter is on limited remand from the Ninth Circuit with directions to answer a specific question. The parties agreed that this question could be answered on the factual record now before the Court, supplemented by additional briefing and proposed findings of fact and conclusions of law, submitted by plaintiffs and the BLM. Those materials have been submitted and the matter is now at issue.

The Circuit remanded this case with directions "to issue findings of fact and conclusions of law on the following issue: Whether the United States sent administrative denial letters to Plaintiffs by a method that qualified as certified mail."

The answer, explained more fully below, is that the only administrative denial letters that were sent by a method that qualified as certified mail were the three denial letters mailed by BLM attorney Ken Sebby to (1) plaintiffs' attorney Steven Anderson (denying the claims of Ball

**Memorandum Decision & Order - 1**

Brothers Farms and Dennis and Leah Smith), (2) Ball Brothers Farms, and (3) Dennis and Leah Smith.

## FINDINGS OF FACT

On April 15, 2002, the BLM received a packet of tort claims from attorney Steven Anderson of the law firm of Holland & Hart alleging damage from the BLM's spraying of an herbicide known as Oust. *See Sebby Declaration (Dkt. 21)* at ¶ 3, p. 1. The BLM reviewed the claims and decided to deny them. BLM attorney Ken Sebby drafted and signed a letter dated August 5, 2002, addressed to attorney Anderson, denying the claims. *Id*. at ¶ 5, p. 2. To that denial letter, Sebby attached a 13-page list of the names, addresses, and claim amounts for 132 claimants. *See Exhibit 1 to Sebby Declaration (Dkt. 21)*. At the top of this denial letter, Sebby identified it as "Administrative Determination Number T-1-B-211." *See Exhibit 2 to Sebby Declaration, supra.* The BLM decided to send a copy of the denial letter not only to plaintiffs' attorney Anderson but also to each of the 132 claimants.

The job of developing a process for this large mailing fell to Karl Gebhardt, an engineer with the BLM. *See Gebhardt Declaration (Dkt. 18)* at ¶ 3, p. 2. He prepared mailing labels with the names and addresses of the claimants, and then established the mailing procedure that was to be followed by Sharon Olendorff, who was the Executive Assistant for the Deputy State Director of the BLM.

The procedure devised by Gebhardt directed Olendorff to (1) place Gebhardt's mailing label on the envelope along with "a certified mail receipt number;" (2) place on a

**Memorandum Decision & Order - 2**

separate card, Postal Service form 3811 (entitled "Domestic Return Receipt"), an identical mailing label with the identical certified mail receipt number in box number 1 entitled "Article Addressed to;" and (3) also place on form 3811 a label containing the identical certified mail receipt number in box number 2, entitled "Article Number." *Id.* at ¶¶ 7-8. Gebhardt also prepared Firm Mailing Sheets using Postal Service form 3877, consisting of a nine-page list of each claimant's name and address, and the envelope's corresponding certified mail receipt number. *See Gebhardt Second Declaration (Dkt. 60)* at ¶ 13, p. 4.

Early on the morning of August 5, 2002, Gebhardt delivered to Olendorff (1) the denial letter (no. T-1-B-211), (2) mailing labels containing the name and address of each claimant, (3) the "certified mailing receipt numbers", (4) form 3811, and (4) form 3877, the nine pages of Firm Mailing Sheets. *Id.* at ¶ 8 (noting delivery of all items except denial letter); *Olendorff Declaration, (Dkt. 20)* at ¶ 3, p. 2 (noting delivery of denial letter). Olendorff was then to prepare the letters for mailing. *Id.*

Olendorff instructed BLM personnel (1) to place copies of the denial letter in envelopes, (2) to affix the computer-generated mailing labels to the front of each envelope, and (3) to affix the "certified mail receipt cards" to the envelopes. *See Olendorff Declaration, supra* at ¶ 6, p.2.

There was one recipient who was not listed on the computer-generated mailing label: attorney Anderson. This required Olendorff to (1) "manually prepare an address label and certified mail receipt card"; (2) "personally affix these items to the envelope

**Memorandum Decision & Order - 3**

which was to go to the attorney"; (3) add[] the attorney's name and certified mail number to the Firm Mailing Sheets by hand"; and (4) place[] the envelope going to the attorney in sequence after the envelope containing the last of the computer generated claimants' names." *See Olendorff Second Declaration (Dkt. 63)* at ¶ 9, p. 3. With this letter added to the others, there were now 133 letters.

Olendorff testified that she completed her work at 1:30 p.m. on August 5, 2002. *See Olendorff Declaration* at ¶ 7. She then placed the envelopes in boxes and arranged them to correspond with the order of letters set forth on the Firm Mailing Sheets (form 3877), "so that the mail carrier would be able to easily check the envelopes." *Id*.

Olendorff personally delivered the boxes of envelopes and the Firm Mailing Sheets to the BLM mail room "before 2:00 p.m. on August 5, 2002." *See Olendorff Second Declaration (Dkt. 63)* at ¶ 11, p. 3. The BLM's mail clerk, Cathy Brown, who works in the BLM's mail room, recalls receiving "boxes of certified mail and computer-generated firm mailing sheets from Ms. Olendorff." *See Brown Second Declaration (Dkt. 61)* at ¶ 12, p. 3. The BLM uses a Pitney Bowes postage meter to place postage on outgoing mail. *Id*. at ¶ 7, p. 2. The machine prints the postage onto a tape that is then manually affixed to the mail, or it prints the postage directly onto the envelope. *Id*. The machine also prints a date onto the tape or envelope. *Id*. While Brown does not state whether she affixed the Pitney Bowes postage and date tape to each piece of outgoing mail, the envelopes recovered by the attorneys in this case contained a Pitney Bowes postage and date stamp. *See Anderson Affidavit* at ¶ 9. That date stamp reads August 5,

**Memorandum Decision & Order - 4**

2002.

Brown testified that she took the boxes of mail to the "delivery and pick up door [at the BLM's building] for pick up by the USPS Collector on the same date they were received in the mail room. I also recall watching the Collector take the boxes of certified mail with him." *Id*. at ¶ 13.

The Postal Carrier, James Pyles, has "no personal recollection of receiving the mail identified in the [Firm Mailing Sheets – form 3877]," but testified that his signature is on each of those Sheets, indicating that (1) he "received from the customer the number of pieces of mail identified on each page of the [Sheets]", *see Pyles Declaration (Dkt. 22)* at ¶ 5, p. 2, and (2) "it is my practice to take all certified mail I sign for with me, and to deposit it in the certified mail cage at the Postal Service Distribution and Processing Plant on the same day I sign for it." *See Pyles Second Declaration (Dkt. 55)* at ¶ 6, p. 3. After signing each of the 9 sheets of form 3877, Postal Carrier Pyles left the forms with the BLM.

There is no official Postal Service postmark showing the date of mailing of any of the 133 denial letters sent by the BLM using the form 3877. The date stamp of August 5, 2002, on the 133 envelopes was made by BLM mail clerk Cathy Brown using a private Pitney-Bowes meter stamp. Because there is nothing to ensure that the Pitney-Bowes date stamp is the same date that the letters were actually mailed, the Pitney-Bowes date stamp does not establish the date of mailing. *See Tuso Affidavit (Dkt. 44)* at ¶ 30, p. 15.

In addition to having no official postmark to establish the date of mailing, there is

**Memorandum Decision & Order - 5**

no testimony that the 133 letters were mailed on August 5, 2002. BLM mail clerk Brown did not testify that she mailed the letters that day, and Collector Pyles did not testify that he picked up the letters that day. Brown merely testified that her "practice" is to "ensure mail is picked up by the USPS Collector on the same date the postage is affixed [using the Pitney-Bowes postage meter]." *See Brown Second Declaration, supra* at ¶ 8, p. 2. Pyles testified that he had no "personal recollection" of receiving the mail listed on the form 3877. *See Pyles Second Declaration*, *supra* at ¶ 6, p. 3. There is a handwritten notation of "8/5/02" at the top of one of the nine sheets of form 3877, but there is no testimony as to who wrote the notation or what it means.

Olendorff did testify that she personally delivered the 133 letters to the mail room on August 5, 2002. But she is the last person in the chain with any specific recollection.

On the delivery end, there is evidence that the Postal Service attempted unsuccessfully to deliver the denial letter concerning the 132 claims to attorney Anderson on August 6, 2002. *See Exhibit 1 to Day Declaration*. That letter must have been mailed on August 5, 2002, according to Boise Postmaster Jeffrey Day, because it would have been "impossible" for a letter mailed August 6, 2002, to be delivered (or attempted to be delivered) on the same day. *See Day Declaration (Dkt. 59)* at ¶ 5, p. 4.

Even with this evidence, the plaintiffs and the Court are still left to infer the mailing date from the date of delivery. This appears to be precisely what certified mail was designed to avoid, especially in the context of an FTCA statute of limitations that is triggered by the mailing date and requires use of certified mail. Claimants are entitled to

**Memorandum Decision & Order - 6**

know precisely when the statute of limitations begins to run so they can timely file their complaint. Certified mail has the capacity to provide this certainty, and so Congress required its use in the FTCA statute of limitations. By failing to obtain an official postmark, the BLM has left the critical fact of the mailing date to inference.

This discussion is intended to simply describe the state of the record concerning the mailing date. The limited remand directs the Court to make a finding on whether the letters were sent by certified mail, not to determine the mailing date.

**<u>Later-Filed Letters</u>**

At about 2:00 p.m. on August 5, 2002, Gebhardt realized that his original list of claimants did not include two claimants. *See Gebhardt Second Declaration, supra* at ¶ 16, p. 4. At 3:20 p.m. that day, Gebhardt e-mailed to Sebby a list of the names, addresses, and claims of these two claimants, and labeled the list "Exhibit B." *Id*. at ¶ 17. Sebby prepared a second denial letter to attorney Anderson, denying the two claims identified on the attached Exhibit B. *See Sebby Declaration, supra* at ¶ 9, p. 2. Sebby numbered this second denial letter as "Administrative Determination Number T-1-B-2211-B," to distinguish it from his first denial letter numbered T-1-B-2211. *Id*. at ¶ 10. This second denial letter was similarly dated at the top, August 5, 2002.

Because this second batch of denial letters – consisting of the letter to attorney Anderson and the copies of that letter to the two claimants – was not prepared until later in the day on August 5, 2002, they were not included in the mass mailing organized by Gebhardt and Olendorff. Instead, Sebby prepared the letters and mailed them himself.

**Memorandum Decision & Order - 7**

*See Sebby Declaration, supra* at ¶ 10, p. 3. Sebby did not use the form 3877, as was used for the mass mailing described above, but instead used form 3800, the form for individual mailings. *See Exhibit 1 to Second Declaration of Sebby (Dkt. 62).* He prepared the envelopes, "affixed postage for mailing via certified mail, return receipt requested, and placed said envelopes in the United States Mail on August 5, 2002." *See Declaration of Sebby, supra,* at ¶ 10, p. 3. Attorney Steven Anderson received this letter (no. T-1-B-2211-B) – addressing the claims of the two claimants – on August 6, 2002, as shown by the form 3811 signed by an employee of Holland & Hart on that date. *See Exhibit 3 to Anderson Affidavit (Dkt. 43).*

## CONCLUSIONS OF LAW

In its earlier decision, the Court interpreted 28 U.S.C. § 2401(b) to require the Government to obtain a postmarked sender's receipt when it sends FTCA administrative denial letters by certified mail. This interpretation, the Circuit held, "is inconsistent with the statute's plain text and is not supported by any case law." *See Order (Dkt. 1897)* at p. 4. The Court remanded the case to this Court to answer this question: "Whether the United States sent administrative denial letters to Plaintiffs by a method that qualified as certified mail."

The question is critical because under the Federal Tort Claims Act, 28 U.S.C. § 2401(b), the plaintiffs had six months from the date of certified mailing to file suit. They filed suit on February 6, 2003, six months and one day after the BLM claims that it mailed the notices. The BLM responded by filing a motion to dismiss, arguing that the

**Memorandum Decision & Order - 8**

plaintiffs failed to comply with the six month limitations period of § 2401(b). The Court denied that motion to dismiss, reasoning that because the mailing date is all-important under § 2401(b), Congress intended that it be established by the Post Office postmark that accompanies certified mail, a postmark that was absent here. On appeal of that decision, the Circuit rejected that analysis, and issued a limited remand to determine whether the denial letters were sent by certified mail. This issue is critical, because § 2401(b) provides that "a tort claim against the United States shall be forever barred . . . unless action is begun within six months after the date of mailing,[1] by certified mail or registered mail, of notice of final denial of the claim by the agency to which it was presented."

There is no statutory definition of certified mail. In the absence of such a statutory definition, it is reasonable to assume that Congress intended that the Postal Service regulations governing certified mail would also be used to govern the determination of whether denial letters were sent "by certified mail" as that phrase is used in § 2401(b) of the FTCA.

The Court will therefore turn to those regulations to set out the legal requirements for certified mail, and then determine whether the BLM's mailing of its denial letters satisfied those legal requirements.

### Certified Mail Requirements

The United States Postal Service is authorized to enact rules "for the collection,

---

[1] As discussed earlier in this decision, the limited remand does not direct the Court to make a finding on the date of mailing.

**Memorandum Decision & Order - 9**

handling, transportation, [and] delivery" of mail. *See* 39 U.S.C § 404. Those rules are found in the Domestic Mail Manual ("DMM") and the Postal Operations Manual ("POM"). *See* 39 C.F.R. §§ 111.1, 211.2(a)(2). The DMM sets forth the standards of the Postal Service governing all domestic mail services, including certified mail. The POM sets forth the internal Postal Service policies and regulations governing mail collection, processing, transportation, and delivery.

Under the DMM, certified mail has two purposes. The first is to provide the mailer with proof of the mailing date. *See DMM* at §§ 912.1.1, 2.5, 2.8. The second is to provide proof of delivery to the intended recipient. *Id.* at §§ 915.1.1, 2.1. The latter purpose is not at issue here and will not be discussed further because the fact and date of delivery are not relevant to whether the mail was certified.

The DMM requires that all certified mail must contain the bar-coded section of form 3800. *Id.* at § 912.2.3. Form 3800 consists of two sections, separated by a vertical dotted line that allows the left section to be detached from the right section. The left section contains the title "Certified Mail" along with a bar code and a unique 20-digit identifying number. The Court will refer to this section as the "bar-coded section." It has a sticky backing for attachment to the front of the envelope or package being sent. The sender detaches the bar-coded section, attaching it to the envelope and keeping the other section as his receipt. The Court will refer to this receipt – the right section of form 3800 – as the "sender's receipt section."

The sender's receipt section has printed on it the identical 20-digit number printed

**Memorandum Decision & Order - 10**

on the bar-coded section.  If the sender wants a date stamp showing the date of mailing, the sender must "present the article and the completed [sender's] receipt [section] to the USPS employee, who then round-dates the [sender's] receipt [section] to show when the article was accepted." *Id*. at § 912.2.5d.  This achieves the first purpose of certified mail: To show the mailing date.

To achieve this same purpose with a larger volume of mailing – three or more items – a sender may use form 3877, known as the Firm Sheet.  *Id.* at § 912.2.6.  Each form 3877 contains 15 lines allowing for the listing of identifying data for 15 different letters.  Each line has places to fill in (1) the intended recipient's name and address, and (2) the unique 20-digit identifying number appearing on the bar-coded section of form 3800, attached to the front of the envelope.

If the sender wants a date stamp on form 3877 to show the mailing date, he "must present the [form 3877] with the articles to be mailed at the post office." *Id.* at § 912.2.6. When a sender presents a form 3877 to the post office, a postal employee (1) randomly selects some of the articles to be mailed to check the 20-digit number on the article against the listing on form 3877, to make sure they match; (2) verifies that proper postage has been paid; (3) places an official Postal Service postmark on the form 3877 and signs on the signature line provided; (4) returns the form 3877 to the sender; and (5) deposits the articles into the mail without returning them to the sender.  *See POM* at § 813.42(a)-(f).

The DMM does not state that certified mail must have an official Postal Service

**Memorandum Decision & Order - 11**

postmark.  There is no requirement that the sender obtain such a postmark on either the sender's receipt section of form 3800 or on form 3877 in order for the mail to be deemed certified mail.

The key issue in resolving whether the BLM's mailing qualified as certified mail is whether the BLM complied with § 912.2.1 of the DMM.  That section directs how and where the certified letter is to be deposited with the Postal Service:

> A mailer may mail certified mail at a post office, branch, or station or give it to a rural carrier.  Certified mail may also be deposited in a post office maildrop, a street letterbox, a nonpersonnel unit, or any other receptacle for First-Class mail, subject to [§ 912.]2.5.

The Court reads this provision to mean that to send certified mail from a mail box – or other receptacle not manned by Postal Service personnel – the sender must comply with § 912.2.5, which directs the use of form 3800.  If the sender is not using form 3800 – and hence not complying with § 912.2.5 – then the options for certified mail include mailing from "a post office, branch, or station or [by] giv[ing] it to a rural carrier."  In other words, if you use form 3877 rather than form 3800, the sender's options for mailing a certified letter are from "a post office, branch, or station or give it to a rural carrier."

This reading is reinforced by the different way the DMM treats forms 3800 and 3877.  For form 3800, the DMM discusses how a sender may obtain a postmarked sender's receipt section by presenting it for stamping at a post office, but then identifies clearly the alternative of self-mailing the letter at a mailbox.  *Id.* at § 912.2.5(d) ("Otherwise, attach the 'certified mail' sticker to the address side of the article, detach the

receipt, and mail the article. Mark the receipt to show the date."). There is no similar self-mailing option offered in the discussion of the procedures governing form 3877.

The BLM filed the Declarations of Pritha Mehra, who manages the certified mail service for the Postal Service, *see Mehra Declaration (Dkt. 64),* and Jeffrey Day, the Postmaster of Boise, Idaho, *see Day Declaration (Dkt 59).* All that is required for certified mail, they say, is that the detachable bar-coded section of form 3800 be attached to the front of the envelope and that the correct postage be paid. Moreover, Postmaster Day states that the mail sent to attorney Anderson denying the 132 claims – that is, the letter sent to him as part of the mass mailing – was "accepted into our system as certified mail [and] it was handled within our system as certified mail . . . ." *See Day Declaration, supra*, at ¶ 2, p. 2. Letters are still deemed certified mail, testified Postmaster Day, even "[i]f elements of the DMM were not precisely followed by the customer . . . ." *Id.*

The Declarations of Day and Mehra do not purport to interpret DMM § 912.2.1, the key regulation interpreted by the Court above. Instead, without referring to § 912.2.1, the two declarants describe the practice of the Postal Service to treat letters as certified mail so long as they have the proper postage and the bar-coded section of form 3800 affixed to the front, even if there is not compliance with other sections of the DMM. *Id.* at ¶¶ 2, 3. Neither Day nor Mehra point to anything in the DMM that supports this practice of ignoring § 912.2.1 of the DMM.

Because Day and Mehra are not interpreting § 912.2.1 of the DMM, the Court need not apply the deference that is due to an agency interpreting its own rules. Instead,

Memorandum Decision & Order - 13

the governing law is that the agency is bound by the rules it promulgates and cannot amend those rules with a contrary practice. *See Portland General Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1035-36 (9th Cir. 2007). Otherwise, the meaning of the phrase "by certified mail" in § 2401(b) of the FTCA would change over time depending on the Postal Service's unwritten practices. That cannot be the intent of Congress.

Even if deference must be given, the agency's interpretation is controlling only so long as it is not "plainly erroneous or inconsistent with the regulation," and there is "no reason to suspect that the interpretation d[id] not reflect the agency's fair and considered judgment on the matter in question." *Auer v Robbins*, 519 U.S. 452, 461-62 (1997). Moreover, if the language of the regulation is unambiguous, the Court applies the terms as written, without deference to the agency's interpretation. *Christopher v. SmithKline Beecham Corp.*, 2011 WL 489708 at *7 (9th Cir. February 14, 2011).[2]

In this case the DMM unambiguously requires a mailing using form 3877 to be done from "a post office, branch, or station or [by] giv[ing] it to a rural carrier." The contrary practice or "interpretation" contained in the Declarations submitted by Postal Service officials are essentially attempts to "rewrite the regulations under the guise of interpreting them." *Amoco Production Co. v. Watson*, 410 F.3d 722, 729 (D.C.Cir. 2005). The Court therefore declines to give deference to the agency interpretation and

---

[2] The BLM invokes the principle that waivers of sovereign immunity must be construed in favor of the Government. *See Lane v. Pena,* 518 U.S. 187, 192 (1996). This principle would certainly be applied to interpretations of the Federal Tort Claims Act, but the BLM cites no case holding that it would apply to the factual findings the Court is making here regarding whether certain letters were sent by certified mail.

**Memorandum Decision & Order - 14**

further finds that it lacks persuasive power.

## BLM's Mailing

According to the BLM's own expert, the BLM "didn't utilize PS Form 3800, they used [form 3877]" with regard to the mass mailing of the 133 letters. *See Day Declaration (Dkt. 59)* at ¶ 10, p. 6. While using form 3877 for the mass mailing, the BLM did not take that form to the post office or give it to a rural carrier, but instead kept the form with the envelopes in the BLM mailroom for pickup by the postal carrier on that route. This meant that the form 3877 was never subjected to the multi-step verification process – including the verification that the correct postage was paid and the bar-coded section of form 3800 was attached to the envelopes – that would have occurred if the form was presented at the post office. *See POM* at § 813.42(a)-(f). As explained above, the only option for mailing certified mail using form 3877 is to mail the letters from "a post office, branch, or station or [by] giv[ing] it to a rural carrier." The BLM did not comply with these certified mail requirements. Thus, the Court finds that the mass mailings done with form 3877 did not constitute certified mail.

Not all denial letters were sent in the mass mailing. Sebby sent three denial letters – two to claimants and one to attorney Anderson regarding those two claimants – by using form 3800 and placing them in the mail himself. This mailing was proper under the DMM because, as explained above, a mailing using form 3800 may be made from a mailbox. Accordingly, the Court finds that these denial letters did comply with the DMM and do constitute certified mail.

**Memorandum Decision & Order - 15**

In conclusion, the Court was asked the following question on remand: "Whether the United States sent administrative denial letters to Plaintiffs by a method that qualified as certified mail." To answer that question, the Court finds that the only administrative denial letters that were sent by a method that qualified as certified mail were the three denial letters mailed by BLM attorney Sebby to (1) plaintiffs' attorney Steven Anderson (denying the claims of Ball Brothers Farms and Dennis and Leah Smith), (2) Ball Brothers Farms, and (3) Dennis and Leah Smith.

DATED: **March 18, 2011**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision & Order - 16**