IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>   Defendants. | Case No. 4:CV 03-49-BLW<br><br>**MEMORANDUM DECISION AND ORDER RE MOTION IN LIMINE TO EXCLUDE TESTIMONY INCONSISTENT WITH PRECLUSION DECISION** |

## INTRODUCTION

The Court has before it plaintiffs' motion in limine to exclude testimony inconsistent with the Court's earlier preclusion decision. The Court heard oral argument on the motion on October 3, 2011, and took it under advisement. For the reasons expressed below, the Court will grant the motion.

## ANALYSIS

On October 29, 2010 – about 14 months after the bellwether trial – the Court ruled that certain aspects of the jury verdict would have preclusive effect on DuPont. The Court held that "[t]he preclusive effect of the bellwether trial extends beyond just the findings that Oust was *capable* of causing harm and also covers findings that Oust was blown downwind onto the bellwether plaintiffs' farms in sufficient quantities to damage crops in 2000 to 2004." *Memorandum Decision (Dkt. No. 1807)* at p. 18 (emphasis in

**Memorandum Decision & Order - 1**

original). In that decision, the Court reviewed the history of the litigation, which clearly demonstrated that all parties – including DuPont, the bellwether plaintiffs and the non-bellwether plaintiffs – knew going into the bellwether trial that the Court would accord preclusive effect to the jury's findings on liability and general causation issues, including whether Oust was capable of moving off-site in quantities sufficient to kill bellwether crops. Indeed, DuPont had originally requested a bellwether trial on the ground that it would be "helpful in applying the outcome of the bellwether trials to the claims of the remaining plaintiff grower groups . . . ." *See DuPont Motion (Dkt. No. 222)* at pp. 5-6. Because of this advance notice, all parties had a full and fair opportunity to litigate the issues of liability and general causation.

About six months after the Court rendered its preclusion decision, DuPont filed its expert reports. Plaintiffs argue that the defense experts ignored the Court's preclusion decision and challenged the capability of Oust to cause the damage found by the jury in the bellwether trial:

> Those experts boldly draw maps and make statements that leave no doubt, under their view of the facts, what the Court and jury found could not, and did not, happen. According to Defendants' new experts, Oust never was deposited onto most bellwether plaintiffs' fields and would have quickly dissipated on those it did reach. Further, they opine that crop damage beyond 2002 is essentially impossible, except for fields practically adjacent to the source areas.

*Plaintiffs' Brief (Dkt. No. 2024)* at p. 11.

To evaluate plaintiffs' argument, the Court turns to the expert reports and documents provided by both parties in conjunction with this motion. Those materials

**Memorandum Decision & Order - 2**

show that DuPont's expert opinions rely heavily on foundational work done by air dispersion expert David Sullivan and soil expert Dr. Jiri Simunek. In turn, those two experts relied on each other's work. Simunek testified about the fate and persistence of Oust, while Sullivan testified about how Oust was carried by the wind. More specifically, (1) Simunek estimated how much Oust was available at the application sites to be blown by the wind; (2) Sullivan estimated where the wind would blow that Oust and, relying on Simunek's work, how much Oust would be deposited at various distances from Oust application sites; and (3) Simunek then calculated how deep the Oust went into plaintiffs' fields, and, relying on Sullivan's Oust deposit figures, how long it persisted there.[1]

With regard to the application sites, Simunek concluded that Oust concentrations "decreased dramatically with time" and that "only small quantities of [Oust] were leached" into the soil. *See Simunek Report (Dkt. No. 2024-5)* at pp. 65-66. That means that very little Oust remained to be wind-blown after the applications.

Sullivan relied on those findings in estimating the amounts of Oust that were deposited by the wind at various distances from the application sites. For example, Sullivan concluded that wind-blown Oust could be transported from an application site at a concentration of 6 parts-per-trillion (ppt) for distances of 15, 25, 10 and 1 mile in 2000, 2001, 2002 and 2003, respectively. *See Sullivan Report (Dkt. No. 2024-8).*

Turning to the plaintiffs' fields, Simunek again concluded that Oust degraded

---

[1] Simunek worked with another soil scientist, Dr. Husein Ajwa on the persistence issues.

**Memorandum Decision & Order - 3**

"dramatically with time" and that Oust concentrations in the root zone "remained above 10 ppt during the first two year only in areas immediately adjacent (up to 1 km) to the [application sites]." *Id* at 66. At larger distances from the application sites, Oust "concentrations in the root zone dropped below 10 ppt during the first year after the Oust application in the [application sites]." *Id.*

Having established the transport, fate, and persistence of Oust, DuPont then turned to other experts to determine the consequences of having a certain concentration of Oust in a field of crops. For example, DuPont's crop pathology expert for crops other than potatoes, Dr. Stephen Miller, concludes that Oust concentrations of 6 ppt or lower would cause no damage, and then uses Sullivan's modeling to determine which plaintiffs are making claims for non-potato crop losses within areas (and years) that Sullivan concluded would have Oust concentrations in the soil of 6 ppt or higher. Dr. Miller concludes that because no non-bellwether plaintiff (other than Perry Van Tassel) farmed land that would have that concentration after 2002, "all other claims [that is, all claims other than Van Tassel's] after 2002 should not be allowed." *See Dr. Miller Report (Dkt. No. 2024-24)* at p. 13.

DuPont's crop pathology expert for potatoes, Dr. Robert Thornton, concluded that many plaintiffs making potato crop loss claims were not affected by Oust, and similarly relied entirely on Sullivan's model to determine the concentration of Oust in various plaintiffs' fields. Dr. Thornton concluded that concentrations of Oust less than 5 ppt cannot harm potatoes. *See Dr. Thornton Report (Dkt. No. 2024-24)* at p. 46-47.

Much of this testimony directly contradicts the jury verdict in the bellwether trial. For example, Sullivan maps the area around the High Point Burn that he concludes remains contaminated in 2004 with 1 part-per-trillion of Oust. *See Map (Dkt. No. 2024-8)*. The area extends out from the High Point Burn only about 2 miles. Any area beyond that point does not contain enough Oust to kill crops in 2004, according to the DuPont experts, as discussed above. *Id.* This means that two of the bellwether plaintiffs whose fields were between 11 and 33 miles from the High Point Burn – Jentzsch-Kearl and Hansen Farms – would have no injury in 2004. Yet the bellwether jury found that both of these parties suffered Oust damage in 2004 for sugar beets and potatoes.

The plaintiffs point out in their briefing that similar contradictions exist for the years 2000 to 2003. Indeed, the plaintiffs assert that under the opinions rendered by Dupont's experts, "no bellwether plaintiff could have suffered the proven Oust damage in 2000." *See Plaintiffs' Brief (Dkt. No. 2024)* at p. 12. This would directly contradict the bellwether jury's findings that in 2000, there was Oust-caused damage to the sugar beets of bellwether plaintiffs Clinger and Hansen and to the potatoes of Jentzsch-Kearl and Hansen. DuPont offered no rebuttal to this argument, and it appears to be confirmed by the Court's cursory examination of the record.

DuPont knew that their experts' opinions were necessarily cabined by the preclusive effect given by the Court to the jury verdict in the bellwether trial, since the Court's preclusion opinion was issued some six months before DuPont's expert reports were due. Yet the experts appear to have made no effort to reconcile their opinions with

Memorandum Decision & Order - 5

that jury verdict. Indeed, it appears that there can be no reconciliation for many of their opinions. When plaintiffs pointed this out in their briefing, DuPont's response did not contain any citation to their experts' reports that explain how their opinions can co-exist with the jury verdict.

At the oral argument on plaintiffs' motion, the Court asked DuPont's counsel if he was arguing that "the jury should be allowed to . . . make a determination in this case that would be utterly inconsistent with the determination they made during the first trial." DuPont's counsel responded that "[u]nfortunately, because we didn't preserve the issues that needed to be preserved for preclusion, I'm thinking that's exactly where we find ourselves." DuPont's counsel elaborated that no precise preclusion boundary could be set because the bellwether jury never made a specific determination on critical issues such as (1) the level at which Oust injures crops, (2) the amount of Oust that remained in the erodible layer of soil at the application sites, (3) the amount of Oust deposited in the bellwether fields, and (4) the length of time that Oust persisted in those fields. The lack of a specific jury finding on these issues, DuPont argues, means that DuPont's experts may render opinions on them without regard to the bellwether jury's findings.

The Court disagrees. Even without those specific findings, the bellwether jury verdict quite clearly means that Oust was capable of being transported to the fields of the bellwether plaintiffs in sufficient quantities to damage crops from 2000 to 2004. The testimony of all experts is constrained by the preclusive effect of these findings. An expert – or group of experts – cannot testify that Oust was incapable of being transported

**Memorandum Decision & Order - 6**

up to 33 miles in sufficient quantities to damage crops from 2000 to 2004. Instead, all experts must start from the premise that Oust *was capable* of being transported up to 33 miles in sufficient quantities to damage crops from 2000 to 2004.

DuPont argues, however, that Oust distribution by wind was "patchy," and that "finding Oust in a bellwether plaintiff's field in the bellwether trial does not prove that any other field – including a nearby field – was also contaminated." *See DuPont Brief (Dkt. No. 2082)* at p. 6. The Court agrees, and earlier rejected any attempt by plaintiffs to establish a "zone" of contamination. DuPont's experts are free to explain why the non-bellwether fields should be treated differently than the bellwether fields. Perhaps the differences are explained by a plaintiff's farming practices, disease, insects, irrigation, the prevailing winds, the type of soil, or many other factors. The expert can point out these differences and argue that even if the non-bellwether fields are adjacent to an Oust-damaged bellwether field – or closer to an application site than an Oust-damaged bellwether plaintiff – the non-bellwether fields suffered no Oust damage.[2] Moreover, DuPont's experts are free to rebut any testimony by plaintiffs' experts that contradicts their earlier testimony in the bellwether trial. Because of the preclusive effect of the bellwether trial, DuPont cannot offer expert opinions that Oust was incapable of being transported in sufficient quantities to damage crops for distances and years so as to contradict – directly, or by implication – the bellwether jury's verdict.

---

[2] The Court expresses no opinion on whether DuPont's experts have actually so testified in their reports or depositions. If they have not, there may well be a serious Rule 26 issue, but it has not been raised by this motion and so will not be considered here.

**Memorandum Decision & Order - 7**

DuPont's suggestion that the bellwether jury's verdict should not have preclusive effect also raises an issue of Constitutional significance. The Reexamination Clause of the Seventh Amendment, provides that, "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." Judge Posner has suggested, in the context of a request for class certification and the bifurcation of issues for trial pursuant to Rule 42(b), that the interests protected by the Seventh Amendment include,

> a right to have juriable issues determined by the first jury impaneled to hear them . . . and not reexamined by another finder of fact. This would be obvious if the second finder of fact were a judge. But it is equally true if it is another jury.

*Matter of Rhone-Poulenc Rorer, Inc.* 51 F.3d 1293, 1303 (7th Cir.1995)(citations omitted); *See also*, *McDaniel v. Anheuser-Busch, Inc.*,987 F.2d 298, 305 (5th Cir. 1993)("[I]nherent in the Seventh Amendment guarantee of a trial by jury is the *general right of a litigant to have only one jury pass on a common issue of fact.*"). The Court, having acceded to DuPont's request that a bellwether trial be used to resolve liability and general causation issues, cannot – consistent with the command of the Seventh Amendment – permit a re-trial of any issue of general causation tried and resolved by the bellwether trial.

For all of these reasons, the Court will grant plaintiffs' motion in limine. The Court has not yet resolved precisely how this decision will be carried out at trial. The Court could take the traditional route and exclude any expert testimony from DuPont that

contradicts the bellwether jury's findings that Oust is capable of being blown by the wind in quantities sufficient to damage crops on the bellwether plaintiffs' fields from 2000 to 2004. In the alternative, the Court may allow the expert to testify freely, but will instruct the jury before the expert's testimony about the preclusive effect of the bellwether jury's findings, and then, after the expert's direct examination, allow plaintiffs' counsel to cross-examine the witness on how his testimony aligned with the Court's instruction on preclusion. That matter will be resolved at the pretrial conference. In either event, the Court will be instructing the jury on the preclusive effect of the bellwether jury's verdict.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion in limine (docket no. 2024) is GRANTED.

DATED: **October 6, 2011**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge