# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIMM ADAMS, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>        Defendants. | Case No. 4:03-cv-00049-BLW<br><br>**MEMORANDUM DECISION AND ORDER ON DUPONT'S MOTION FOR SUMMARY JUDGMENT OF FIFE DAIRY, LLC'S CLAIMS** |

## INTRODUCTION

The Court has before it defendant DuPont's Fifth Set of Motions for Summary Judgment re Plaintiffs' Fraud, Assumed Duty, and Other Claims (Dkt. 1990, 1990-17). This order focuses on DuPont's request for summary judgment of all claims asserted by Fife Dairy, LLC, Randy Fife, Jean Fife, Sam Fife, Sam Fife and Jenny Fife (collectively, "Fife Dairy").

## FACTUAL BACKGROUND

Fife Dairy's damages claim relates to its corn and hay crops for 2001, 2002, and 2003. *See Expert Report (Dkt. 1990-18)*, at 1-2. The dairy did not grow hay and corn to sell to others; rather it grew these crops to feed its dairy cows. *Id.* The corn was ensiled, meaning it was converted to livestock feed, or silage. *Id.* Fife Dairy asserts that its cows generated less milk during 2001 to 2003 because they were fed corn silage that was

grown on fields contaminated with Oust.  *Id.*  Fife Dairy also claims that its hay crop was damaged by Oust.  Individual plaintiff Randy Fife further claims that in 2003, he was forced to sell a piece of land – Metz Field – in an effort to pay off debts caused by Oust losses and keep Fife Dairy in business.  *Id.*

## LEGAL STANDARD

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings.  *Id.*  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).  And a court is not obligated to take the non-movant's version of events as true when the account is blatantly contradicted by video evidence.  *Scott v. Harris,* 550

U.S. 372, 378-81 (2007).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen,* 237 F.3d at 1029. Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### Spoliation

DuPont contends that the Court should dismiss all of Fife Dairy's claims because the dairy routinely discarded test reports regarding the nutritional value of its silage. DuPont contends that these test reports are "the very records that would allow DuPont to effectively refute a central premise of [Fife Dairy's] claims against it: that decreased

nutritional value of silage caused a drop in milk production." *Reply (Dkt. 2063-9)*, at 4. Alternatively, DuPont seeks an adverse-inference jury instruction.

During the time the Fifes operated the dairy, they regularly tested the nutritional value of silage. The Fifes conducted tests as early as 1995, when they began operating the dairy, and continued testing until the dairy closed. *See Fife Dec. (Dkt. 2013-12) ¶ 2.* As Randy Fife explained, "these were not tests for Oust damages, but rather were for the purpose of determining the correct ratio of feed mixture for optimum health of the dairy herd to maximize milk production." *Id.* Further, when a new feed ratio, as determined by a test, was put in place, the dairy's standard practice was to throw away the old recommendation "so you would not get it mixed up with the new one." *Id. ¶ 3.*

Federal trial courts have the "inherent discretionary power to make appropriate evidentiary rulings in response to destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *see also Leon v. IDX Sys. Corp.*, 464 F. 3d 951, 958 (2006). Courts may sanction parties for destruction of evidence in three ways. "First, a court can instruct the jury that it may draw an inference adverse to the party or witness responsible for destroying the evidence. Second, a court can exclude witness testimony proffered by the party responsible for destroying the evidence and based on that destroyed evidence. Finally, a court may dismiss the claim of the party destroying the evidence." *In re Napster Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (all internal citations omitted).

The third sanction – dismissal – is available when "a party has engaged

deliberately in deceptive practices that undermine the integrity of judicial proceedings"

because "courts have inherent power to dismiss an action when a party has willfully

deceived the court and engaged in conduct utterly inconsistent with the orderly

administration of justice." *Leon,* 464 F.3d at 958. The Ninth Circuit has described

the dismissal sanction as "harsh" and requires district courts to consider the following

factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's

need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the

public policy favoring disposition of cases on their merits; and (5) the availability of less

drastic sanctions." *Id*. The defendants bear the burden of producing evidence suggesting

that the destroyed evidence was relevant to their claims and would have been used at trial

if not destroyed. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Under this standard, dismissal is not warranted. Mr. Fife has offered a logical,

innocent explanation as to why the test reports were regularly discarded. He also

explained that during 2001 to 2003, he did not yet appreciate the fact that these the test

reports might be relevant to a later-filed lawsuit. In this regard, the Court disagrees with

Dupont's assertion that the following testimony "clearly" establishes that Fife Dairy "had

'some notice that the documents were *potentially* relevant to the litigation before thy were

destroyed,'" *Reply re Fife Dairy (Dkt. 2063-9),* at 4 (quoting *Leon*, 464 F.3d at 959):

> Q.  Specifically about 2001, after that corn silage had been ensiled and
> you're doing testing on it, was there anything about what you had
> observed with your corn silage crop up until that point that led you to
> think maybe I ought to test this more than normal to make sure that
> it's all right to give to my herd?

A.    Yes.

Q.    Did you act on that?

A.    Yes.

Q.    How?

A.    By having tests.

Q.    More tests than you normally would?

A.    When you put the corn in the pit and it's immature, water runs out of it in a big stream. You have a big body there where it's immature. There's so much moisture in, it runs out. You know the feed is not—no good. We knew the kernels—you brought up a line, milk line. Milk line tells you if the corn's mature or not. That's what it's for. It was not there. Our corn was not mature. It wasn't going to get mature.

. . .

Q.    Let's pick back up where you left off about a stream coming out of the pit. Specifically my question was: What did you do to act on that impulse or that idea that you should test more often than normal?

A.    We knew our corn was immature, so then Dr. John would come, and we worked really hard on our ration. In the milking business and the farming business, in any business, you don't want to wait until the cow's dry or empty to react. You try and do it ahead of time.

*Fife Deposition (Dkt. 2014-24)*, at 183:25 to 185:19. This testimony does not demonstrate that when the Dairy was regularly discarding reports, Mr. Fife understood and appreciated the fact that the reports would be relevant in this litigation.

Mr. Fife testified that in 2001, he attended several grower meetings and learned that some growers were considering a lawsuit. *Id.* at 145:14 to 146:11. But he did not testify as to when he decided to become a plaintiff, nor did he testify that these meetings

caused him to understand that his test reports would be relevant evidence in the litigation that was ultimately filed. *See id.* at 146:18-24.

In short, the evidence fails to establish that Mr. Fife "engaged deliberately in deceptive practices that undermine the integrity of judicial proceeding." *Leon*, 464 F.3d at 958. DuPont's request for dismissal of all Fife Dairy's claims will be denied.

The Court also declines to impose a lesser sanction, such as an adverse-inference jury instruction, because there is no evidence of bad faith. *Cf. Med. Lab. Mgmt. Consultants v. ABC, Inc*, 306 F.3d 806, 824 (9th Cir. 2002) (absence of bad faith and plaintiff's failure to pursue other evidence formed proper basis for district court's refusal impose evidentiary sanction). If this matter proceeds to trial, DuPont may examine Mr. Fife regarding the destroyed test reports. No further sanctions will be imposed.

**Specific Causation and Damages**

DuPont contends that all of Fife Dairy's claims fail because Fife Dairy cannot prove specific causation and damages. DuPont first argues there is no evidence that Fife Dairy's silage was nutritionally deficient during the claim years because "Mr. Fife threw away the only evidence ever known to exist on that issue." *Mot. Memo re Fife Claims (Dkt. 1990-17)*, at 5. Second, DuPont seeks dismissal of Fife Dairy's claim for lost hay income on the grounds that the dairy cannot prove it lost hay income because the dairy "had no experience selling hay, any plans to do so, or any records . . . ." *Id.* Third, DuPont argues that Fife Dairy cannot prove it lost money on a 2003 land sale. Finally, in its reply brief, DuPont argued that under a 1906 Idaho Supreme Court case, *Risse v.*

*Collins*, 87 P. 1006 (Idaho 1906), Fife Dairy's claim for lost milk income is barred as a matter of law. *See Reply re Fife, Dkt. 2063-9*, at 5; *Fifth Omnibus Reply, Dkt. 2063*, at 6-12. The Court will address each argument, beginning with the final argument, regarding *Risse*.

### A. The Measure of Damages

DuPont asserts that *Risse v. Collins*, 87 P. 1006, establishes the proper measure of damages for Fife Dairy's claims.

In *Risse*, the plaintiffs ran a cattle and butter-making operation. *Id.* at 1007. They sued defendants for trespass under an 1887 sheep-trespassing statute after defendants herded and grazed their sheep on plaintiffs' pasture. *Id.* at 1006-07. Plaintiffs alleged that the sheep damaged the pasture, forcing them to abandon their butter-making business, among other things. *Id.* at 1008. Plaintiffs sought general damages, as well "special damages," including lost profits from the butter business and lost profits based on plaintiffs' inability to fatten their cattle for market. *Id.* at 1008-09. The court rejected these claimed "special damages" based on its conclusion that they "could not have been foreseen by the parties committing the trespass." *Id.* at 1008. The court went on to hold:

> Without entering into any discussion or review of the conflicting rules as to the measure of damage to growing crops, we are satisfied, after an examination of the question, to say that the measure of damages in such cases is and should be the value of the crop at the time of the injury or destruction.

*Id.* DuPont contends that Fife Dairy's lost milk income damages claim is indistinguishable from *Risse's* claim for lost profits from the butter business and that

summary judgment is therefore appropriate. *Reply (Dkt. 2063-9)*, at 8-9.

Broadly speaking, this argument fails as to Fife Dairy because even assuming *Risse* controls, Fife Dairy seeks damages that are recoverable under *Risse*. For example, Fife Dairy seeks to recover for Oust damage to its hay crop. Fife Dairy also claims it spent $65,000 in nutritional supplements because of its Oust-damaged corn silage. *Cf. Risse,* 87 P. at 1008-09 (holding that to determine damages, it would have been "proper to inquire into . . . the price of such feed stuffs as would have been necessary to have kept and fed plaintiffs' live stock, . . . ."). Under these circumstances, although the parties may dispute the overall amount of damages, as well as the specific types of damages that may be recoverable, Fife Dairy has put forth sufficient evidence to survive summary judgment.

As for Fife Dairy's ability to seek damages for lost milk income and the forced sale of Metz Field, the Court questions the continuing vitality of *Risse*. To be sure, later Idaho decisions have relied on *Risse* in generally reciting the proper measure of damages in crop-loss cases.[1] Nevertheless – although DuPont correctly points out that *Risse* has

---

[1] For example, in *Casey v. Nampa & Meridian Irrigation District*, 379 P.2d 409, 411 (Idaho 1963), the Idaho Supreme Court cited *Risse* in stating:

> This court is committed to the rule that the measure of damages for injury to a growing crop is the difference between the value of the crop actually raised upon the land and the crop which would have been raised upon it under normal conditions for the year in question, less the cost of maturing, harvesting and marketing such additional portion of the crop,-the difference in value between the probable yield and the actual yield, less the probable cost of placing the additional crop in a marketable condition and marketing it.

not been directly overruled – later Idaho decisions undermine *Risse's* holding that damages are strictly limited to the value of the crop.

The Court discusses these cases below. First, however, the Court addresses Plaintiffs' argument that *Risse* is distinguishable because the *Risse* plaintiffs sued under a sheep-trespassing statute. *See* Idaho Rev. Stat. §§ 1210, 1211 (1887).[2] This contention lacks merit because *Risse* has been cited by later Idaho courts where plaintiffs sued for crop damages on other theories, including negligence. *See Casey*, 379 P.2d at 411 (crops

_____

*Casey*, in turn, has been cited by later Idaho decisions. *See, e.g, Merrill v. Penrod*, 704 P.2d 950, 960 (Idaho Ct. App. 1985) (rejecting plaintiff's contention that they were entitled to cost of restoring flood-damaged land to its former condition, noting that the district court correctly determined damages to a hay crop by relying upon the "well-established rule set forth by our Supreme Court in *Casey* . . . ."); *Wing v. Hulet*, 684 P.2d 314, 321 (Idaho Ct. App. 1984) ("Broadly speaking, the measure of damages for crop loss is the difference between the value of crops actually raised and the value of crops that would have been raised under normal conditions.") (citing *Casey*, 379 P.2d at 411).

[2] These statutes provide:

Section 1210. It is not lawful for any person owning or having charge of sheep to herd the same, or permit them to be herded on the land or possessory claims of other persons, or to her the same or permit them to graze within two miles of the dwelling house of the owner or owners of such possessory claim.

Section 1211. The owner or agents of such owner of sheep violating the provisions of the last section, on complaint of the party or parties injured . . . is liable to the party injured for all damages sustained; and if the trespass be repeated; is liable to the party injured for the second and every subsequent offense in double the amount of damages sustained.

damaged by negligently maintained irrigation canal); *see also Walker v. Am. Cyanamid Co.*, 948 P.2d 1123, 1131 (Idaho 1997) (citing *Casey*; breach of warranty claim involving pesticide).

The plaintiffs in those cases which cited *Risse* as establishing the measure for damages in a crop-loss case, did not fall into Fife Dairy's particular factual situation. That is, they did not claim that their damages were measured by lost profits from a related enterprise – in this case, milk production. Further, while *Risse* held that the plaintiffs' trespass damages were unforeseeable as a matter of law, Idaho courts uniformly hold that in negligence cases, whether plaintiff's injury is foreseeable "is nearly always for the jury." *Doe v. Sisters of Holy Cross*, 895 P.2d 1229, 1234 (Idaho Ct. App. 1995).

Additionally, more recent Idaho decisions have relaxed the rules in determining trespass damages. In *Weitz v. Green*, 230 P.3d 743, 758-59 (Idaho 2010), for example, the Idaho Supreme Court held that landowners were not limited to the market value of harvested trees as trespass damages. *Id.* at 759. In that case, the parties owned adjacent parcels of land, although both claimed ownership of 8.5 acres located along the common border of the two properties. *Id.* at 748. Plaintiffs sued for "timber trespass" after defendants cut down several trees on the 8.5-acre parcel. *Id.*; *see* Idaho Code § 6-202 (timber trespass statute). It was later determined that this parcel belonged to the plaintiffs. As such, plaintiffs were entitled to damages for the trees. *Id.* at 755.

The trial court limited plaintiffs' damages to "the market value of the destroyed

trees as merchantable timber; . . . ." *Id.* at 759. The Idaho Supreme Court reversed

because the plaintiffs did not cultivate the trees for timber but kept them for their

aesthetic value. *Id.* at 756, 758. The court held that under these circumstances, it would

be appropriate to deviate "from the diminution-in-market-value limitation." *Id.* at 758. In

reaching this holding, the court first acknowledged a 1941 decision that would have

limited plaintiffs to the market value of the harvested trees. *Id.* at 757 (citing *Alesko v.*

*Union Pacific R. Co.*, 109 P.2d 874, 877 (Idaho 1941)). The court then noted that more

recent decisions allowed deviation from the diminution-in-market-value rule to

accommodate the basic goal of compensatory damages, which is "'to put an injured

person in a position as nearly as possible equivalent to his position prior to the tort.'"

Rest. (Second) of Torts § 901 cmt. a (1979) (quoted parenthetically in *Weitz*, 230 P.3d at

758). Consequently, the *Weitz* plaintiffs were entitled to restoration, or replacement costs,

rather than the lesser value of merchantable timber. *Id.* at 759.

Applying *Weitz*'s logic here, a deviation from *Risse*'s strict, "market-value-of-the-

crop" measure of damages should be allowed if necessary to make a plaintiff whole.

Plaintiffs have also directed this Court to a line of Idaho cases holding that if a defendant

negligently damages property, plaintiffs may seek economic loss damages that are

"parasatic to" the underlying property-damage claim. *See, e.g., Duffin v. Idaho Crop*

*Ass'n*, 895 P.2d 1195, 1200 (Idaho 1995) ("economic loss is recoverable in tort as a loss

parasitic to an injury to person or property"). Although DuPont correctly points out that

none of these cases deal with crop losses, these holdings are nonetheless difficult to square with *Risse*'s conclusion that plaintiffs cannot recover economic losses flowing from (or "parasitic to") an underlying property damage claim.

Viewing all of the above authorities together, Idaho courts appear to be trending away from strict applications of the "diminution-in-market-value" measure of damages. And when this Court determines state law, it "should be careful to avoid the 'danger' of giving 'a state court decision a more binding effect than would a court of that state under similar circumstances.' Rather, relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir. 1980) (quoting 1A *Moore's Federal Practice* ¶ 0.307, at 3077 (2d ed. 1979)). With this instruction in mind, the Court predicts that Idaho courts, if faced with this issue today, would allow Fife Dairy to seek recovery of its lost milk income, as well as losses due to the forced sale of Metz Field.

### B. Evidence Regarding the Nutritional Value of Corn Silage

DuPont argues that there is "no evidence" that Oust impacted the nutritional value of Fife Dairy's silage based on the fact that the test reports discussed above were discarded. This argument lacks merit. Fife Dairy has put forth other evidence regarding Oust damage to its corn crop, and the resulting loss in nutritional value of corn silage. For example, Mr. Fife testified at some length regarding "Oust symptomology."

Specifically, he testified that Oust damage delayed his corn crop by three weeks, which required the corn to be harvested before it was mature. This lack of maturity, in turn, led to silage with minimal nutritional value. Because of the lower nutritional value of its silage, Fife Dairy spent an additional $65,000 on feed supplements. *Id.* (citing *Fife Deposition (Dkt. 2014-24)*, at 49-50, 78, 111-12, 115-16, 151-56, 158-59, 183-85; *Ex. 204 (Dkt. 2016-48)* at 1.

Additionally, Fife Dairy lists the following evidence: "Crop Damage Reports filled out in 2001 describing the damage, photographs of the damaged corn crop, a positive Oust soil sample on a Fife Dairy field taken by Dr. Terry Miller, and demonstrated milk losses in the GEC Report, where the Dairy's milk production was significantly below its historical average during the claim years." *Id.* at 41-42 (citing Ex. 24 at 52-54; Ex. 132 & 133; Ex. 141; Exs. 160 & 161; Ex. 204 at 1.)[3]

This evidence is sufficient to create a triable issue of fact as to whether Oust damaged Fife Dairy's corn crop, and whether that damage negatively impacted the silage's nutritional value.

The Court rejects DuPont's argument that Mr. Fife cannot competently testify as to the nutritional value of the silage. Here, DuPont points out that "[a]fter all, Mr. Fife required the services of a laboratory to test his silage; he could not determine its nutritional value simply by looking at it." *Opp. (Dkt. 2063-9)*, at 7. This argument

[3]The referenced exhibits are filed at Dockets 2014 to 2016.

ignores the fact that Mr. Fife was prompted to test his silage more than he normally would have because he knew – by looking at it – that the silage was made up of immature corn, which would not produce valuable feed. *Fife Deposition (Dkt. 2014-24)* at 183:25–185:19. Consequently, while Mr. Fife may not have the expertise to testify as to the precise, scientific make-up of the silage, he is competent to testify as to the general nutritional value and quality of the dairy's silage based on his experience operating the dairy.

Relatedly, DuPont argues that Mr. Fife cannot properly testify as to exactly what caused the drop in milk production. Here, DuPont insists that "expert opinion testimony is required to establish this causal link, but none is offered." *Reply re Fife Dairy, Dkt. 2063-9,* at 8. DuPont also points out that Mr. Fife testified that "a million things" could cause a drop in milk production.

DuPont asks too much. The evidence must show that the drop in milk production was caused by Oust-damaged silage, and not any other variables – the so-called "million things." *Cf. Zanotti v. Cook*, 922 P.2d 1077 (Idaho Ct. App. 1996) ("to establish recoverable damages for a crop loss, the evidence must show that the loss was produced by a defendant's conduct rather than by such other variables as weather, insects, disease, weeds or the plaintiff's own farming practices."). But this does not require Plaintiffs to prove causation with the level of certainty DuPont demands. As one court explained,

> In view of the need to identify the damage caused by the defendant, and to separate it from damage caused by other factors, it has been said that

damages must be proven with reasonable certainty. However, this does not mean that proof must be mathematically precise; rather, it means that the evidence must be sufficient to avoid speculation among multiple causes. Where causation is to be inferred from circumstantial evidence, the trier of fact must be able to find, reasonably, that the inference linking the defendant's conduct to the damage is more probable than an inference connecting the loss to other causes.

*Wing v. Hulet*, 684 P.2d 314, 321 (Idaho Ct. App. 1984). In *Wing v. Hulet*, plaintiff produced evidence that his crop was damaged due to lack of water. *Id.* "Although there was also evidence that crop loss may have resulted from a hail storm, the [plaintiff] lessee's evidence, if believed, was sufficiently detailed to furnish a basis upon which the jury could have distinguished between the loss attributable to lack of water and the loss produced by the storm." *Id.* The same is true here; although the dairy cows might produce less milk for many reasons, Fife Dairy has produced enough evidence to allow a juror to conclude that the decreased milk production was caused by Oust-damaged corn silage.

DuPont's "million things" argument does not alter this conclusion. That argument is based on the following deposition testimony:

> Q: Aside from Oust-affected corn silage, what other factors can cause a lower than expected milk production in a dairy?
> ...
> A: I don't know. There's a million things. The worst is if your cow dies you get no milk. You know. From there you get a little better and a little worse. But we manage our dairy very well. I can count three days I wasn't there in eight years. We work very hard. They're animals. You have sick ones. You have live ones. But we had a very good dairy.

Q:     Aside from the relative health of your dairy herd, is there any other factors that could have affected the milk production?

A:     There's a lot of factors, but I don't think they there at my dairy.

Q:     What leads you to believe that?

A:     Because of my management.

*Fife Deposition (Dkt. 2014-24)*, at 206:13 to 207:7. Mr. Fife went on to testify that his milk production was typically "right there at state average" except during the Oust years. *Id.* at 207:12-21.

### C.     Damage to Hay Crop

DuPont next asserts that Fife Dairy cannot prove that any of its hay crop was ever damaged and, moreover, cannot prove the monetary value of the crop. Plaintiffs have supplied sufficient factual evidence to create a triable issue of fact on this point.

Mr. Fife testified that the hay had Oust symptoms – a thin, stunted stand that resulted in smaller cuttings in 2001. *Fife Dep. (Dkt. 2014-24)*, at 26-28. The first two cuttings for that year yielded 515 tons of hay – less than half of what Mr. Fife would have expected in a "normal" year. *Id.* at 61-62, 117-18; *Ex. 182 (Dkt. 2016-25)*; *Ex. 254 (Dkt. 2017-26)*. Fife estimated that the third and fourth cuttings yielded 375 tons, resulting in total production of 890 tons, or 4.76 tons per acre. Based on his experience raising alfalfa, which he had done"[o]ff and on for 40 years," Mr. Fife testified that he would expect 6 tons per acre in a "normal" year. *Fife Dep. (Dkt. 2014-24)*, at 61-62, 117-18. Plaintiffs have thus shown triable factual disputes regarding whether Oust damaged Fife

Dairy's hay crop.

Similarly, DuPont's argument that Fife Dairy cannot establish damages for its hay because that hay was fed to the cows lacks merit. As a general matter, the fact that the hay was not sold does not mean it has no readily ascertainable monetary value. Fife Dairy indicates that it valued its hay crop based on 2001 hay purchases from third parties at $115 per ton.

### D.    Forced Sale of Metz Field

Plaintiff Randy Fife says that he sold his property – known as Metz Field – in 2003 to raise cash to pay off debts caused by Oust losses and keep Fife Dairy in business. He claims damages of $171,000 which represents the difference between the 2003 sales price and its alleged "current" value.

DuPont advances three basic arguments as to why the Court should dismiss this claim. First, Dupont argues that the Metz Field damages claim is legally untenable under *Risse*. Second, DuPont argues that even if recovery were permissible, the Fifes must establish that they sold Metz Field for below fair market value, which they cannot do because Mr. Fife believes he received "a fair price" for the land. *Dkt. 2013-6 at 45.* Third, DuPont argues that Mr. Fife is not qualified to testify regarding the value of his land and, further, has failed to account for the time value of money in calculating damages. *See Mot. Memo re Fife (Dkt. 1990-17)*, at 6.

The Court rejects the first two arguments, both of which depend primarily on

*Risse*, for the reasons discussed above. Briefly, the Court believes that under current Idaho law, a jury must decide whether Mr. Fife's sale of Metz Field was a foreseeable consequence of DuPont's conduct. Further, assuming a jury finds that such a consequence was foreseeable, a diminution-in-market value measure of damages would not make the Fifes whole. *Cf. Weitz*, 230 P.3d at 758-59.

DuPont's third contention – that Mr. Fife cannot competently testify as to the value of the property – lacks merit. Under Idaho law, a landowner is competent to testify as to the value of his farmland, despite the fact that "he does not himself make land valuations or buy and sell lands as a business . . . ." *Ruud v. United States*, 256 F.2d 460, 461 (9th Cir. 1958) (applying Idaho law). DuPont asserts that these authorities are inapplicable because Mr. Fife is currently a truck driver and has not farmed or operated a dairy for several years.

The deposition testimony, however, indicates that although Mr. Fife sold Metz Field in 2003, he (or Fife Dairy) retained 200 acres of farmland until 2008, and continued to own some farmland as of his October 2010 deposition. *See Fife Deposition (Dkt. 2014-24)*, at 93:20-24. Moreover, in his deposition, Mr. Fife demonstrated familiarity with property in the area, despite having sold the land. *See Schroeder v. Partin*, — P.3d —, 2011 WL 3332178, at *5 (Idaho Aug. 4, 2011) (owner of property competent witness to its value, "'as he is presumed to be familiar with its value by reasons of inquiries, comparisons, purchases and sales'") (citation omitted). He testified that demand remains

high, and that sprinkler-irrigated lands had sold in the area recently for around $4000 to $4500 per acre. Mr. Fife may therefore testify as to the value of Metz Field, despite the fact that he no longer owns it. *See Goodson v. Goodson*, 551 S.E. 2d 200, 204 (N.C. Ct. App. 2001) (in challenging a judicial sale of property, former owner qualified to opine regarding the value of the property); *Fox v. Wilson*, 507 P.2d 252, 266 (Kan. 1973) (former ranch owner and neighbors, all of whom were "thoroughly familiar with the ranch," were competent to testify as to its value).

Finally, DuPont's related "time value of money" argument does not provide a basis for granting summary judgment. If DuPont believes an alternative damages method is more appropriate, they may cross examine Mr. Fife regarding his damages calculations.

**Pleading Special Damages**

DuPont argues that Fife Dairy's claims for "lost future business opportunities and income relating to the sale of Metts Field" should be dismissed because these are "special damages," which Fife Dairy failed to plead with particularity as required by Federal Rule of Civil Procedure 9(g). *See* Fed. R. Civ. P. 9(g) (if "an item of special damages is claimed, it must be specifically stated" in the pleadings).

Under federal pleading standards, "[g]eneral damages typically are those elements of injury that are the proximate and foreseeable consequence of defendant's conduct. Special damages are those elements of damages that are the natural, but not the necessary or usual, consequence of defendant's conduct, and typically stem from and depend upon

the particular circumstances of the case." 5A Charles Alan Wright, Arthur R. Miller et al.

*Federal Practice & Procedure* § 1310 (3d ed. 2005) (internal footnote citations omitted).

Unless the existence of special damages is an essential ingredient of plaintiff's claim for

relief, "the purpose of requiring that special damages be specifically pleaded is to protect

the defendant against being surprised at trial by the extent and character of the plaintiff's

claim." *Id.; see also Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 922 n.10 (8th Cir.

2004). Consequently, where the alleged special damages are not an essential element of

the underlying claim, "considerable liberality is the appropriate principle of construction"

in assessing the sufficiency of these allegations. Wright & Miller, *Federal Practice &

Procedure* § 1311.

Plaintiffs contend that their Third Amended Complaint sufficiently pleads special

damages because in the section entitled, "Damages Allegations Against All Defendants,"

all plaintiffs indicate they will seek recovery for, among other things, "loss of profits due

to property or crop damage," "loss of business due to property or crop damage," "loss of

production due to property or crop damage," "reasonable mitigation costs and expenses,"

and "loss of the use of land due to property or crop damage." *Third Amended Complaint

(Dkt. 499)* ¶ 199. Additionally, in their final prayer for relief, plaintiffs request "special

damages." *Id.* at 37.

Minimal as they are, these allegations put defendants on notice of the types of

special damages plaintiffs sought and thus satisfy the requirements of Rule 9(g). More

importantly, however, even if the allegations were deficient, the purpose of the pleading rule has been served in this case: DuPont conducted discovery specifically regarding Fife Dairy's sale of Metz Field.

Among other things, in September 2010, Plaintiffs served their Court-ordered expert report upon DuPont, which analyzed Fife Dairy's economic losses. *See GEC Group Report* (Dkt. 2106-48), at 1. The report states: "Due to Oust-induced financial pressures, Randy Fife had to sell his Metz Farm (107 acres) in February 2003 in order to keep the dairy operable and to pay for extraordinary feed bills." *Id.* The report also details the "Lost Asset Value" related to the sale of "Metz Farm." *Id.* At the same time, the Fifes supplied interrogatory responses indicating that they "sold their Metz farm in an effort to pay debt caused by their loss of crop value." *See Fife Dairy's Discovery Responses (Dkt. 2017-30)*, at 15. With this information in hand, DuPont questioned Mr. Fife extensively regarding the sale of Metz Field during his October 2010 deposition. *See, e.g., Fife Deposition (Dkt. 2014-24),* at 77-78, 93-95.

Under these circumstances, the Court would have no difficulty allowing Fife Dairy to amend its complaint to more particularly state special damages. *See* Fed. R. Civ. P. 15(a). Given the parties' discovery efforts relating to Metz Field – as well as the strong federal policy favoring resolution of cases on their merits – it would be unjust to preclude Fife Dairy from seeking damages related to Metz Field based on a pleading misstep. *See, e.g., Foman v. Davis*, 371 U.S. 178, 181-82 (1962) (Rule 15 assures that cases will be

heard on their merits and avoid injustices that could result from strict adherence to technical pleading requirements); *Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir. 1997), *overruled in part on other grounds*, *Green v. City of Tucson*, 255 F.3d 1086, 1092 (9th Cir. 2001) (leave to amend should be freely granted unless the opposing party shows unfair prejudice or bad faith).

DuPont's assertion that it is "far too late to amend the complaint" is not supported by any specific facts and the authorities DuPont relies upon are distinguishable. In *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946 (9th Cir. 2006), for example, the plaintiff sought to amend its complaint after drastically changing its theory of the case well into the litigation. *Id.* at 953. Allowing an amendment would have "requir[ed] the parties to scramble and attempt to ascertain" whether the new theory was supported and "would have unfairly imposed potentially high, additional litigation costs" on the defendant. *Id.* Similarly, in *Texaco v. Ponsoldt*, 939 F.2d 794, 798-99 (9th Cir. 1991), plaintiff's complaint sought specific performance and declaratory relief, yet four and one-half months before trial, plaintiff sought to add a host of new claims that raised the spectre of money damages for the first time. Here, by contrast, DuPont has not articulated how it will be surprised or prejudiced if Fife Dairy is permitted to seek damages related to the sale of Metz Field. DuPont is not entitled to summary adjudication of Fife Dairy's request for "special" damages.

**Fraud & Stewardship**

Plaintiffs indicate that they will no longer be pursuing fraud and assumed-duty claims and have stipulated to dismissal of these claims. *Opp. (Dkt. 1992)*, at 3. The Court will therefore not address these claims here.

**ORDER**

**IT IS ORDERED** that DuPont's Motion for Summary Judgment of all Claims asserted by Fife Dairy, LLC, Randy Fife, Jean Fife, Sam Fife, Sam Fife and Jenny Fife is **DENIED.**

DATED: **October 6, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge